**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KEY ENERGY SERVICES, INC., <u>et al.</u>[1] | Case No. 16-12306 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF J. MARSHALL DODSON IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

J. Marshall Dodson, being duly sworn, states the following under penalty of perjury:

1.       I am the Chief Financial Officer ("<u>CFO</u>"), Senior Vice President and Treasurer of

Key Energy Services, Inc. ("<u>Key</u>"), a corporation headquartered in Houston, Texas and one of

the above-captioned debtors and debtors in possession (each, a "<u>Debtor</u>," and collectively, the

"<u>Debtors</u>").[2]  I have served as CFO and Senior Vice President since 2013, and as Treasurer since

2009.  I joined Key as Chief Accounting Officer in August 2005, and served in that capacity

until I was appointed Vice President and Treasurer in 2009.

2.       I am generally familiar with the Debtors' day-to-day operations, financial affairs,

business affairs, and books and records.  Except as otherwise indicated, all facts set forth in this

declaration (the "<u>Declaration</u>") are based upon my personal knowledge, my review of relevant

documents, or my opinion based upon my experience, knowledge, and information concerning

the Debtors' operations and financial affairs.  I am over the age of 18 and authorized to submit

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Misr Key Energy Investments, LLC (4528), Key Energy Services, Inc. (8081), Key Energy Services, LLC (5567), and Misr Key Energy Services, LLC (7527).  The mailing address for each Debtor is 1301 McKinney Street, Suite 1800, Houston, Texas 77010.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as defined herein).

this Declaration on behalf of each of the Debtors.  If called upon to testify, I would testify to the facts set forth herein.

3.      The Debtors in these chapter 11 cases (the "Chapter 11 Cases") are listed in footnote 1 of this Declaration.  Key has several other domestic and foreign subsidiaries, none of which is a Debtor in these Chapter 11 Cases.

4.       On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors have requested various types of relief in certain "First Day" motions (collectively, the "First Day Operational Motions").  The First Day Operational Motions seek relief aimed at, among other goals, (a) securing the use of cash collateral, which is necessary to continue the Debtors' operations; (b) preserving customer and vendor relationships; (c) maintaining their workforce; (d) continuing the Debtors' cash management systems and other business operations; and (e) establishing certain administrative procedures to facilitate a smooth transition into chapter 11.  The requested relief is essential to the success of these Chapter 11 Cases and the Debtors' reorganization efforts.  The Debtors are not seeking debtor-in-possession financing at this time.

6.      In addition, the Debtors have submitted several motions seeking approval of documents and agreements critical to the success of these Chapter 11 Cases (collectively with the First Day Operational Motions, the "First Day Motions").  First and foremost, the Debtors seek to establish a timeline for confirmation of the *Joint Prepackaged Plan of Reorganization of Key*

*Energy Services, Inc. and its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), as well as approval of the Disclosure Statement in respect of the Plan, which dates and deadlines comply with the terms of the Plan Support Agreement (defined below).  In addition, the Debtors seek approval of their assumption of the Plan Support Agreement between the Debtors, the Supporting Noteholders, and the Supporting Term Lenders (each as defined in the Plan Support Agreement), which forms the backbone for the consensual restructuring of the Debtors' funded indebtedness.  The Debtors also anticipate seeking shortly after the commencement of these Chapter 11 Cases approval of (i) their assumption of the Backstop Agreement (defined below) between the Debtors and the Backstop Participants, through which certain Supporting Noteholders have agreed to backstop the Debtors' prepetition rights offering for shares in Reorganized Key (the "Rights Offering"); and (ii) their assumption of, and their entry into, as applicable, two escrow agreements with Capital One N.A. pursuant to which funds from the Rights Offering are being held and will be held during these Chapter 11 Cases.  In connection with approval of the Plan and assumption and approval of these agreements, the Debtors also request this Court's approval of solicitation and Rights Offering procedures and related forms.  The Debtors are seeking to have their motions in respect of the Plan Support Agreement, Backstop Agreement, and other Rights Offering documents (including the escrow agreements) heard in connection with confirmation of the Plan.

7.      I submit this Declaration in support of the First Day Motions.  I am familiar with the contents of each First Day Motion, including the exhibits attached thereto, and believe that the relief sought (i) is necessary to preserve the value and productivity of the Debtors' operations, (ii) is integral to the successful reorganization of the Debtors, and (iii) serves the best interest of the Debtors' estates, their creditors and other parties in interest.

## PART I

**A.      General Overview**

8.       Key is a publicly-held corporation headquartered in Houston, Texas and, together with its Debtor and non-Debtor wholly-owned or controlled subsidiaries (collectively, the "Company"), is the largest onshore rig-based well servicing contractor based on the number of rigs owned.  The Company has been operating for over thirty-eight years, providing a full range of well services to major oil companies, foreign national oil companies and independent oil and natural gas production companies, and operates in most major oil and natural gas producing regions of the continental United States.  The Company also has a technology development and control systems business, which is focused on the development of hardware and software related to oilfield service equipment controls, data acquisition and digital information flow.

9.       The combination of prolonged, depressed oil prices since mid-2014 and the resulting reduction in demand for well services, along with an increase in competitive pricing among well service providers, have adversely affected the Debtors' businesses.  The Company, in consultation with its advisors, determined that pursuing a potential restructuring of its funded debt with its significant debt holders was necessary to strategically respond to the challenging industry environment and manage its approximately $1 billion in aggregate funded indebtedness.

10.      After extensive, good-faith negotiations with the Supporting Term Lenders and the Supporting Noteholders (collectively with the Debtors, the "PSA Parties"), as well as the ABL Agent and the ABL Lenders, the Company reached an agreement on the material terms and conditions of a consensual restructuring transaction (the "Restructuring") to be implemented swiftly through the Plan.  The negotiations among the PSA Parties resulted in the execution of a plan support agreement, dated August 24, 2016 (as may be amended from time to time, the "Plan Support Agreement"), which appended numerous term sheets reflecting the material terms of the

4

Restructuring.  The compromise represented by the Plan Support Agreement permits the Debtors to reduce their funded debt from approximately $1 billion to approximately $250 million and emerge from these Chapter 11 Cases with a manageable debt load they can service with cash from operations.

11.     Upon execution of the Plan Support Agreement, the Debtors and other PSA Parties vigorously and in good faith negotiated the final forms of the Plan, Disclosure Statement, and exhibits thereto, including the Backstop Agreement and the procedures and forms through which the Debtors would conduct the solicitation for votes on the Plan, as well as the Rights Offering providing substantial funding for certain distributions under the Plan.  The solicitation of the Plan commenced on September 21, 2016, and the deadline for receipt of votes on the Plan, valid Rights Offering forms, and funding for shares pursuant to the Rights Offering (other than from the Backstop Participants) was October 20, 2016.  The Debtors filed these Chapter 11 Cases on October 24, 2016, having received 100% in principal amount and 100% in number of Holders of Term Loan Claims and 99.89% in principal amount and 93.88% in number of Holders of Senior Notes Claims voting by class in favor of the Plan.

### B.     Overview of the Debtors' Businesses

12.     Key is a Maryland corporation headquartered in Houston, Texas.  The Company is the largest domestic onshore, rig-based well servicing contractor based on the number of rigs owned.  The Company provides a full range of well services to major oil companies, foreign national oil companies and independent oil and natural gas production companies.  The Company's services include rig-based and coiled tubing-based well maintenance and workover services, well completion and recompletion services, fluid management services, fishing and rental services, and other ancillary oilfield services.  Additionally, certain of the Company's rigs

are capable of specialty drilling applications.  The Company also has a technology development and control systems business based in Canada.

13.     Prior to its suspension in July, 2016, Key traded on the New York Stock Exchange under the ticker "KEG."  It now trades over-the-counter under the ticker "KEGX."

14.     The Company conducts all of its domestic operations through Key Energy Services, LLC ("KES"), and its international operations through several foreign, non-Debtor affiliates.  None of the Debtors, beside KES, has substantial business operations.  Key is the ultimate parent company of all other Key affiliates.  Key's foreign businesses function independently from its domestic businesses from a cash management and operational perspective.  The Company has operating locations in 13 states and operates in most major oil and natural gas producing regions of the continental United States and also has operations in Canada and Russia.

15.     Key was organized in April 1977 and commenced operations in July 1978 under the name National Environmental Group, Inc.  In December 1992, the Company's name was changed to "Key Energy Group, Inc." and then was subsequently changed to "Key Energy Services, Inc." in December 1998.

16.     The Debtors currently have approximately 2,900 employees, nearly all of whom are located in the United States.  The Debtors also supplement their workforce by employing a small number of temporary workers, whose services are procured indirectly through third-party staffing agencies, and independent contractors.

17.     The Company's customers include major oil companies, foreign national oil companies, and independent oil and natural gas production companies.  During the past three fiscal years, Chevron Texaco Exploration and Production ("Chevron") accounted for

approximately 15% of the Company's consolidated revenue, and that relationship remains

strong.  Although approximately 80% of the Company's revenues derive from approximately 40

customers, no individual customer besides Chevron accounted for more than 10% of the

Company's consolidated revenue or accounts receivable in the last fiscal year.

    **C.**    <u>**Service Offerings**</u>

18.    The Company offers its customers a broad array of services, including rig-based

and coiled tubing-based well maintenance and workover services, well completion and

recompletion services, fluid management services, fishing and rental services and other ancillary

oilfield services.  The Company provides these services through five (5) reportable segments: (i)

U.S. Rig Services, (ii) Fluid Management Services, (iii) Coiled Tubing Services, (iv) Fishing and

Rental Services and (v) International.

    **1.**    **U.S. Rig Services**

19.    The Company's U.S. Rig Services accounted for nearly 48% of its 2015 revenues

and 54% of its revenues in the first half of 2016.  These services include the completion of

newly-drilled wells, workover and recompletion of existing oil and natural gas wells, well

maintenance, and the plugging and abandonment of wells at the end of their useful lives.  The

Debtors also provide specialty drilling services to oil and natural gas producers by using certain

larger rigs capable of providing both conventional and horizontal drilling services.  The

Company owns rigs of various sizes and capabilities, allowing it to service all types of wells,

with depths up to 20,000 feet.  Many rigs are outfitted with the Company's proprietary

KeyView® technology, which captures and reports well site operating data and provides safety

control systems.

20.    Through its completion and recompletion services, the Company's rigs prepare

wells for production – both for newly drilled wells and wells recently extended through a

workover operation, as described below.  The completion process may involve selectively perforating the well casing to access production zones, removal of plugs installed during the stimulation process, stimulating and testing these zones, and installing tubular and downhole equipment.  The Company typically provides a well service rig and may also provide other equipment to assist in the completion process.  Completion services vary by well, and work may take a few days to several weeks to perform, depending on the nature of the completion.

21.    The Company's workover services are designed to enhance the production of existing wells and generally are more complex and time consuming than normal maintenance services.  Workover services can include deepening or extending wellbores into new formations by drilling horizontal or lateral wellbores, sealing off depleted production zones and accessing previously bypassed production zones, converting former production wells into injection wells for enhanced recovery operations, and conducting major subsurface repairs due to equipment failures.  Workover services may last from a few days to several weeks, depending on the complexity of the workover.

22.    Maintenance services provided with the Company's rig fleet are generally required throughout the life cycle of an oil or natural gas well.  Examples of these maintenance services include conducting routine mechanical repairs on the pumps, tubing and other equipment used downhole in the wellbore, removing debris and formation material from wellbores, and pulling rods and other downhole equipment from wellbores to identify and resolve production problems.  Maintenance services are generally less complicated than completion and workover related services and require less time to perform.

23.    The Company's rig fleet is also used to permanently shut-in oil or natural gas wells that are at the end of their productive lives, as required by state and/or federal regulations.

These plugging and abandonment services generally require auxiliary equipment in addition to a well servicing rig.

### 2.    Fluid Management Services

24.    The Company also provides transportation and well-site storage services for various fluids utilized in connection with drilling, completion, workover and maintenance activities.  The Company employs an extensive and diverse fleet of approximately 930 oilfield transportation service vehicles, including vacuum trucks, winch trucks, hot oilers and other vehicles, including kill trucks and various hauling and transport trucks.  As part of this business segment, the Company further provides disposal services for fluids produced in connection with well completion.  These fluids are removed from the well site and transported for disposal in saltwater disposal wells operated by third parties or by Key, approximately 40% of which are owned by the Company and the balance of which are leased in whole or in part from third parties.  Approximately 19% of the Company's 2015 revenues and 21% of its revenues in the first half of 2016 were derived from its Fluid Management Services business.

### 3.    Coiled Tubing Services

25.    The Company's Coiled Tubing Services segment accounted for approximately 11% of the Company's 2015 revenues and 8% of its revenues in the first half of 2016.  These services involve the use of a continuous metal pipe spooled onto a large reel, which is then deployed into oil and natural gas wells to perform various applications, such as wellbore clean-outs, nitrogen jet lifts, through-tubing fishing, and formation stimulations utilizing acid and chemical treatments.  Coiled tubing, particularly larger diameter coil units, is also used for a number of horizontal well applications, such as milling temporary isolation plugs that separate frac zones and various other pre- and post-hydraulic fracturing well preparation services.  The Company has approximately 51 coil units in its fleet, all of which are owned by the Company.

####    4.        Fishing and Rental Services

26.        The Company also offers a full line of fishing services and rental equipment designed for use in providing both onshore and offshore drilling and workover services.  Fishing services involve recovering lost or stuck equipment in the wellbore utilizing a broad array of "fishing tools."  The Company's rental tool inventory consists of drill pipes, tubulars, handling tools (including its patented Hydra-Walk® pipe-handling units and services), pressure-control equipment, pumps, power swivels, reversing units and foam air units.  Its rental inventory also includes frac stack equipment used to support hydraulic fracturing operations and the associated flowback of frac fluids, proppants and oil and natural gas.  Approximately 15% of the Company's 2015 revenues and 14% of its revenues in the first half of 2016 were derived from its Fishing and Rental Services business.

####    5.        International Segment

27.        Finally, the Company's International segment accounted for approximately 6% of its 2015 revenues and 3% of its revenues in the first half of 2016 and is operated through several non-Debtor affiliates.  The International segment provides rig-based services such as the maintenance, workover, and recompletion of existing oil wells in Russia.  The Company has a technology development and control systems business based in Canada, which is focused on the development of hardware and software related to oilfield service equipment controls, data acquisition and digital information flow.

28.        Over the past two and a half years, the Company conducted an internal review and independent investigation relating to allegations of possible violations of the U.S. Foreign Corrupt Practices Act ("FCPA") in connection with certain of its operations in Russia and its former operations in Mexico.  After initial review by the Company, the Board of Directors formed a Special Committee to investigate the allegations and to conduct a review and risk

assessment of all of the Company's international operations.  In conjunction with its broad

internal review and risk assessment of the Company's international operations, the Company

promptly undertook significant remedial measures.  It also cooperated with investigations by the

Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ").

29.     On April 28, 2016, Key announced that the DOJ had closed its investigation and

had decided not to pursue prosecution of the Company.  Negotiations with the SEC to resolve its

related investigation culminated in April in an agreement in principle on the terms of a proposed

offer of settlement in the amount of $5 million, which was presented to the SEC for approval and

was approved by the SEC on August 11, 2016 (the "FCPA Settlement").  As required by the

FCPA Settlement, the Company made a $5 million payment to the SEC on August 25, 2016.

Also, in keeping with its representations to the SEC, Key exited from the Mexico market on

October 18, 2016, when it closed on the sale of those operations to Química Apollo S.A. de C.V.

In connection with that sale, the Company sold the equity of Key Energy Mexico, LLC, an entity

previously obligated on the Company's funded indebtedness and a party to the Plan Support

Agreement and Backstop Agreement, which is now no longer in the Key family of companies.

30.     In April 2015, the Company announced its decision to exit markets outside of

North America.  As a result, the Company has sought to sell or relocate the assets of the

businesses operating in non-North American markets.  In the Middle East, the Company

operated in the Kingdom of Bahrain and Oman.  On August 5, 2013, it agreed to the dissolution

of AlMansoori Key Energy Services, LLC, a joint venture formed under the laws of Abu Dhabi,

UAE.  As of December 31, 2015, the Company had also sold its subsidiary in Bahrain and

certain assets in Oman, Ecuador and Colombia.  The Company is also in discussions to sell OOO

Geostream Services Group LLC, a wholly-owned limited liability company incorporated in the Russian Federation, which conducts all of the Company's operations in Russia.

### D.     Summary of Assets and Liabilities

#### 1.     Assets

31.     The Company had approximately $1.13 billion in total assets as of the end of the second quarter of 2016, which substantial asset base is necessary to support the Debtors' operations.  As of the date of this Declaration, the Debtors hold approximately $29.8 million in encumbered, unrestricted cash.  The Debtors own approximately 880 rigs of various sizes, approximately 2,500 trucks and similar vehicles, and thousands of pieces of other equipment related to their businesses.  The Debtors also own more than 135 pieces of real estate, including, among other things, various permitted disposal wells for disposal of saltwater and other fluid byproducts.  In addition, the Debtors own certain patents and other intellectual property.

#### 2.     Liabilities

32.     The Debtors have approximately $1 billion in aggregate funded indebtedness, as further described below.  The Debtors have granted security interests in and liens on all or substantially all of their assets to secure their obligations under the Term Loan Facility and ABL Credit Facility, as set forth in more detail below.  Each of the Debtors is obligated on the Senior Notes, but only Key and KES (the "Term Loan Obligors") are obligated under the Company's Term Loan Facility and ABL Credit Facility.

##### a.     The Term Loan Facility

33.     On June 1, 2015, Key, as borrower and the guarantors party thereto entered into the Term Loan Credit Agreement with Cortland Capital Market Services LLC (the "Term Loan Agent") in its capacity as Agent, the Term Loan Lenders, and Bank of America, N.A. ("BofA") in its capacity as sole Lead Arranger and Bookrunner (in each case, as defined in the Term Loan

Credit Agreement).  The Term Loan Credit Agreement provided Key with secured term financing, after Original Issue Discount (as defined in the Term Loan Credit Agreement), of $315 million (the "Term Loan Facility").  The Debtors used a portion of the proceeds of the Term Loan Facility to, among other things, repay and terminate the $122.6 million outstanding under the Debtors' then-existing credit facility, and to pay certain related fees and expenses.

34.     The Term Loan Facility is guaranteed by KES.  The obligations under the Term Loan Facility are secured by a first-priority lien (subject to certain permitted liens, certain exclusions, and the terms of an intercreditor agreement between, among others, the ABL Lenders and the Term Loan Lenders (the "Intercreditor Agreement")) on substantially all of the assets of the Term Loan Obligors, including, without limitation, the Term Loan Obligors' goods, intellectual property, real estate, and commercial tort claims, together with all proceeds of the foregoing.  The Term Loan Lenders have a first priority lien on substantially all of the Term Loan Obligors' assets, including, without limitation, goods, intellectual property, real estate, commercial tort claims, and the TL Proceeds and Priority Collateral Account (as defined below), together with all proceeds of the foregoing, other than (i) the ABL Priority Collateral (as defined below) and (ii) certain excluded assets (*e.g.*, assets owned by foreign subsidiaries) (such assets other than (i) and (ii), collectively, "Term Priority Collateral"), and a second priority lien on present and future accounts receivable, inventory, deposit accounts and securities accounts (other than the TL Proceeds and Priority Collateral Account) and related assets and proceeds of the foregoing ("ABL Priority Collateral").

35.     The term loan proceeds currently held by the Debtors are "unrestricted," meaning they can be used for operating purposes under the Term Loan Credit Agreement.  Pursuant to the Term Loan Credit Agreement, such proceeds have been, as of the Closing Date of the Term Loan

Credit Agreement, segregated and held in a deposit account located at Merrill Lynch (as defined below), which account is subject to a perfected, first-priority lien in favor of the Term Loan Agent on behalf of the Term Loan Lenders (such account, the "TL Proceeds and Priority Collateral Account").

36.     Borrowings under the Term Loan Facility bear interest at a fluctuating rate per annum measured by reference, at the option of Key, to either adjusted LIBOR or an alternate base rate, in each case plus an applicable margin.  The Term Loan Obligors are also responsible for various fees, charges and expenses under the Term Loan Agreement.  The Term Loan Facility will mature on June 1, 2020, although such maturity date may, at the Company's request, be extended by one or more of the Term Loan Lenders pursuant to the terms of the Term Loan Facility.

37.     The Term Loan Obligors entered into a Forbearance Agreement, dated as of May 11, 2016, with each of the lenders party thereto, and the Term Loan Agent, as amended by Amendment No. 1, dated June 6, 2016 and Amendment No. 2, dated June 17, 2016.  Under, and subject to the terms of the Plan Support Agreement, the Supporting Lenders have agreed to further forbear from certain defaults under the Term Loan Credit Agreement.

*b.     The ABL Credit Facility*

38.     Also on June 1, 2015, Key and KES (collectively, the "ABL Obligors"), entered into the ABL Credit Agreement (the "ABL Credit Agreement") with BofA, in its capacity as Administrative Agent and Co-Collateral Agent (as such terms are defined in the ABL Credit Facility Documents) (the "ABL Agent"), Wells Fargo Bank, National Association ("Wells"), in its capacity as Co-Collateral Agent and Joint Lead Arranger and Bookrunner, and sole Syndication Agent (in each case as defined in the ABL Credit Agreement), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), as Joint Lead Arranger and Bookrunner

(in each case as defined in the ABL Credit Agreement), and certain financial institutions party thereto (the "ABL Lenders").  The ABL Credit Agreement provided the ABL Obligors with secured asset-based revolving loans and letters of credit of up to a maximum aggregate principal amount of $100 million outstanding at any time (the "ABL Credit Facility").  There are currently no amounts outstanding on the revolver, and there are issued and outstanding letters of credit with an undrawn balance of $38,526,688.  Due to the fixed charge coverage ratio covenant in the ABL Credit Agreement, the Company has no further availability under the ABL Credit Facility, as amended by the ABL Forbearance Agreement (defined below), without triggering cash domination.

39.     The ABL Obligors' obligations arising under the ABL Credit Facility are secured by liens (subject to certain permitted liens, certain exclusions, and the terms of the Intercreditor Agreement) on substantially all of the assets of the ABL Obligors, including, without limitation, the ABL Obligors' accounts, cash, goods, intellectual property, real estate, and commercial tort claims, together with all of the proceeds of the foregoing.  Specifically, the ABL Lenders have a first priority lien on ABL Priority Collateral and a second priority lien on Term Priority Collateral.

40.     Borrowings under the ABL Credit Facility bear interest at a fluctuating rate per annum measured by reference, at the option of the ABL Borrowers, to either adjusted LIBOR or an alternate base rate, in each case plus an applicable margin.  The ABL Obligors are also responsible for various fees, charges and expenses under the ABL Credit Facility.  The ABL Credit Facility matures on February 28, 2020.  On August 24, 2016, the ABL Obligors entered into a *Limited Consent and Second Amendment to Loan Agreement and Amendment No. 3 to Limited Consent to Loan Agreement and Forbearance Agreement* (the "ABL Forbearance

Agreement") with each of the lenders party thereto.  Under, and subject to the terms of the ABL

Forbearance Agreement, the ABL Agent and the ABL Lenders agreed to, among other things,

forbear from certain specified defaults under the ABL Credit Agreement.

c.    *The Senior Notes*

41.    On March 1, 2011, Key and certain of its Debtor subsidiaries entered into an

Underwriting Agreement (the "Underwriting Agreement") with Credit Suisse Securities (USA)

LLC, Merrill Lynch, J.P. Morgan Securities LLC, Morgan Stanley & Co. Incorporated and the

other underwriters named therein (the "Underwriters").  Pursuant to the Underwriting

Agreement, and upon satisfaction of certain specified closing conditions, Key agreed to issue and

sell to the Underwriters $475 million in aggregate principal amount of 6.75% senior notes due in

2021 (the "Senior Notes").  The Senior Notes are guaranteed by the following Debtors: (i) KES;

(ii) Misr Key Energy Investments, LLC; and (iii) Misr Key Energy Services, LLC (collectively,

the "Notes Guarantors" and, together with Key, the "Notes Obligors").

42.    On March 4, 2011, Key issued the Senior Notes pursuant to an Indenture (as

defined below) among Key, the Notes Guarantors and The Bank of New York Mellon Trust

Company, N.A., as trustee (the "Indenture Trustee"), which was restated in its entirety by a First

Supplemental Indenture, dated March 4, 2011.  The First Supplemental Indenture (as further

modified or supplemented from time to time prior to the Petition Date, the "Indenture")

permitted Key to, among other things, issue Senior Notes in excess of the original $475 million

in principal.

43.    Key issued an additional $200 million aggregate principal amount of Senior Notes

in a private placement on March 8, 2012, pursuant to the Indenture.  On March 5, 2013, the $200

million in previously unregistered Senior Notes were exchanged for Senior Notes registered

under the Securities Act, pursuant to a further supplement to the Indenture.  All of the Senior Notes are treated as a single class under the Indenture.

44.     Key used the proceeds of the Senior Notes to, among other things, repay outstanding notes and revolving debt.

45.     The Senior Notes mature on March 1, 2021 and pay interest at a rate of 6.75% per annum, payable in cash in arrears semi-annually on March 1 and September 1 of each year.  An aggregate principal amount of $675 million of Senior Notes is currently outstanding, plus applicable fees and interest.  The Supporting Noteholders have agreed to forbear from certain defaults under the Indenture pursuant to the terms of the Plan Support Agreement.

<em>d.     Other Indebtedness</em>

46.     In addition to the funded debt obligations described above, Key is the account party under an uncommitted global letter of credit facility with HSBC (with availability of up to $15 million).  Only one letter of credit has been issued under this facility, in the amount of $2 million, to secure the performance of a foreign, non-Debtor affiliate in Bahrain.  The outstanding letter of credit is in the process of being cancelled and returned in connection with the sale of that business.  The HSBC letter of credit facility terminates on May 7, 2017.

47.     The Debtors currently have approximately $13.4 million of trade debt and other debt owed to general unsecured creditors.  The Debtors' trade creditors are essentially current. The Debtors believe that because KES is the only operating Debtor, most, if not all, trade debt in these Chapter 11 Cases will be owed by KES alone.  However, it is possible, given the scope of the Debtors' businesses and the similarity of corporate names, that one or more of the other Debtors are named in one or more invoices, or that such invoices are unclear as to which corporate entity is being invoiced.

17

48.     In addition, the Company maintains certain intercompany obligations, comprising

both formal intercompany debt and intercompany receivables and payables.  Certain of the

Debtors are payors and payees under a Global Subordinated Intercompany Note dated as of June

1, 2015 (the "Global Subordinated Intercompany Note"), which expressly subordinates any debt

(other than trade payables) among the Debtors to their obligations under the Term Loan Credit

Agreement and ABL Credit Agreement.  Debtors Misr Key Energy Investments, LLC and Misr

Key Energy Services, LLC–which are not parties to the Term Loan Agreement or ABL Credit

Agreement – are not parties to the Global Subordinated Intercompany Note.  Non-Debtor Key

Energy Services Luxembourg II S.à.r.l. is a Payee under the Global Subordinated Intercompany

Note.

49.     Certain of the Debtors have also made several loans evidenced by stand-alone

promissory notes to foreign, non-Debtor affiliates in Canada and Russia.  Key made two loans to

its indirect Canadian subsidiaries, Advanced Measurements, Inc. and Canadian Key Energy

Services ULC (collectively, "Key Canada"), the outstanding balance of which as of the date

hereof was approximately $11.7 million.  KES extended loans to its affiliates in Russia, and the

aggregate amount outstanding under those intercompany loans was approximately $13.7 million

as of the date hereof.  The Debtors also track historic intercompany receivables and payables

outstanding to those and other foreign non-debtor affiliates.  The Debtors have no current

ordinary course transactions with their foreign affiliates, and their Russian affiliates are net

debtors to KES on account of the intercompany notes discussed above and historical trade and

administrative payables.

50.     Over time, Key Canada has provided hardware technology to KES in the ordinary

course of business, and has invoiced KES accordingly.  As of the Petition Date, KES owed Key

Canada approximately $16 million on account of technology-related invoices.  The Debtors are

not seeking authority to pay Key Canada or any other non-debtor affiliates on account of any

prepetition obligations, other than to pay post-petition trade obligations incurred in the ordinary

course, if any.

## PART II

A.   **Macroeconomic Trends Leading to the Commencement of These Chapter 11 Cases**

51.     Beginning in mid-2014, oil prices began to fall sharply, resulting in a 50% decline

over a period of six months.  Depressed commodity price conditions persisted and worsened

during 2015.  In response to declining oil prices, the Debtors' customers substantially reduced

their existing production operations and implemented severe cutbacks in capital spending.  As a

result, demand for the Debtors' products and services declined substantially, and the prices the

Company has been able to charge customers for products and services have also declined

substantially.

52.     More specifically, the demand for new or existing field drilling and completion

work is driven by available investment capital for such work, and the Debtors' customers have

significantly curtailed their capital spending.  Well maintenance work also declined substantially

during this period as customers scaled back their production and deferred such maintenance in

order to conserve cash while profits are down.  The combination of prolonged, depressed oil

prices and the resulting reduction in demand for well services, along with an increase in

competitive pricing among well services providers, have materially and adversely affected the

Company's results of operations, cash flows and financial condition.  The Company reasonably

believes that these trends will reverse with rising oil prices and the pent up demand for oil field

services based upon the deferred maintenance by its customer base, and the Company expects a material improvement in EBITDA for 2017 and thereafter.

53.     The Debtors have taken numerous steps to streamline their operations and reduce costs, including by downsizing their workforce, closing locations, and focusing on their core North American businesses.  Over the past 18 months, the Debtors have sold numerous assets, have sold or given up leases on approximately 25 locations, have reduced their headcount by approximately 55% and reduced benefits for employees, and have tightened their invoicing processes to expedite cash receipts.  The Debtors have also carefully managed cash to maintain operations.

**B.     Debtor-Specific Challenges Leading to the Commencement of These Chapter 11 Cases.**

54.     In light of the downturn in the industry, the Debtors sought to engage the holders of their funded indebtedness in meaningful discussions regarding the terms of a potential restructuring.  In February 2016, the Debtors approached holders of their Senior Notes, encouraging them to organize an ad hoc committee (as formed, the "Noteholder Committee") and hire a financial advisor.  Once the Noteholder Committee formed, the Debtors continued to negotiate with both the Noteholder Committee, and then with the Term Loan Lenders, over the contours of a more sustainable debt service level in light of the downturn in the industry.

**1.     The Great American and Hilco Appraisals**

55.     While negotiations with the Noteholder Committee and the Term Loan Lenders were ongoing, the Debtors were working with their historic appraiser, Great American Group Inc., ("Great American") on the then-due appraisal of the Debtors' assets as of January 5, 2016. The Debtors' loan documents required such an appraisal of the Company's machinery and equipment assets that serve as security for their loans.  Upon completion, the Great American

20

appraisal (the "Great American Appraisal") demonstrated that, as of March 31, 2016, the Debtors were not in default under the covenants in the secured loan documents (even when only considering the value of the Debtors' machinery and equipment and not additional qualifying asset values).

56.     However, during the first quarter of 2016, certain of the Term Loan Lenders exercised their right under the Term Loan Credit Agreement to require preparation of a new appraisal by an appraiser selected by the Term Loan Agent at the direction of such Term Loan Lenders, and retained Hilco Valuation Services ("Hilco") to conduct a new appraisal (the "Hilco Appraisal").  Based on the Hilco Appraisal, certain of the Term Loan Lenders took the position that the Debtors were in violation with the asset coverage ratio covenant (the "Coverage Ratio Covenant") as of March 31, 2016 under their Term Loan Agreement.

57.     The Debtors disputed the scope, accuracy, and process of the Hilco Appraisal, as well as the contention that they were in violation of the Coverage Ratio Covenant, and such dispute was ultimately resolved consensually in connection with negotiating and entering into the Plan Support Agreement.

### 2.    Forbearance Agreements and Litigation

58.     On May 11, 2016, although the Debtors continued to disagree with the validity of the appraisal commissioned by certain of the Term Loan Lenders and reserved certain of their rights to contest such appraisal, the Debtors entered into a Forbearance Agreement, pursuant to which the Debtors made a $7.5 million loan paydown, without prepayment penalty, to the Term Loan Agent in exchange for the Term Loan Lenders' agreement not to declare a default with respect to the Coverage Ratio Covenant or exercise any remedies through June 6, 2016.  On May 26, the Debtors delivered a counterproposal to the Noteholder Committee in response to a previous restructuring proposal.

21

59.     On May 31, 2016, the Debtors delivered a draft Compliance Certificate (as defined in the Term Loan Credit Agreement) to the Term Loan Agent for the period ending March 31, 2016.  The Term Loan Agent and Term Loan Lenders did not acknowledge the Debtors' compliance.  On June 2, 2016, the Debtors delivered a final Compliance Certificate to the Term Loan Agent for the period ending March 31, 2016, which demonstrated that the requisite asset coverage ratio had been satisfied.  The Debtors also filed a lawsuit against the Term Loan Agent and Term Loan Lenders in the New York Supreme Court, seeking declaratory and injunctive relief that would have prevented the defendants from declaring a default and from sweeping over $105 million in unrestricted cash.  The Debtors also requested a further forbearance from the Term Loan Lenders, to permit the parties to continue negotiating toward a broader deal.  Later that day, the Term Loan Lenders agreed with the Debtors to extend the existing forbearance on identical terms through June 20, 2016, in exchange for a loan paydown of $2.5 million.  The lawsuit was dismissed at that time without prejudice.

60.     On June 17, 2016, the Term Loan Lenders again agreed to extend the existing forbearance period, in exchange for another $2.5 million loan paydown, without prepayment penalty, through the later of July 18, 2016 and five days after the Term Loan Lenders provided notice of termination of the forbearance.  During this extended forbearance period, the Debtors and certain Holders of Senior Notes and Term Loan Lenders were able to reach an agreement on the terms of a consensual restructuring to be implemented through a prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, and determined that commencing the Chapter 11 Cases to implement a swift, consensual reorganization would maximize value and put the Company in the best position for future success.

### C.    Plan Support Agreement

61.    On August 24, 2016, the PSA Parties entered into the Plan Support Agreement, a copy of which is attached to the Disclosure Statement as Exhibit B.  The Debtors engaged in months of intensive, substantial, good-faith and arm's length negotiation with the other PSA Parties over the terms of the Plan Support Agreement, as well as the various term sheets attached thereto, which formed the basis for the Plan, the Rights Offering and the Backstop Agreement, among other things.

62.    The Plan Support Agreement also includes an agreement by the Term Loan Lenders to forbear as to certain defaults through the filing of the Chapter 11 Cases in exchange for another $10 million loan paydown, without prepayment penalty.  In conjunction with entering into the Plan Support Agreement, Key and KES entered into the ABL Forbearance Agreement with ABL Agent and certain ABL Lenders, which provided consent to the $10 million loan paydown to the Term Loan Lenders and an agreement to forbear prior to the Debtors' Chapter 11 Cases.

63.    The Plan Support Agreement establishes the framework for the development and solicitation of the Plan, which has been formulated not only to eliminate debt, but to maintain the underlying value of the Debtors' businesses and to position the Debtors for future growth.  This contemplated process was designed to save the Debtors significant administrative costs and prevent any potential drag on their businesses, and will result in a far better outcome for the estates than a potential free-fall bankruptcy that could be necessary without the Plan Support Agreement.  The Debtors believe, and I agree, that a protracted bankruptcy could, among other things, have a significant and negative impact on their relationships with customers, employees and vendors, cause a deterioration of trade terms and operational disruptions, and ultimately threaten their ability to reorganize.

23

64.     The Plan Support Agreement represents a significant step forward in resolving the Debtors' financial difficulties by right-sizing their balance sheet through a consensual and swift restructuring process.  In addition to reducing funded debt, the Plan Support Agreement negotiations resulted in binding term sheets (incorporated therein) that set forth the material terms of (a) the Plan, including with respect to corporate governance and the terms of New Warrants (as defined in the Plan) to be issued thereunder, as well as preserving some recovery for equity holders, even though I am informed that Plan valuation does not merit any distribution, (b) between $85 million and $110 million in fully-backstopped new money equity investment pursuant to the Rights Offering, (c) the Debtors' consensual use of cash collateral, which I believe will be sufficient to fund these Chapter 11 Cases without the need for debtor-in-possession financing (and the associated costs and fees), and (d) a $250 million term exit facility to be provided by, and serve as a distribution to, Holders of Term Loan Claims under the Plan. The Plan Support Agreement also avoids the risk and expense of a contested bankruptcy process, with potential fights over cash collateral, treatment of claims, and valuation.  The Debtors believe, and I agree, that the Plan Support Agreement, the Plan, the Backstop Agreement and the various ancillary documents represent a compromise that is in the best interest of the Debtors, their estates, and their various constituencies.

### D.    Backstop Agreement and Rights Offering

65.     Pursuant to the Plan Support Agreement, on September 21, 2016, the Debtors commenced the Rights Offering for shares in Reorganized Key to be issued on the Effective Date.  Under the terms of the Plan Term Sheet attached to the Plan Support Agreement, 95% of the shares available through the Rights Offering could be purchased by Qualifying Noteholders and 5% of such shares could be purchased by Qualifying Equity Holders, who were pre-qualified by the Debtors to participate in the Rights Offering.  The size of the Rights Offering ultimately

depends upon a calculation of Reorganized Key's "Minimum Liquidity" on the Effective Date.

Reorganized Key is required to issue $85 million in shares through the Rights Offering (referred

to in the documents as the Primary Rights Offering), and, depending upon the calculation of

"Minimum Liquidity," up to $25 million (in $1 million increments) of additional shares (referred

to in the documents as the Incremental Liquidity Facility Rights Offering).  Further detail

regarding the shares to be issued, including particulars about the number of shares, to whom they

are allocated, and the prices at which they will be issued, is set forth in Schedule 1 to the

Disclosure Statement.  The entire Rights Offering has been backstopped by the Backstop

Participants, subject to the terms of the Backstop Agreement.

66.     It is currently contemplated that the proceeds from the Primary Rights Offering

and, if applicable, the Incremental Liquidity Rights Offering (including any proceeds from the

Backstop Commitment), will be used (i) for the Cash distribution to Class 3 (Term Loan

Claims), (ii) to pay certain Restructuring transaction fees, (iii) for general corporate and business

purposes and (iv) to make distributions to Holders of Claims contemplated under the Plan.

### E.     Plan and Solicitation

67.     Coincident with the Rights Offering, the Debtors commenced solicitation of votes

on the Plan from Holders of Term Loan Claims (Class 3) and Holders of Senior Notes Claims

(Class 5).  The deadline for submitting votes on the Plan was October 20, 2016.  As further

evidenced in the Voting Affidavit filed in connection with these Chapter 11 Cases, voting

creditors overwhelmingly support the Plan.  Upon verifying that they had votes sufficient to

confirm the Plan from both voting classes, the Debtors filed these Chapter 11 Cases.

### PART III

68.     The Debtors have filed a number of First Day Motions, consisting of

administrative motions, motions relating to the Debtors' business operations, and motions related

25

to confirmation of the Plan and assumption of the Plan Support Agreement.  The Debtors

believe, and I agree, that approval of each First Day Motion is an important element of their

reorganization efforts and is necessary to ensure a smooth transition into and out of chapter 11

with minimal disruption to their operations.  I have reviewed each of the First Day Motions or

had their contents explained to me, including the exhibits thereto, and believe that the Debtors

would suffer immediate and irreparable harm absent the ability to continue their business

operations and swiftly confirm the Plan, all as requested in the First Day Motions.  Factual

information with respect to each First Day Motion is provided below and additional detail is

contained in each First Day Motion.  Capitalized terms, to the extent not defined herein, have the

meanings provided in the respective First Day Motions.

## I.      **Administrative Motions**

### A.      *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases* (the "**Joint Administration Motion**")

69.      These Chapter 11 Cases involve four affiliated Debtors.  In the Joint

Administration Motion, the Debtors are requesting consolidation for procedural purposes only.

Accordingly, my understanding is that no party's substantive rights will be adversely impacted if

the cases are jointly administered.  Given the integrated nature of the Debtors' business

operations, joint administration of the Debtors' cases will promote efficiency and ease the

administrative burden on this Court and all parties in interest.

70.      Further, I understand that joint administration will significantly reduce the volume

of paper that otherwise would be filed with the office of the Clerk of the Bankruptcy Court,

reduce costs associated with various administrative tasks, and minimize the number of

unnecessary delays.  Moreover, the joint administration of these Chapter 11 Cases will simplify

supervision of these cases by the Office of the United States Trustee.  Accordingly, the Debtors

believe, and I agree, that joint administration of these Chapter 11 Cases is in the best interest of the Debtors' respective estates, creditors and all other parties in interest.

**B.**   ***Debtors' Motion for Entry of Interim and Final Orders (i) Establishing Notice and Objection Procedures for Transfers of Equity Securities and Claims of Worthless Stock Deductions and (ii) Granting Related Relief* (the "<u>Trading Motion</u>")**

71.     Pursuant to the Trading Motion, the Debtors seek entry of orders (i) establishing notice and objection procedures related to certain transfers of, and declarations of worthlessness for federal or state tax purposes with respect to, Key's Common Stock; (ii) directing that any purchase, sale, or other transfer of Common Stock in violation of the procedures set forth therein be null and void *ab initio*; and (iii) granting certain related relief.  In addition, the Debtors request that the Court schedule a final hearing to consider approval of the Trading Motion on a final basis.

72.     The Debtors estimate that, as of December 31, 2015, they had available $243.8 million of federal NOLs and $258.9 million of state NOLs.  I understand that approximately $2.4 million of the Debtors' federal net operating losses as of December 31, 2015 are subject to a $5,000 annual Section 382 limitation and expire in 2016 through 2018.  The remaining net operating loss carryforwards are not subject to Section 382 and will begin to expire in 2035.  The Debtors further estimate that they have incurred approximately $160 million of NOLs through June 30, 2016 and will continue to incur losses for the remainder of the year.  The Debtors also had an approximately $61 million capital loss and $13.4 million of foreign tax credit carry forwards as of December 31, 2015, which I believe may also provide incremental value to their stakeholders if protected.  The procedures contemplated in the Trading Motion are intended to protect such tax attributes in addition to the NOLs.

27

73.     The Debtors have NOLs in sixteen (16) different states, with effective income tax rates ranging from approximately 4.5% to 9.5%, with an effective, blended state income tax rate of approximately 7.5%.

74.     In addition to the NOLs, the Debtors estimate that they currently have significant "net unrealized built-in losses" ("NUBIL"), which represents the amount by which the tax basis of property exceeds its fair market value.  A NUBIL can generate future losses as the property containing the NUBIL is sold, depreciated, or amortized.  While it is not possible to determine the exact amount of the Debtors' future NUBIL at the time of emergence, the Debtors currently project that they will have an aggregate NUBIL of approximately $350 million when they emerge from chapter 11.

75.     The NOLs and NUBIL are of significant value to the Debtors and their estates. The Debtors can carry forward their NOLs to offset their future taxable income for up to 20 years, thereby reducing their future aggregate tax obligations.  In addition, such NOLs may be utilized by the Debtors to offset any taxable income generated during these Chapter 11 Cases. The NUBIL may generate future losses or deductions that will enable the Debtors and their estates to offset their future taxable income.  The value of the NOLs and NUBIL will inure to the benefit of all of the Debtors' stakeholders.

76.     The NOLs are a key asset of the Debtors' estates and may be essential to the Debtors' restructuring.  To protect the NOLs, NUBIL, and other tax attributes, on or about August 24, 2016, the board of directors of Key adopted an amendment to Key's Ninth Amended and Restated Bylaws (the "NOL Protective Amendment") to impose certain restrictions on transfers of shares of Key's common stock.  The NOL Protective Amendment's transfer restrictions generally prohibit any direct or indirect transfer of Key's common stock if the effect

28

would be to increase the direct or indirect ownership of any person from less than 4.9% to 4.9% or more of Key's common stock, or increase the ownership percentage of a person owning or deemed to own 4.9% or more of Key's common stock.  The NOL Protective Amendment provides that any direct or indirect transfer attempted in violation of this restriction would be void as of the date of the prohibited transfer.   However, it does not restrict shareholders from claiming worthless stock deductions, and it does not provide the Debtors with notice of transactions that may come close to violating (or, if the relevant parties mistake the relevant threshold, actually violating) the NOL Protective Amendment.

77.    A loss of the NOLs and NUBIL cannot be reversed, and so would cause immediate and irreparable harm to the Debtors' estates.  The procedures described in the Trading Motion will supplement the NOL Protective Amendment and will enable the Debtors to monitor and object to certain transfers of and declarations of worthlessness with respect to Common Stock to ensure preservation of the NOLs and NUBIL.  I believe that such procedures and other relief requested in the Trading Motion are critical for maximizing estate value.  If no restrictions on trading or worthlessness deductions are imposed, as requested in the Trading Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the NOLs and NUBIL.  I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.

**C.    *Debtors' Application for Appointment of Epiq Bankruptcy Solutions as Claims and Noticing Agent* Nunc Pro Tunc *to the Petition Date* (the "<u>Claims Agent Application</u>")**

78.    I understand that this Court is authorized to utilize agents and facilities other than the Clerk for the administration of bankruptcy cases.  I believe that if Epiq Bankruptcy Systems, LLC ("<u>Epiq</u>") is retained as the claims and noticing agent in these Chapter 11 Cases, the

distribution of notices and the processing of claims will be expedited and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

79.     I have also reviewed Epiq's Retention Agreement, which is attached as <u>Exhibit C</u> to the Claims Agent Application, and the description of services that Epiq has agreed to provide and the compensation and other terms of the engagement as provided in its application.  Based on that review, I believe that the Debtors' estates, creditors, parties in interest, and the Court will benefit from Epiq's experience and cost-effective methods.  Prior to retaining Epiq, the Debtors also solicited, and reviewed, engagement proposals from two other potential claims and noticing agents.  The Debtors believe, and I agree, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise, and that the appointment of Epiq as claims and noticing agent is the most effective and efficient manner by which to provide noticing and claims processing services in the Chapter 11 Cases and is necessary and in the best interest of the Debtors and their estates.

## II.    Motions Relating to Business Operations

   **A.**    ***Debtors' Motion for Interim and Final Orders (i) Authorizing the Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363; (ii) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 503, 507, And 552; (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B); and (iv) Granting Related Relief** (the "<u>Cash Collateral Motion</u>")*

80.     In the Cash Collateral Motion, the Debtors are seeking interim and final orders (i) authorizing the Debtors to use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (ii) granting adequate protection to the Prepetition Secured Parties pursuant to sections 105(a), 361, 362, 363, 503, 507, and 522 of the Bankruptcy Code; (iii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and

effectuate the terms of the Interim Order and the Final Order, and (iv) granting related relief, including scheduling a final hearing pursuant to Bankruptcy Rule 4001(b).

81.     I believe that the Debtors' continued use of Cash Collateral during the pendency of the Chapter 11 Cases is essential to preserve the value of the estates and maximize value for the Debtors' stakeholders.  The Debtors provide extensive and sophisticated services to oil and gas companies.  To support these businesses during the Chapter 11 Cases, the Debtors must be able to use Cash Collateral generated from operations in order to fund payroll and other employee-related expenses, pay vendors, and make such other payments as are essential for the continued management, operation, and preservation of the Debtors' businesses.  Absent the use of Cash Collateral to satisfy these expenses, I believe that the Debtors would likely be unable to continue operating.  If the Debtors had to shut down operations, their enterprise value would be destroyed and the usefulness and value of the Debtors' extensive assets would be endangered.

82.     As described further herein and in the Cash Collateral Motion, in connection with the Plan Support Agreement process and prior to the filing of the Chapter 11 Cases, the Debtors successfully engaged in good faith and arm's-length negotiations with the Supporting Term Lenders and the ABL Admin Agent and ABL Lenders for the consensual use of Cash Collateral during the Chapter 11 Cases.  Agreement on the terms of adequate protection set forth in the Cash Collateral Orders was required by the Supporting Term Lenders and the ABL Admin Agent and ABL Lenders as a condition of the Debtors' consensual use of Cash Collateral, which agreement was necessary to preserve the consensual restructuring process in these Chapter 11 Cases.  Accordingly, the Interim Order and the Final Order, as proposed, provide for adequate protection in the form of, among other things, additional and replacement liens, superpriority claims, the reimbursement of any drawn letters of credit under the ABL Credit Facility, the

payment of interest at the non-default contract rate and certain other amounts payable under the

Credit Documents, and the payment of postpetition professional fees, costs, and expenses of the

Agents and certain other Prepetition Secured Parties to protect against any postpetition

diminution in value of the Prepetition Collateral.

83.     As of the Petition Date, the Debtors have approximately $50 million in cash on

hand (including restricted cash), all or substantially all of which constitutes Cash Collateral.  I

believe that if the Debtors were unable to use Cash Collateral, the Debtors would not have

sufficient working capital to (a) make payments to employees, vendors, or suppliers, (b) satisfy

ordinary operating costs, or (c) fund the administrative costs of the Chapter 11 Cases.  I believe

that without access to Cash Collateral, the Debtors' ability to restructure as contemplated under

the Plan Support Agreement and the Plan will be jeopardized, and the Debtors could be forced to

ultimately liquidate.  In either alternative scenario, I believe that the value available for

distribution to stakeholders in the Chapter 11 Cases would be significantly reduced.

Accordingly, I believe that the Debtors have an immediate need to use Cash Collateral to ensure

sufficient liquidity throughout the pendency of the Chapter 11 Cases to enable them to confirm

and consummate the Plan that has been overwhelmingly accepted by the two impaired voting

classes thereunder.

84.     I am informed that the adequate protection proposed in the Interim Order consists

primarily of typical protections.  Any reimbursements will be made from existing Cash

Collateral, pursuant to the terms of the Interim Order, and have been agreed to by the Term Loan

Agent.  This additional protection, along with the setting aside of the Segregated Cash, in each

case for the benefit of the ABL Secured Parties, were heavily negotiated requirements of the

ABL Secured Parties.  I believe that without these additional protections, the Debtors would not

have been able to achieve consensus on the relief requested herein, and would face potential litigation regarding collateral usage and/or the need to obtain debtor-in-possession financing, in either case imperiling their businesses and the consensual restructuring process.

85.     Accordingly, I believe that the Cash Collateral Motion should be approved and the Debtors should be authorized to immediately use Cash Collateral (subject to the amounts set forth in the Initial Approved Budget with the Permitted Variances) and that granting the other relief requested in the Cash Collateral Motion is necessary to (i) avoid a severe disruption in the Debtors' operations at this critical juncture, (ii) preserve the Debtors' carefully-negotiated consensual restructuring, and (iii) maximize the value of the Debtors' estates for the benefit of all stakeholders.

**B.**      ***The Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to (a) Continue to Use Their Cash Management System, Including Existing Bank Accounts and Purchase Card Programs, (b) Honor Certain Prepetition Obligations Related Thereto, (c) Continue, in the Ordinary Course of Business, Interdebtor Transactions and (d) Maintain Existing Check Form, (ii) Waiving The Requirements Of Section 345(b) On An Interim Basis, and (iii) Granting Related Relief*** **(the "<u>Cash Management Motion</u>")**

86.     In the Cash Management Motion, the Debtors are seeking interim and final orders (i) authorizing the Debtors to (a) continue to use their existing Cash Management System, including existing bank accounts and Purchase Card Programs, (b) honor certain prepetition obligations related thereto, (c) continue, in the ordinary course of business, Interdebtor Transactions consistent with the Debtors' customary prepetition practices and (d) maintain their existing check form, (ii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis, and (iii) granting related relief.

87.     The Debtors maintain a Cash Management System which comprises a total of twelve (12) Bank Accounts.  Two of the Bank Accounts reside at Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>"), one account resides at Amegy Bank, N.A. ("<u>Amegy</u>"); five accounts reside at

Bank of America, N.A. ("BofA"); one account resides with Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"); and three accounts reside at JPMorgan Chase Bank, N.A. ("Chase" and, together with Wells Fargo, Amegy, and BofA, the "Banks").  The Company is in the process of transitioning certain of its banking activity from the Chase accounts to the BofA accounts.  Further detail with respect to the Bank Accounts is set forth in the Cash Management Motion.

88.     In the ordinary course of business, the Banks charge, and the Debtors pay, honor or allow to be deducted from the appropriate Bank Accounts, certain service charges and other fees, costs and expenses charged by the Banks (collectively, the "Bank Fees").  The Bank Fees (not including any fees related to the ABL Facility) currently average approximately $14,000 per month in the aggregate, less total earnings credits of approximately $200 per month.  The Debtors estimate that approximately $11,000 of accrued but unpaid Bank Fees are outstanding as of the Petition Date, including $2,000 of fees relating to letters of credit.

89.     As depicted on the Funds Flow Diagram included as Exhibit 2 to the proposed interim order, the main components of the Cash Management System are the receipt of funds, the concentration of cash, the disbursement of cash, and the investment of cash.  A detailed and accurate description of the flow of funds between the Bank Accounts is contained in the Cash Management Motion.

90.     The Debtors also maintain certain Purchase Card Programs as part of the Cash Management System.  Under the recently implemented BofA Purchase Card Program, the Debtors issue credit cards to eligible employees to be used for authorized travel and other business-related expenses, including on-location purchases, such as parts and services necessary to keep the Debtors' equipment in good working order.  The BofA Purchase Card Program

replaced a similar purchase card program the Debtors had previously maintained with Capital One Bank (USA), N.A., which is in the final stages of being wound down.  The Debtors estimate that, if the relief sought in the Cash Management Motion is granted, all pending charges to the Capital One purchase cards will have been billed to, and paid by, the Company no later than 60 days after the Petition Date.  The Debtors also maintain the WEX Fuel Card Program with WEX, through which eligible employees may purchase fuel for Debtor-owned passenger vehicles and heavy-duty vehicles.  Further detail on the three Purchase Card Programs is contained in the Cash Management Motion.  As of the Petition Date, the Debtors estimate that prepetition amounts due on account of the Purchase Card Programs should not exceed $600,000.

91.     In the normal course of their businesses, the Debtors do not engage in regular intercompany transactions or incur substantial intercompany obligations because KES is the only domestic entity with active business operations.  At times, however, KES receives or disburses funds on behalf of another Debtor, and it accounts for that transaction with journal entry receivables and payables, as applicable, in the Debtors' accounting records.  Although not extensive, these Interdebtor Transactions are an essential feature of the Debtors' integrated Cash Management System.  Even a temporary disruption in the Debtors' ability to continue such Interdebtor Transactions would impose a significant burden on the Debtors and have a material, negative impact on the value of the Debtors' estates.

92.     The Cash Management System enables the Debtors to efficiently track and control funds, ensure cash availability and reduce administrative costs.  I believe that requiring the Debtors to dismantle the Cash Management System and adopt a new, segmented cash management system would, among other things, impair the Debtors' day-to-day operations and ability to generate timely reports of transactions and balances.  Adopting a new cash

management system would force the Debtors to incur material expenses, create unnecessary administrative burdens on their employees and disrupt relationships with their key customers and suppliers.

93.    In contrast, I believe that maintaining the Cash Management System will facilitate the Debtors' reorganization efforts by preserving a "business as usual" atmosphere and avoiding the costly delays, distraction and unnecessary confusion that would accompany any substantial disruption in the Cash Management System.  In my opinion, maintaining the Cash Management System would also facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts, eliminating administrative inefficiencies and allowing the Debtors' treasury and accounting employees to focus on their daily responsibilities.

94.    I do not believe that any parties in interest will be harmed by maintaining the Cash Management System, including the Bank Accounts.  As an initial matter, I understand that the Debtors have implemented appropriate measures to ensure that payments will not be made on account of obligations incurred before the Petition Date other than the prepetition obligations authorized to be paid by the Court.  I also understand that, with the assistance of their professional advisors, the Debtors have implemented protocols prohibiting payments on account of prepetition debts, including prepetition intercompany debts, without the prior approval of the Debtors' treasury or accounting departments.  Finally, I am informed that the Debtors will continue to work closely with the Banks to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored without the Court's approval.

95.    Additionally, I believe that according certain flexibility to the Banks, as requested in the Cash Management Motion, is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether the Debtors may pay a particular item in

accordance with a Court order or otherwise.  As a result, my view is that the relief being

requested is necessary in order to induce the Banks to continue providing cash management

services without additional credit exposure.

96.     The Debtors also seek authority to continue utilizing the Purchase Card Programs

postpetition in the ordinary course of business.  The Purchase Card Programs are critical to the

Debtors' ability to carry out their ongoing operations without disruption because they enable

eligible employees to engage in business travel, purchase fuel for company vehicles, and pay for

small but critical expenses incurred in the Debtors' daily operations without undue delay.

Discontinuing the use of the Purchase Card Programs would significantly disrupt the Debtors'

administrative procedures related to employee business expenses as the Debtors rely on these

programs to ensure that daily operations run smoothly and would also likely impact employee

morale by forcing employees to personally incur business-related expenses pending

reimbursement.

97.     The Debtors are also requesting a waiver of the requirement of the U.S. Trustee

Guidelines that their Bank Accounts be closed and that new postpetition bank accounts be

opened.  If enforced in these cases, I believe that such requirements would cause enormous

disruption in the Debtors' businesses and would impair the Debtors' efforts to successfully

reorganize.  The Bank Accounts comprise an established Cash Management System that the

Debtors must maintain in order to ensure the uninterrupted collection and disbursement of funds

in the ordinary course of their businesses.  Therefore, to avoid delays in paying obligations

incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, I believe

that the Debtors should be permitted to continue to maintain the Bank Accounts and, if

necessary, to open new accounts and close existing accounts in the normal course of business

operations.  Otherwise, the process of transitioning the Debtors' Bank Accounts to new bank

accounts will be disruptive, time consuming and expensive.

98.     The Debtors or their agents print nearly all of their own checks and do so on an

ongoing, as-needed basis.  The Debtors believe, and I agree, that they will be in a position to

begin printing checks with the designation "Debtor in Possession" and the corresponding

bankruptcy number on all such checks within fifteen (15) days of the date of the entry of the

Interim Order.

99.     Finally, I believe that the Debtors are substantially in compliance with what I

understand are the requirements of section 345(b) of the Bankruptcy Code.  Each of the Debtors'

Banks (other than Merrill Lynch) is on the list of authorized depositories for the District of

Delaware maintained by the U.S. Trustee, and Merrill Lynch is an affiliate of BofA, which is on

the list of authorized depositories.  Moreover, each of the Debtors' domestic Bank Accounts that

is a deposit account (as opposed to an investment account) is insured by the United States,

through the Federal Deposit Insurance Corporation, up to $250,000.

     **C.**     ***Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the
Debtors to (a) Pay Prepetition Wages, Salaries, Employee Benefits, Prepetition
Payroll Taxes and Other Compensation, and (b) Maintain Employee Benefits
Programs and Payment of Related Administrative Obligations, (ii) Authorizing
Applicable Banks and Other Financial Institutions to Honor and Process
Related Checks and Transfers, and (iii) Granting Related Relief* (the "<u>Wages
Motion</u>")***

100.    The Wages Motion requests authority to pay certain prepetition amounts related

to the Employee Compensation Obligations and to continue to pay Employee Compensation

Obligations on a postpetition basis in the ordinary course of business.  Employee Compensation

Obligations consist of wages, salaries and other compensation provided to the Debtors'

employees, as well as related withholdings, deductions and expense reimbursement obligations

(including any related obligations and administrative expenses).  In addition, the Wages Motion

requests that the Debtors be authorized to maintain Employee Benefits Programs and pay related administrative obligations.  A description of Employee Compensation Obligations and the Employee Benefits Programs is set forth below, and further detail is contained in the Wages Motion.

101.    As of the Petition Date, the Debtors have approximately 2,900 employees in both full- and part-time positions, including analysts, crane operators, derrickhands, dispatchers, drillers, drivers, equipment operators, floorhands, officers, managers, mechanics, rig operators, sales representatives, supervisors, technicians, welders, well testers, administrative support staff and other personnel.  The employees are located at the Debtors' offices and at various field locations in Texas, Arkansas, California, Colorado, Kansas, Louisiana, Montana, New Mexico, North Dakota, Oklahoma, Pennsylvania, West Virginia and Wyoming.  None of the Debtors' employees are covered by a collective bargaining agreement.  The Debtors also supplement their workforce by employing a de minimis number of temporary workers, whose services are procured indirectly through third-party staffing agencies, and independent contractors.  The Debtors pay the independent contractors directly, while the staffing agencies pay the wages and benefits of the temporary workers. The Debtors' aggregate average gross bi-weekly payroll is currently approximately $8.1 million.

102.    All of the Debtors' employees are paid bi-weekly on Friday, either in arrears or on a current basis.  The Debtors use ADP as their third-party payroll administrator for wages and payroll taxes.  The Debtors estimate that, as of the Petition Date, they owe approximately (i) $65,000 in unpaid processing fees to ADP; (ii) $1.25 million in accrued and unpaid prepetition wages and salaries to their employees and $325,000 to staffing agencies and independent

contractors; (iii) $484,000 in accrued Payroll Taxes and/or Deductions; and (iv) $86,000 in

accrued but unpaid Reimbursable Expenses.

103.    The wages and salary obligations contained in subsection (ii) of the preceding

paragraph were earned within 180 days before the Petition Date.  I believe that, when Unpaid

Compensation is combined with the other Prepetition Employee Obligations currently owed to or

for the benefit of the Debtors' employees, exclusive of Payroll Taxes and Deductions, and

Vacation and Leave Obligations, no individual employee is owed more than $12,850, with the

following potential exception.  Key is obligated under existing prepetition contracts to make

retention payments to five non-insider employees in its payroll department on or before

November 10, 2016.  Two payments will be for $12,000, two will be for $15,000, and one will

be for $30,000.

104.    In addition to the Employee Compensation Obligations discussed above, the

Debtors offer employees a number of Employee Benefit Programs.  These Employee Benefit

Programs include medical plans, disability coverage plans, workers compensation plans, life and

accidental death and dismemberment plans, optional employee-funded coverage plans, a 401(k)

plan, and vacation and leave policies.  The Debtors utilize the services of Gallagher as their

employee benefits consultant.

105.    The Debtors also provide additional Employee Compensation and Benefits to

certain eligible employees, including a Business Vehicle Reimbursement Plan, relocation

benefits, temporary housing program, Purchase Program, and educational assistance.  All of the

Employee Compensation and Benefits, including the Debtors' estimated prepetition Employee

Compensation Obligations with respect thereto, are described in further detail in the Wages

Motion.

106.    I believe that payment of the Prepetition Employee Obligations as described in the Wages Motion enhances the value of the Debtors' estates for the benefit of all parties in interest. I also believe that any delay in paying any such Employee Compensation and Benefits could severely disrupt the Debtors' relationship with their employees and risk substantial disruption of the Debtors' business operations at a critical time in the Debtors' restructuring efforts.

107.    I believe it is critical that the Debtors obtain the authority to pay the Prepetition Employee Obligations and to continue to honor and pay Employee Compensation and Benefits, in order to ensure the uninterrupted operation of the Debtors' business, prevent undue harm to the Debtors' employees, and maximize the value of the Debtors' estates.

108.    I further believe that failure to honor and pay Employee Compensation and Benefits may impair employees' morale, dedication, confidence and cooperation to the detriment of the Debtors' restructuring efforts.  At this early stage in the Chapter 11 Cases, and given their anticipated brief duration, I do not believe that the Debtors can risk the substantial damage to their businesses that could attend any decline in their employees' morale attributable to the Debtors' failure to pay the Prepetition Employee Obligations or maintain Employee Compensation and Benefits.  The Debtors also face a risk of attrition of key employees if they are unable to honor prepetition obligations and continue paying compensation and funding employee programs postpetition.  Absent assurances that such employees will continue to be compensated in the ordinary course, the Debtors' employees may seek opportunities elsewhere, including at competitors of the Debtors.   The Debtors' employees are critical to the Company's business model and operations and provide valuable services to and on behalf of the Debtors. Losing valuable employees at this stage of the Debtors' restructuring efforts would have a direct and negative impact on the Debtors' abilities to sustain operations and maintain revenues.

41

**D.**   ***Debtors' Motion for Entry of Interim and Final Orders (i) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (ii) Deeming Utility Providers Adequately Assured of Future Performance, (iii) Establishing Procedures for Determining Adequate Assurance of Payment, and (iv) Granting Related Relief* (the "<u>Utilities Motion</u>")**

109.   To operate their businesses and manage their properties, the Debtors incur utility expenses for natural gas, electricity, water, sewage, waste management, local and long-distance telecommunications, data, wireless, and other similar services (collectively, the "<u>Utility Services</u>").  These services are provided by approximately 255 Utility Providers, with which one or more of the Debtors may have multiple accounts.  A non-exhaustive list of the Utility Providers is attached to the Utilities Motion as <u>Exhibit C</u>.   The Debtors spend an aggregate amount of approximately $755,000 each month on Utility Services from the Utility Providers listed on the Utility Services List.  I believe the Utility Services List is substantially complete.

110.   To manage the Utility Services at their many locations, the Debtors contract with Ecova, a third-party processor.  Ecova manages the Debtors' accounts for almost all of the Utility Providers, including managing the Utility Services, reviewing bills for the Utility Services, paying bills for the Utility Services as an agent for the company (after receiving funds from the Debtors for such payments), establishing new Utility Services, terminating Utility Services for closing locations and providing accounting information to the Debtors with respect to the Utility Services managed by Ecova.  Although the Debtors contract directly with the Utility Providers, invoices from the Utility Providers are directed to Ecova, which then reconciles and consolidates the invoices, submits them to the Debtors with a request for funding and a payment date (via a consolidated daily invoice), and then disburses the funds from the Debtors to the Utility Providers.  Ecova charges the Debtors a monthly fee for such services based on the volume of activity with respect to the Debtors' accounts, and the Debtors believe that, as of the Petition Date, the Debtors owe approximately $5,500 to Ecova for prepetition

accrued but unpaid service and administrative fees.   The services provided by Ecova are integral to the Debtors' operations.

111.    I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations, and, therefore, to the success of the Debtors' reorganization efforts.   Indeed, I believe that any disruption in utility services—even for a brief period of time—would seriously disrupt the Debtors' continued operations.   The Debtors operate a complex business with operations in numerous states around the country that depend on the reliable delivery of power and other Utility Services.   Should any Utility Provider refuse or discontinue service even for a brief period, I believe the Debtors' operations could be severely disrupted.   Such a disruption could negatively impact the Debtors' business operations and revenue and could jeopardize the Debtors' reorganization efforts and, ultimately, creditors' recoveries.   In addition to their corporate headquarters, the Debtors operate several regional and field offices responsible for ensuring the smooth operation of the Debtors' businesses, and also provide temporary housing for certain employees at various mobile home and other facilities.   These offices and employee housing facilities require Utility Services to operate.   The Debtors also require the Utility Services in order to, among other things, maintain the equipment the Debtors use to service their customers.

112.    In general, the Debtors have established satisfactory payment histories with the Utility Providers and have made payments on a regular and timely basis.   To the best of my knowledge, there are no material defaults or arrearages with respect to undisputed invoices for prepetition Utility Services as of the Petition Date.   The Debtors intend to pay any postpetition obligations to the Utility Providers in a timely fashion and in the ordinary course.   The proposed Adequate Assurance Deposit of $377,688 is equal to approximately 50% of the Debtors'

estimated average monthly cost of Utility Services, calculated based on the Debtors' average

expenses for such Utility Services during the preceding 12 full months, with certain exceptions

discussed in the Utilities Motion.

113.    The Debtors have budgeted for the payments and believe that cash on hand, cash

generated through operations, and cash otherwise available to the Debtors will be sufficient to

satisfy obligations for Utility Services in the ordinary course on a postpetition basis in a manner

consistent with the Debtors' prepetition practice.

    **E.**    ***Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Debtors to Pay Certain Prepetition Taxes, (ii) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (iii) Granting Related Relief* (the "<u>Tax Motion</u>")**

114.    In the ordinary course of business, the Debtors collect, withhold, and incur

various Taxes, which they remit to various Taxing Authorities.

115.    Although the Debtors believe that they are substantially current on all of the

Taxes that have become due as of the Petition Date, because many such Taxes are paid on a

periodic basis (and in arrears), there is in many instances a lag between the time when the

Debtors incur an obligation to pay the Taxes and the date such Taxes become due and payable.

The principal categories of these Taxes, as well as the estimated accrued and unpaid amounts

with respect to such Taxes as of the Petition Date, are described in greater detail in the Tax

Motion.

116.    The amounts of the Taxes listed in the Tax Motion are good faith estimates based

on the Debtors' books and records and remain subject to potential audits and other adjustments.

Although the estimates of outstanding Taxes are based on a good-faith assessment of the existing

amounts due on a prepetition basis, there is a possibility—because of audit rights—that one or

more of the various Taxing Authorities may determine at a later date that the Debtors owe additional prepetition Taxes.

117.    I believe that the relief requested in the Tax Motion represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of the resources and going-concern values of their estates.  I am informed that the Debtors' failure to pay the prepetition Taxes as they come due may ultimately increase the amount of priority claims held by the Taxing Authorities against the Debtors' estates to the detriment of the Debtors' general unsecured creditors.  I further believe that payment of the prepetition Taxes is critical to the Debtors' uninterrupted operations.  I am informed that nonpayment of these obligations may also cause certain Taxing Authorities to take precipitous actions, including, but not limited to, initiating audits, preventing the Debtors from conducting business in applicable jurisdictions, seeking to modify the automatic stay, attempting to file liens against the Debtors' real and personal property, and/or pursuing other remedies, all of which would disrupt the Debtors' day-to-day operations, hinder the Debtors' efficient and effective administration of the Chapter 11 Cases, and burden the Debtors' estates with unnecessary expenses.

118.    I am informed that certain of the Debtors' directors and officers might also be subject to personal liability – even if the nonpayment of Taxes was not a result of any malfeasance on their part – which I believe would distract such key personnel from their duties related to the Debtors' restructuring.

   **F.**    ***Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Their Insurance Policies and Pay All Obligations in Respect Thereof, (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief*** **(the "<u>Insurance Motion</u>")**

119.    Prior to the Petition Date, the Debtors maintained, through several different Insurance Carriers, Insurance Policies, including those identified in <u>Exhibit C</u> to the Insurance

Motion.  The Insurance Policies provide the Debtors with insurance coverage for liabilities

relating to, among other things, general liability, directors' and officers' liability (including

excess liability), employment practices liability, commercial property physical damage,

automobile liability, pollution liability, commercial and special crime liability, workers'

compensation, business travel accidents, and various other property-related and general

liabilities.  The aggregate amount of annual premiums on account of all of the current Insurance

Policies is approximately $7.2 million, the majority of which was either paid in advance or

financed.  As detailed more fully in the Insurance Motion and the ACE Renewal Motion

(discussed below), certain of the Insurance Policies are supported by letters of credit provided by

Key.

> 120.    Key has a number of current Insurance Policies that expire on November 1, 2016

(the "Liability Policies").  The aggregate amount of annual premiums, taxes, and fees on account

of the current Liability Policies is approximately $5,930,000, which was financed and paid in full

in the ordinary course of business prior to the Petition Date.   Key intends to renew the Liability

Policies and make the related premium payments either in full at the time of renewal or, with

respect to some of the Liability Policies, in quarterly installments.  Certain premium payments

made in connection with the renewal of the Liability Policies may be paid prior to such renewal

becoming effective on November 1st.  During the remainder of 2016, in connection with the

renewal of the Liability Policies, not including those policies that are the subject of the ACE

Renewal Motion, the Debtors anticipate making payments in respect of premiums and fees and

expenses (if any) of approximately $1,355,000.  This amount does not include anticipated

premiums for the Pollution Liability-Claims Made policy with AIG Specialty Insurance

Company, for which the Debtors are continuing to explore renewal and premium payment options.

121.    In addition to annual premiums, pursuant to certain of the Insurance Policies, the Debtors may be required to pay various deductibles and retentions for claims asserted under such policies.  I believe it is possible that the failure to pay these amounts may result in a loss of coverage under the Insurance Policies or other disputes with the Insurance Carriers over the parties' respective rights and obligations if such amounts remain unpaid.  As of the Petition Date, the Debtors do not believe that any such amounts covered by the Insurance Motion are outstanding, though amounts may become due in the future relating to insured claims occurring prior to the Petition Date.

122.    I believe that continuation of the Insurance Policies and entry into new insurance policies is essential to the operation of the Debtors' businesses and is necessary to protect the Debtors from catastrophic, potential liability.  Furthermore, I have been advised that, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  I believe that, because the Debtors are required by the U.S. Trustee and the Debtors' customers, among others, to maintain insurance coverage during their Chapter 11 Cases, the cancellation of these policies would have significant negative consequences for the Debtors.

123.    The Debtors obtain their Insurance Policies through Lockton Companies LLC (the "Insurance Broker").  The Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing

47

support throughout the applicable policy periods.  The Debtors pay Brokerage Fees to the

Insurance Broker in the amount of $600,000, which is paid in two installments.  As of the

Petition Date, the Debtors do not believe they owe any amounts to the Insurance Broker on

account of Brokerage Fees or any other prepetition obligations.

> **G.**    ***Debtors' Motion For Entry Of An Order (I) Authorizing Assumption Of The ACE Prepetition Insurance Program, (II) Authorizing The Debtors To Enter Into The ACE Postpetition Insurance Program, And (III) Granting Related Relief* (the "<u>ACE Renewal Motion</u>")**

124.    ACE provides the Debtors with coverage for, among other things, workers'

compensation, general liability, automobile liability, international casualty, property,

energy/mining, fidelity, director and officer, accident and health, and certain other insurance for

specified policy periods pursuant to the Prepetition Insurance Program.  The Prepetition

Insurance Program imposes on the Debtors certain monetary and non-monetary obligations and,

as security for such obligations, the Debtors provided ACE with a first priority, perfected

security interest and liens in certain collateral (the "<u>ACE Collateral</u>"), which currently consists of

the Letter of Credit issued by Wells Fargo and certain other cash collateral.

125.    The workers' compensation, general liability and automobile liability insurance

coverage under the Prepetition Insurance Program is set to expire on November 1, 2016 at 12:01

a.m. (the "<u>Expiration Date</u>").   As further described in the ACE Renewal Motion, in order to

ensure that the Letter of Credit would be renewed prepetition, the Debtors commenced arms'

length and good faith negotiations with ACE in August 2016, to ensure continuing insurance

coverage from the Expiration Date through March 2017.  The timing of the negotiations with

ACE was driven, in large part, by the desire of the Debtors and other parties in interest to renew

the Letter of Credit, which would have expired by its terms during these Chapter 11 Cases,

prepetition, and address the Debtors' obligations in respect of the Letter of Credit in connection

with the Debtors' application for use of cash collateral, rather than through a separate debtor-in-possession financing.   These negotiations culminated in the Debtors and ACE agreeing to, subject to this Court's approval and other conditions, enter into the Proposal under which the Postpetition Insurance Program will be issued to the Debtors as further described in the ACE Renewal Motion.

126.    In connection with their acceptance of, and entry into, the Proposal, the Debtors were able to negotiate terms under which they were not required to provide any additional collateral at the time of renewal to ACE beyond what currently constitutes the ACE Collateral. In addition, no policy premiums will be due post-petition because the Debtors paid the entire aggregate premium of $358,814 to ACE with respect to the Proposal prepetition.   The Debtors ultimately will owe additional amounts in connection with their obligations under the Insurance Program, as set forth in the Proposal and as further described in the ACE Renewal Motion and the Employee Benefits Motion.

127.    I believe that the Debtors' assumption of the Prepetition Insurance Program and their entry into the Postpetition Insurance Program are appropriate under the circumstances and in the best interest of the Debtors and their estates.  I am informed that the Debtors are required to carry general liability, automobile liability, and workers' compensation insurance in order to operate.  I believe that the circumstances in which Wells Fargo was obligated and prepared to renew the Letter of Credit were narrow.  Accordingly, if the Debtors are unable to maintain and enforce the Postpetition Insurance Program, I believe that they would face a real risk of not being able to secure replacement insurance or not being able to comply with the terms of the Plan Support Agreement, which is the bedrock of the heavily-negotiated, widely-supported

prepackaged Plan.  I further believe that either outcome would substantially impair the success of the Debtors' operations and their ultimate value.

128.    In addition, I believe that the Debtors and their estates will be benefited by entering into the Postpetition Insurance Program, as opposed to seeking insurance from a third party, because ACE is not requiring any additional collateral to renew the applicable policies.  If the Debtors were to seek replacement insurance from a third party, I believe that such an insurer would likely require at least the same, if not additional, amount of collateral as currently held by ACE on account of the Prepetition Insurance Program.  I also believe that there would likely be a delay in recovering the cash portion of the ACE Collateral, and no practical ability to provide a new letter of credit, such that the Debtors would be faced with the prospect of needing to provide collateral and being unable to do so.

129.    ACE has conditioned its entry into the Postpetition Insurance Program upon the Debtors seeking and obtaining certain relief on a "first day" basis, and ultimately obtaining an order authorizing them to, among other things, assume the Prepetition Insurance Program. Failure to satisfy ACE's conditions to entering into the Postpetition Insurance Program could result in a cancellation of any Policies issued under the Proposal, or a refusal of ACE to issue such Policies.  I believe that such an outcome would leave the Debtors scrambling to avoid exposure on various liability claims, including workers' compensation, general liability and automobile liability claims.  Further, due to the laws in the majority of the states in which the Debtors operate, I am informed that the Debtors would be required to cease operations in those states if they could not obtain replacement insurance.  I believe that if the Debtors were exposed to liability as a result of being uninsured or forced to cease operations in certain states it would

seriously jeopardize the Debtors' heavily negotiated and hard-fought restructuring contemplated under their widely-supported prepackaged Plan.

130.     I believe that the Debtors have engaged in good-faith discussions and negotiations with ACE and that they have negotiated fair and reasonable terms for the provision of insurance under the Insurance Program.  I further believe that assumption of the Prepetition Insurance Program and entry into the Postpetition Insurance Program are essential to protect the Debtors' businesses and preserve the value of the Debtors' estates.  Under the circumstances, I believe that superior financing for postpetition coverage comparable to that provided by ACE under the Insurance Program is unobtainable.

131.     In connection with the assumption of the Prepetition Insurance Program, the Debtors do not believe that there are any existing defaults.  To the extent any cure amounts are due, the Debtors intend to pay such amounts pursuant to the terms of the Prepetition Insurance Program in the ordinary course of business.

132.     The Debtors need the Insurance Program to remain in place uninterrupted.  I believe that failure to enter into the Postpetition Insurance Program could have disastrous effects on the value of the Debtors' assets and, consequently, on the Debtors' efforts to maximize recoveries for their stakeholders as well.  Occurrence of any one or more of these events could stop the Debtors' flow of revenue, which potentially could result in irreparable harm to the Debtors' current and future operations.

   **H.**     ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain Customer Programs and Honor Related Prepetition Obligations, (II) Authorizing Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief (the "<u>Customer Programs Motion</u>")***

133.     In the ordinary course of their businesses, the Debtors maintain Customer Programs designed to increase business, meet competitive pressures, and build key customer

relationships.  I believe that the viability and success of the Debtors' businesses depends on fostering the loyalty of their various customers.

134.    The Debtors' customers include major oil companies, foreign national oil companies, and independent oil and natural gas companies.  The Debtors implement the Customer Programs to encourage their customers to increase the frequency and extent to which they retain the Debtors' services, resulting in larger net revenues for the Debtors.  The Debtors seek to continue the Customer Programs because they involve minimal cash outlay, have produced positive results in the past, and are responsible for generating valuable goodwill, repeat business and increased revenue.

135.    In the ordinary course of business, KES provides limited warranties (the "Warranty Program") to certain customers pursuant to Master Services Agreements (the "MSAs") between KES and such customers.  KES is a party to approximately 5,850 active MSAs, and has performed services under approximately 840 of those MSAs in the past six months.  The overwhelming majority of MSAs contain identical terms.  Each MSA, however, is subject to negotiation on a customer-by-customer basis.

136.    Under the Warranty Program, KES agrees to maintain certain standards with respect to the quality and specifications of its tools and equipment, services, and workmanship. Although there are slight variations to the warranty provisions in each MSA, in general, in the event KES's performance does not meet the required standard, it agrees to replace the defective work product or re-perform such work at no additional cost to the customer.  Alternatively, under some of the MSAs, KES must refund or credit the customer for the cost of the defective work. Further, in some instances, KES warrants and guarantees to repair or replace, at its sole cost and

expense, any of the customer's materials and equipment which have been damaged or destroyed as a result of KES's work.

137.    If KES fails to perform the remedial action within a reasonable time, the MSAs generally provide that the customer has the right to remedy the defect itself—and KES could be responsible for reasonable costs incurred by the customer.  The duration of KES's liabilities for the warranties vary from contract to contract, ranging between thirty days from the customer's acceptance of the completed services up to twelve months or longer.

138.    Under the Warranty Program, further details of which are set forth in the Customer Programs Motion, credits provided by KES to customers for defective work can take various forms including, but not limited to, (i) billing future work at a reduced rate, (ii) charging for less than the actual number of hours worked, (iii) reclassifying the type of services or equipment used to a less-costly category, and (iv) crediting a portion of the customer's payment toward future services.

139.    I believe that, as of the Petition Date, the total amount of credits owed on account of prepetition work under the Warranty Program is approximately $3 million.  Although I believe these credits are all that are owed under the Warranty Program as of the Petition Date, because of the nature of warranty claims, it is possible that additional credits are owed.  I believe that the ability to continue to honor these obligations—which generally do not require a cash outlay—is critical to the satisfaction of the Debtors' customers and the maintenance of customer relationships.

140.    KES also provides certain of its customers with discounts and other incentives that are tied to the volume of services purchased (the "Volume Incentives Program").  The Volume Incentives Program is offered in an effort to build and maintain relationships with new

customers.  Under the Volume Incentives Programs, in exchange for using KES's services at a certain threshold, customers are offered certain discounts that may be applied toward future services.  For example, when one particular customer spends over a certain threshold in a quarter, that customer is entitled to a discount on amounts spent over the threshold; one other customer receives varying rig rate discounts based on the number of the Debtors' rigs that are used.  Only these two customers currently participate in the Volume Incentives Program and, because of the slowdown in the industry, only one of these customers is currently operating at the thresholds required for earning discounts.

141.    The Debtors believe that KES's ability to continue to honor its obligations under the Customer Programs—which also generally do not require an affirmative cash outlay—is essential to the Debtors' ability to grow their customer base and market share and is critical to future sales growth.  The Debtors believe, and I agree, that the cost of maintaining the Customer Programs and honoring the Prepetition Customer Obligations will be more than offset by the revenue generated if the Customer Programs remain in place.

142.    Further, I believe that continuing the Customer Programs without interruption and honoring the Prepetition Customer Obligations is critical to the Debtors' reorganization efforts.  I believe that the grant of the relief requested in the Customer Programs Motion will facilitate a smooth transition into chapter 11 and advance the restructuring of the Debtors' businesses, both in terms of profitability and the engendering of goodwill with essential customers, especially at this critical time early in the Chapter 11 Cases.

**I.** ***Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing Debtors To Pay Certain Prepetition Claims Of Trade Creditors, (II) Authorizing Applicable Banks And Other Financial Institutions To Honor And Process Related Checks And Transfers, And (III) Granting Related Relief* (the "<u>Pay Trade Motion</u>")**

143. In the ordinary course of business, the Debtors obtain goods and services from numerous creditors that support the Debtors' operations ("<u>Trade Creditors</u>").  These Trade Creditors provide, among other things, fuel and oilfield disposal services, coil and steel tubing, maintenance and repair services, fuel, tires, supplies, fabrication, welding, equipment, and mechanical work, as well as goods and services in support of the Debtors' corporate and administrative functions including financial and legal services and employee purchase cards.  I believe that the goods and services provided by Trade Creditors are necessary for the continued operation of the Debtors' businesses.

144. In exchange for the Trade Creditors' provision of such goods and services, the Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors.  The Debtors have paid $18 million per month on average to Trade Creditors since January 2016, which has declined to $13 million per month on average to those creditors in the last four months.  The Debtors estimate that, as of the Petition Date, they owe a total of approximately $13.4 million on account of undisputed allowed prepetition claims of the Trade Creditors ( "<u>Trade Claims</u>").

145. The types of Trade Claims held by the Trade Creditors can be broken down into four categories: (i) providers of support services for corporate and administrative functions, including professional/legal fees, rent, employee purchase cards and corporate G&A, as well as corporate overhead costs associated with facilities and utilities; (ii) suppliers, service providers and other vendors utilized in connection with Debtors' business operations including repairs and maintenance, equipment rentals, coiled tubing, disposal costs and other equipment and supplies;

(iii) providers of supplies and repairs/maintenance for entire fleet operations and logistics such as fuel, tires, supplies, and providers of similar services; and (iv) potential lienholders, which include saltwater disposal well service suppliers for the provision of fabrication, welding, mechanic and repair work and royalty payment recipients for land owners and certain oilfield servicing companies operating on Native American reservations.

146.     The Debtors are seeking to pay the Trade Claims as they become due and payable in the ordinary course of the Debtors' businesses.  Cash maintained by the Debtors and the cash generated in the ordinary course of their businesses will provide ample liquidity for payment of the Trade Claims, as well as for the Debtors to conduct operations during the Chapter 11 Cases. The Debtors further propose that all payments made under the Pay Trade Motion be subject to certain conditions, including that by accepting any such payment, a Trade Creditor will be deemed to have agreed to continue providing goods and/or services to the Debtors on at least Customary Terms (as defined in the Pay Trade Motion), unless the parties agree to different terms and conditions.  If a Trade Creditor that accepts such payment(s) fails to comply with the payment conditions, the Debtors will be authorized to exercise certain remedies, including recovery of any amounts paid to such a Trade Creditor as voidable postpetition transfers or application of such payment(s) to any postpetition amounts owing to such a Trade Creditor.

147.     I believe it is a sound exercise of the Debtors' business judgment to pay the Trade Claims in the ordinary course of business in order to avoid value destroying business interruption.  I believe that failure to pay the Trade Claims as they become due is likely to result in the Trade Creditors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms.  Indeed, where a Trade Creditor may itself be facing financial hardship, I believe that the

Debtors' failure to pay Trade Claims may leave such Trade Creditor with little choice but to stop work for, and deliveries to, the Debtors.  Further, I believe that replacement vendors and the search for such vendors, even to the extent available, would likely result in substantially higher costs for the Debtors and/or subject the Debtors to risk of operational shutdowns and noncompliance with state regulations.

148.    I do not believe that the Debtors can rely on bringing motions to compel Trade Creditors to address potential holdups as their primary means of ensuring an uninterrupted supply of goods and services.  A disruption may occur before the Debtors would be able to successfully bring an action in the Court to compel performance or otherwise enforce the automatic stay.  In addition, the Debtors interact with the Trade Creditors pursuant to a variety of arrangements, including many arrangements that are not executory in nature.  The counterparty of such an arrangement may decide not to continue to do business with the Debtors unless paid on account of prepetition amounts due from the Debtors, and would be under no obligation to do so.

149.    The relief set forth in the Pay Trade Motion – that the Debtors be able to pay such creditors in the ordinary course of business – was specifically negotiated and agreed to in the binding term sheets attached to the Plan Support Agreement.  In other words, the only creditors that are being disadvantaged economically pursuant to the Plan and in the Chapter 11 Cases have negotiated for this relief in order to preserve the Debtors' businesses.

150.    Any disruption to the Debtors' supply chain and receipt of necessary goods and services could negatively impact their performance of rig-based and other services.  Any such negative operational impact would likely harm their business by damaging the Debtors' market reputation and possibly leading to termination of customer relationships.  Accordingly, it is

critical that the Debtors maintain positive relationships with their Trade Creditors throughout the course of these Chapter 11 Cases.  It is also critical that the Debtors obtain the relief envisioned under the Plan Support Agreement and in the Plan. The Debtors and the Supporting Creditors negotiated the terms of the Plan with the goal in mind of preserving the legal, equitable, and contractual rights of holders of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims (each as defined in the Plan), and paying such Claims in full, or otherwise leaving them unimpaired.

151.    Because the Trade Claims are unimpaired under the Plan and will be paid in full upon the effective date of the Plan, the relief requested in the Pay Trade Motion seeks to alter only the timing, not the amount or priority, of such payments.

152.    Further, I am advised that certain of the Trade Claims are administrative expense priority claims pursuant to section 503(b)(9) of the Bankruptcy Code and must be paid in full to confirm a plan of reorganization.  Instead of paying such claims after confirmation of the Plan, the Debtors seek to pay such Trade Claims during the pendency of the Chapter 11 Cases as and when due.  I believe that this relief is in the best interest of the Debtors' estates and will prevent detrimental changes to trade terms or a refusal to do business altogether, and as such, preserve the Debtors' liquidity and operations.

153.    Finally, certain of the Trade Claims are held by (i) service suppliers for saltwater disposal wells owned by the Debtors and (ii) landowners and other entities that are entitled to prepetition royalty payments from the Debtors.  These Trade Creditors may assert liens in the future, or liens may have arisen in favor of these Trade Creditors against certain of the Debtors' assets under certain state and federal laws.  Under the Plan, Creditors holding Other Secured Claims are unimpaired.  Moreover, I am advised that under Bankruptcy Code section 363(e),

certain Trade Creditors with liens may be entitled to adequate protection of their liens, the enforcement of which may impose additional costs on the Debtors' estates.  Considering that both General Unsecured Claims and Other Secured Claims will be unimpaired under the Plan, to avoid any unnecessary costs to the Debtors' estates, and for reasons previously stated regarding avoiding disruption to the Debtors' operations, the Debtors' payment of the Trade Claims supported by liens is an exercise of the Debtors' sound business judgment.

**J.** ***Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Continue Their Surety Bond Program And Pay All Obligations In Respect Thereof, (II) Authorizing Applicable Banks And Other Financial Institutions To Honor And Process Related Checks And Transfers, And (III) Granting Related Relief* (the "Surety Bond Motion")**

154.    In the ordinary course of business, the Debtors are required to provide Surety Bonds to certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations (the "Surety Bond Program").  These obligations include, among others, environmental, road damage, lease, licensing and permitting, and contractor obligations.

155.    Statutes or ordinances often require the Debtors to post Surety Bonds to secure these obligations.  I believe that failing to provide, maintain, or timely replace the Surety Bonds will prevent the Debtors from undertaking essential functions related to their services.  A schedule of the Surety Bonds currently maintained by the Debtors is attached as Exhibit C to the Surety Bond Motion.

156.    The outstanding Surety Bonds were issued by Hartford Fire Insurance Company, International Fidelity Insurance Company, and Lexon Insurance Company (collectively, the "Sureties").  The premiums for the Surety Bonds generally are determined on an annual basis and are paid by the Debtors when the bonds are issued and annually upon renewal.

157.     As of the Petition Date, the Debtors have approximately forty-three (43) outstanding Surety Bonds, which renew at various times throughout the year.  KES is the principal on each of the Surety Bonds, which guarantee only the performance of KES.  The aggregate sum of the Surety Bonds is approximately $7.6 million.  For Surety Bonds currently outstanding, the Debtors have paid premiums totaling approximately $170,000.  As of the Petition Date, the Debtors believe they are current on all Surety Bond Obligations owed to Sureties.

158.     KES has provided Lexon Insurance Company with a letter of credit issued by Bank of America, N.A. as collateral for certain of the Surety Bonds.  The amount of available credit under the Lexon letter of credit is $244,000 (as of July 26, 2016).  Absent an extension, which KES intends to seek following emergence from these Chapter 11 Cases, the Lexon letter of credit expires on February 10, 2017.  In addition to Lexon Insurance Company, additional beneficiaries of the Letter of Credit are Lexon-affiliates Bond Safeguard Insurance Company, Boston Indemnity Group, and Ironshore Specialty Insurance.

159.     While the Surety Bonds shift the risk of the Debtors' non-payment or nonperformance from the obligee to the Sureties, a surety bond is not an insurance policy.  Rather, if a Surety incurs a loss on a Surety Bond as a result of the Debtors' underlying liability, the Surety is entitled to recover the full amount of the loss from the Debtors.  To maintain the Surety Bond Program, the Debtors have executed indemnity agreements in favor of two of the Debtors' Sureties (collectively, the "Indemnity Agreements"), pursuant to which each of the Debtors agree to indemnify the relevant Surety if it is required to pay or perform under any of the Surety Bonds.  In addition, among other terms, the Indemnity Agreements generally require that

the Debtors, at the request of the Surety, pay to the Surety the amount of any loss reserves or post cash or other acceptable collateral to protect the Surety against actual or anticipated losses.

160.    For the Debtors to continue their business operations during this reorganization process, I believe that they must be able to provide financial assurances to state governments, regulatory agencies, and other third parties.  This, in turn, requires the Debtors to maintain the existing Surety Bond Program, including paying bond premiums as they come due, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of business, and executing other agreements, as needed, in connection with the Surety Bond Program.  In addition, I am informed that the Sureties may require that the Debtors furnish cash or other collateral as a condition to the renewal of existing Surety Bonds or the issuance of new ones.

161.    I further believe that continuing the Surety Bond Program is necessary to maintaining the Debtors' existing relationships with the Sureties.  Based on the Debtors' current circumstances, I do not believe it is likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties.  The process of establishing a new Surety Bond Program, moreover, would be burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the Surety Bonds in time to avoid defaults or other consequences of the applicable obligations.

### III.     Motions Related to the Restructuring

**A.      *Debtors' Motion For Entry Of An Order (I) Scheduling Combined Hearing On (A) Adequacy Of Disclosure Statement, (B) Confirmation Of Prepackaged Plan Of Reorganization, And (C) The Assumption Of Executory Contracts And Cure Costs; (II) Fixing Deadlines To Object To Disclosure Statement, Prepackaged Plan, And Proposed Assumption Or Rejection Of Executory Contracts And Cure Costs; (III) Approving (A) Prepetition Solicitation Procedures, (B) Form And Manner Of Notice Of Commencement, Combined Hearing, Assumption Of Executory Contracts And Cure Costs Related Thereto, And Objection Deadlines, And (C) Form And Manner Of Notice Of Equity Holder Election Forms; (IV) Conditionally (A) Directing The United States Trustee Not To Convene Section 341(A) Meeting Of Creditors And (B) Waiving Requirement Of Filing Statements Of Financial Affairs And Schedules Of Assets And Liabilities; And (V) Granting Related Relief (the "Confirmation Scheduling Motion")***

162.     To capitalize on the efficiencies of the prepackaged plan process and minimize both the administrative costs and potential operational impact of the Chapter 11 Cases, the Debtors are pursuing an expedited plan confirmation process.  To that end, the Debtors are filing the Confirmation Scheduling Motion, requesting that the Court approve and/or schedule certain confirmation-related dates and deadlines on the following timeline:

| Proposed Timetable | |
| --- | --- |
| Voting Record Date | September 16, 2016 |
| Commencement of Solicitation | September 21, 2016 |
| Voting Deadline | October 20, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Plan Supplement Filing Date | November 21, 2016 |
| Proposed Plan/Disclosure Statement Objection Deadline | November 23, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Proposed Executory Contract Objection Deadline | November 29, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Proposed Plan/Disclosure Statement Reply Deadline | December 2, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Proposed Equity Holder Election Deadline | December 2, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Proposed Combined Hearing Date | December 6, 2016, at _:00 a/p.m. (Prevailing Eastern Time) |

163.     In addition to proposing the foregoing timeline of events, the Confirmation Scheduling Motion seeks approval of (i) the prepetition Solicitation Procedures utilized by the

Debtors in respect of their Plan, (ii) the form and manner of a combined notice of the commencement of the Chapter 11 Cases and the Combined Hearing to consider the adequacy of the disclosure statement, confirmation of the Plan, and the proposed assumption or rejection of executory contracts and cure costs, and (iv) the form and manner of notice of the Equity Holder Election Forms (through which holders of Existing Key Common Stock may elect, subject to the availability of funds, to receive cash in lieu of some or all of the Equity Holder Plan Securities they would otherwise receive under the Plan).  The Confirmation Scheduling Motion also requests Court authorization for the Debtors to file replies to any timely-filed objections or responses to the proposed assumption or rejection of Executory Contracts and Unexpired Leases or Cure Costs related thereto at any time prior to the Combined Hearing.  Finally, the Confirmation Scheduling Motion requests that the Court conditionally (i) direct the U.S. Trustee not to convene a meeting of creditors pursuant to section 341(a) and (ii) waive the requirement that the Debtors file Schedules and SOFAs, in each case until December 23, 2016.

164.    I believe that the proposed schedule of confirmation-related dates is fair to all parties in interest and is consistent with the Debtors' need to comply with the Restructuring Timeline set forth in the Plan Support Agreement.  Such compliance, in turn, is critical to the Restructuring, as the Plan Support Agreement provides a right of termination in favor of the Required Consenting Noteholders and the Required Consenting Term Loan Lenders if the deadlines within the Restructuring Timeline are not satisfied.  Similarly, the requested conditional waivers and the request for approval, on a first-day basis, of the Solicitation Procedures, the Combined Notice, and the Equity Holder Election Form will permit the Debtors to proceed expeditiously toward confirmation without unnecessary delays or distractions.

**B.**      ***Debtors' Motion For Entry Of Order (I) Approving Debtors' Assumption of Plan Support Agreement, And (II) Granting Related Relief* (the "<u>PSA Assumption Motion</u>")**

165.     Pursuant to the PSA Assumption Motion, the Debtors seek entry of an order authorizing the Debtors to assume the Plan Support Agreement.  The Plan Support Agreement requires that the Supporting Creditors continue to support the Plan and the restructuring embodied therein.  Assumption of the Plan Support Agreement is required pursuant to its terms, and will ensure that the agreement continues to be valid and binding on all parties thereto, that the Debtors will continue to receive the benefits negotiated for therein and that the Plan process stays on track through the consummation of the Plan.

166.     I believe that the Debtors entered into the Plan Support Agreement in exercise of their prudent business judgment, and that the Debtors' assumption of the Plan Support Agreement is a further sound exercise of such prudent business judgment and in the best interest of the Debtors and the Debtors' estates.   The Plan Support Agreement is the product of extensive, good-faith and arm's length discussions and negotiations among the Debtors and came only after months of careful consideration by the Debtors' management and board of directors, and after consultation with their legal and financial advisors in these cases.  I believe that the Plan Support Agreement makes the consensual restructuring now before the Court possible, and if confirmed and consummated pursuant to the Restructuring Timeline, the Plan will allow the Debtors to reduce a significant portion of their funded indebtedness in an efficient and expedited manner while limiting any potential bankruptcy-related drag on their businesses.  Assumption of the Plan Support Agreement will further ensure the support of the Supporting Creditors through the Effective Date of the Plan, subject to the terms and conditions contained therein, and if the Plan Support Agreement is not assumed pursuant to its terms, each of the Required Consenting Noteholders and the Required Consenting Term Lenders will be able to terminate the Plan

Support Agreement, and the Backstop Parties will be able to terminate and walk away from the Backstop Agreement, which in combination would effectively terminate the Plan.

167.     I believe that many of the benefits of the Plan Support Agreement are already evidenced in these Chapter 11 Cases.  The Debtors have solicited acceptances on the Plan and conducted the Rights Offering that will raise at least $85 million to fund the Plan and provide additional liquidity for the future operations of Reorganized Key.  Based on the acceptance of the Plan by the only two impaired voting classes under the Plan, the Debtors filed these Chapter 11 Cases and have filed multiple pleadings, including the PSA Assumption Motion and the Confirmation Scheduling Motion described above, all pursuant to the terms of the Plan Support Agreement.  In other words, the Chapter 11 Cases continue to be influenced and governed by the terms of the Plan Support Agreement, and therefore I believe that the Debtors' assumption of the Plan Support Agreement is critical to the success of the Chapter 11 Cases.

168.     Importantly, the Debtors' obligations under the Plan Support Agreement remain subject to their fiduciary duties as debtors and debtors in possession, and to the extent any Superior Alternative Transactions (as defined in the Plan Support Agreement) are presented to the Debtors, they would be permitted to pursue any such proposals.  I believe that these critical terms of the Plan Support Agreement are further evidence of the Debtors' careful negotiation of the agreement, and underscore the sound business judgment employed by the Debtors in entering into the Plan Support Agreement.

169.     The Plan Support Agreement also calls for payment of the reasonable and documented fees and expenses of the Supporting Creditors, which I am informed is typical in plan or restructuring support agreements of this type.  Although this will add incremental expense obligations to the Debtors' estates, the Debtors believe – in the exercise of their sound

business judgment – and I believe, that the value of the Plan Support Agreement far outweighs this increased burden, which was a carefully-negotiated term required by the Supporting Creditors in exchange for their entry into the Plan Support Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated:  October 24, 2016                    Respectfully submitted,
Houston, Texas

  /s/ J. Marshall Dodson
J. Marshall Dodson