**<u>Exhibit A</u>**

**Amended and Restated Certificate of Incorporation of
Reorganized Key Energy Services, Inc.**

**CERTIFICATE OF INCORPORATION**

**OF**

**KEY ENERGY SERVICES, INC.**

It is hereby certified that:

1:   The name of the corporation (hereinafter called the "Corporation") is Key Energy Services, Inc.

2:   The Articles of Conversion of the Corporation were filed with the Department of Assessments and Taxation of the State of Maryland on [•] and the Certificate of Conversion of the Corporation was filed with the Secretary of State of the State of Delaware on [•].

3:   The original Articles of Incorporation of the Corporation were filed with the State Department of Assessments and Taxation of the State of Maryland on April 22, 1977.

4:   The provision for making this Certificate of Incorporation is contained in the Joint Prepackaged Plan of Reorganization of Key Energy Services, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), as filed with the United States Bankruptcy Court for the District of Delaware on October 24, 2016, the [Findings of Fact, Conclusions of Law and Order Confirming] the Plan, as entered by the United States Bankruptcy Court for the District of Delaware on December [•], 2016, and the Plan having become effective on [•] (the "Effective Date").

5:   Pursuant to the General Corporation Law of the State of Delaware (as from time to time amended, the "DGCL"), the Certificate of Incorporation of the Corporation hereby reads as follows:

SECTION 1. The name of the Corporation is Key Energy Services, Inc.

SECTION 2. The address of the Corporation's registered office in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Corporation Trust Center, Wilmington, Delaware 19801.  The name of its registered agent at such address is The Corporation Trust Company.

SECTION 3. The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

SECTION 4. The total number of shares of all classes of stock which the Corporation shall have authority to issue is 110,000,000 shares, of which 100,000,000 shares of the par value of $0.01 per share shall be designated as shares of Common Stock ("Common Stock") and 10,000,000 shares of the par value of $0.01 per share shall be designated as shares of Preferred Stock ("Preferred Stock").  The Corporation shall not issue any non-voting equity securities.

Shares of Preferred Stock may be issued in one or more series from time to time by the board of directors, and the board of directors is expressly authorized to fix by resolution or resolutions the designations and the powers, preferences and rights, and the qualifications, limitations and restrictions thereof, of the shares of each series of Preferred Stock, including without limitation the following:

(a)  the distinctive serial designation of such series which shall distinguish it from other series;

(b)  the number of shares included in such series;

(c)  the dividend rate (or method of determining such rate) payable to the holders of the shares of such series, any conditions upon which such dividends shall be paid and the date or dates upon which such dividends shall be payable;

(d)  whether dividends on the shares of such series shall be cumulative and, in the case of shares of any series having cumulative dividend rights, the date or dates or method of determining the date or dates from which dividends on the shares of such series shall be cumulative;

(e)  the amount or amounts which shall be payable out of the assets of the Corporation to the holders of the shares of such series upon voluntary or involuntary liquidation, dissolution or winding up the Corporation, and the relative rights of priority, if any, of payment of the shares of such series;

(f)  the price or prices at which, the period or periods within which and the terms and conditions upon which the shares of such series may be redeemed, in whole

-2-

LA_LAN01:302645.11
218433198

or in part, at the option of the Corporation or at the option of the holder or holders thereof or upon the happening of a specified event or events;

(g) the obligation, if any, of the Corporation to purchase or redeem shares of such series pursuant to a sinking fund or otherwise and the price or prices at which, the period or periods within which and the terms and conditions upon which the shares of such series shall be redeemed or purchased, in whole or in part, pursuant to such obligation;

(h) whether or not the shares of such series shall be convertible or exchangeable, at any time or times at the option of the holder or holders thereof or at the option of the Corporation or upon the happening of a specified event or events, into shares of any other class or classes or any other series of the same or any other class or classes of stock of the Corporation, and the price or prices or rate or rates of exchange or conversion and any adjustments applicable thereto;

(i) whether or not the holders of the shares of such series shall have voting rights, in addition to the voting rights provided by law, and if so the terms of such voting rights; and

(j) any other powers, preferences and rights and qualifications, limitations and restrictions not inconsistent with the DGCL.

Unless otherwise provided in the certificate of designations or the resolution or resolutions of the board of directors or a duly authorized committee thereof establishing the terms of a series of Preferred Stock, no holder of any share of Preferred Stock shall be entitled as of right to vote on any amendment or alteration of the Certificate of Incorporation to authorize or create, or increase the authorized amount of, any other class or series of Preferred Stock or any alteration, amendment or repeal of any provision of any other series of Preferred Stock.

Except as otherwise required by the DGCL or provided in the resolution or resolutions of the board of directors or a duly authorized committee thereof or other document establishing the terms of a series of Preferred Stock (including this Certificate of

-3-

Incorporation or any certificate of designation relating to any series of Preferred Stock), no holder of Common Stock, as such, shall be entitled to vote on any amendment or alteration of the Certificate of Incorporation that alters, amends or changes the powers, preferences, rights or other terms of one or more outstanding series of Preferred Stock.

Subject to the rights of the holders of any series of Preferred Stock, the number of authorized shares of any class or series of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the outstanding shares of such class or series, voting together as a single class, irrespective of the provisions of Section 242(b)(2) of the DGCL or any corresponding provision hereafter enacted, and no vote of the holders of any of the Common Stock or the Preferred Stock voting separately as a class shall be required therefor, unless a vote of any such holder is required pursuant to this Certificate of Incorporation (including any certificate of designation relating to any series of Preferred Stock).

SECTION 5. The Corporation hereby authorizes and designates a series of Preferred Stock, which shall have the voting powers and other rights, and qualifications, limitations and restrictions thereof, as follows:

(a) Designation. The distinctive serial designation of such series is "Series A Preferred Stock" (the "Series A Preferred Stock").

(b) Number of Shares. The number of shares of Series A Preferred Stock shall be one. If such share of Series A Preferred Stock is redeemed or otherwise acquired by the Corporation, it shall be cancelled and revert to authorized but unissued shares of Preferred Stock undesignated as to series.

(c) Dividends. Series A Preferred Stock shall not accrue any dividends.

(d) Redemption. Series A Preferred Stock shall be redeemed and cancelled automatically at no cost without any action by the Corporation upon the earliest to occur of any of the following:

-4-

(i)      Platinum (as defined below) beneficially owns less than any of the following: (i) [91.578]% of the number of shares of Common Stock of the Corporation that were held by Platinum on the Effective Date (it being understood that such number was [_____] shares), solely as a result of Platinum selling such shares, (ii) [42.5]% of the issued and outstanding shares of Common Stock (excluding shares issued pursuant to the 2016 Equity and Cash Incentive Plan adopted by the Corporation on [_____]) at any time, provided that such percentage shall be adjusted downward to no less than 40% to the extent the Corporation issues shares of Common Stock for the purpose of satisfying the market capitalization requirements of the New York Stock Exchange (the "NYSE") or NASDAQ Global Select Market ("NASDAQ") in order to obtain a listing thereon, or (iii) 40.0% of the issued and outstanding shares of Common Stock at any time;

(ii)      the second anniversary of the Effective Date, if the Common Stock of the Corporation has not been Listed prior thereto; or

(iii)      there occurs any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, including a sale of all or substantially all of the assets of the Corporation.

"Control", when used with respect to any specified Person, means the power to direct or cause the direction of the management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and "Controlled" has a correlative meaning.

"Controlled Affiliate" means an affiliate (as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended) Controlled, directly or indirectly, by Platinum.

"Listed" means registered under Section 12(b) of the Securities Exchange Act of 1934, as amended, and listed on either the NYSE or the NASDAQ.

-5-

LA_LAN01:302645.11
218433198

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

"Platinum" means Platinum Equity Advisors, LLC and its Controlled Affiliates, managed funds and/or accounts.

(e) Voting Rights.

(i)   Following the Initial Board Term (as defined below), the holder of the share of Series A Preferred Stock, voting as a separate class, shall be entitled to nominate and elect between five (5) and seven (7) directors, as provided in Section 2.3(a) of the by-laws of the Corporation (as in effect from time to time, the "By-laws"), at each meeting or for purposes of each consent of the Corporation's stockholders for the election of directors.

(ii)   The Corporation shall not amend or repeal any provision of this Certificate of Incorporation so as to adversely affect the rights, preferences or privileges of the Series A Preferred Stock without the written consent or affirmative vote of the holder of the share of Series A Preferred Stock.

(f) Economic Rights; Liquidation Preference.  The Series A Preferred Stock shall not be entitled to any economic rights in the Corporation and shall not be entitled to any liquidation preference or to participate in any dividends paid by the Corporation.

(g) Transfers.  Series A Preferred Stock may not be sold, transferred, assigned or otherwise disposed of except to a Person set forth in the definition of "Platinum". Any attempted sale, transfer, assignment or other disposition in violation of this provision shall be void.

-6-

SECTION 6. The name and mailing address of the incorporator is James L. Wigginton, 1888 Century Park East, Los Angeles, California 90067.  The powers of the incorporator shall terminate upon the filing of this Certificate of Incorporation.

SECTION 7. The persons serving as the initial directors of the Corporation (the "Initial Directors"), their position and the party designating such Initial Director are as set forth below:

| Name | Position | Designation | Designating Party | Initial Number of Votes |
|---|---|---|---|---|
| Robert Drummond | CEO Director | Designated Platinum Director | Platinum | 1 |
| Jacob Kotzubei | Super Voting Director | Designated Platinum Director | Platinum | 2 |
| Philip Norment | Super Voting Director | Designated Platinum Director | Platinum | 2 |
| [Mary Ann Sigler] | Super Voting Director | Designated Platinum Director | Platinum | 2 |
| [Bryan Kelln] | Director | Designated Platinum Director | Platinum | 1 |
| [•] | Director | Designated Other Director | Other Backstop Parties | 1 |
| [•] | Director | Designated Other Director | Other Backstop Parties | 1 |
| [•] | Independent Director | NA | Platinum | 1 |
| [•] | Independent Director | NA | Other Backstop Parties | 1 |
| [•] | Independent Director | NA | Mutually Agreed by Platinum and the Other Backstop Parties | 1 |

"Other Backstop Parties" means the parties (other than Platinum and the Corporation) to the Backstop Commitment Agreement, dated September 21, 2016.

The mailing address of the Initial Directors is c/o Key Energy Services, Inc., 1301 McKinney, Suite 1800, Houston, Texas 77010.

SECTION 8. The Initial Directors shall serve a term commencing on the Effective Date and concluding upon the election and qualification of such Initial Directors' successors at the first annual meeting of stockholders occurring not earlier than the second

-7-

anniversary of the Effective Date to be held in accordance with Section 1.1 of the By-laws (the "Initial Board Term").

SECTION 9. Stockholders of the Corporation are not permitted to call a special meeting or to require that the Board call a special meeting of stockholders.

SECTION 10.

(a)    At each meeting of the board of directors or any committee thereof, on each matter submitted to the board of directors or such committee, except as provided in Section 10(b), Section 10(c) or Section 10(d) of this Certificate of Incorporation, (i) during the Initial Board Term until the Series A Preferred Stock is no longer outstanding, three (3) of the directors designated by Platinum as the holder of the Series A Preferred Stock may be designated by it as Super Voting Directors, and (ii) following the Initial Board Term until the Series A Preferred Stock is no longer outstanding, two (2) of the directors designated by Platinum as the holder of Series A Preferred Stock may be designated by it as Super Voting Directors.  "Super Voting Director" shall mean a director who has two (2) votes, rather than one (1) vote.

(b)    Notwithstanding Section 10(a) of this Certificate of Incorporation, so long as the Series A Preferred Stock is outstanding and has not been redeemed pursuant to Section 5(d) of this Certificate of Incorporation, at the election of the holder of the Series A Preferred Stock, the Board size may be increased by up to a number of additional directors equal to the number of Platinum Directors (as defined in the By-laws) that may then be designated as Super Voting Directors by the holder of the Series A Preferred Stock pursuant to Section 10(a) of this Certificate of Incorporation, with such resulting vacancies filled by the holder of the Series A Preferred Stock.  Each additional Platinum Director filling such vacancies shall serve until the expiration of the then-current term of the other directors, or until his or her earlier resignation or removal.  Each additional Platinum Director appointed pursuant to this Section 10(b) shall have one (1) vote, and for each additional Platinum Director appointed pursuant to this Section 10(b), the voting power of one (1) Super Voting Director (designated by the holder of the Series A Preferred Stock) shall

-8-

decrease to one (1) vote.  Concurrently with the appointment of any such additional Platinum Director pursuant to this Section 10(b), and as a condition to such additional Platinum Director being qualified and taking office as a director, the holder of the Series A Preferred Stock shall irrevocably designate which Super Voting Director will cease to be a Super Voting Director and instead have one (1) vote.

(c)     Notwithstanding Section 10(a) of this Certificate of Incorporation, during the Initial Board Term, if there is no CEO Director (as defined in the By-laws) for any reason, including due to a removal, the Board size shall decrease by one (1) director and until a CEO Director is appointed to the Board, the voting power of one (1) of the Super Voting Directors (as promptly designated by the holder of the Series A Preferred Stock, or if the holder of the Series A Preferred Stock fails to promptly designate, the Super Voting Director designated by the Designated Other Directors or their successors) shall decrease to one (1) vote; provided, however, that if there is no Super Voting Director at such time pursuant to Section 10(b), the Board size shall further decrease by one (1) director, and accordingly one (1) Platinum Director who is not an Independent Director (as designated by the holder of the Series A Preferred Stock, or if the holder of the Series A Preferred Stock fails to promptly designate, the Platinum Director designated by the Designated Other Directors or their successors) will resign from the Board.  In the event that any such Platinum Director fails to resign as required by the immediately preceding sentence, the voting power of such additional Platinum Director shall decrease to zero (0) votes.

(d)     Notwithstanding Section 10(a) of this Certificate of Incorporation, after the Initial Board Term, effective upon the automatic redemption and cancellation of the Series A Preferred Stock pursuant to Section 5(d)(i), 5(d)(ii) or 5(d)(iii) of this Certificate of Incorporation, the voting power of the Super Voting Directors shall decrease to one (1) vote each and any additional Platinum Directors previously appointed by the holder of the Series A Preferred Stock pursuant to Section 10(b) shall immediately resign from the Board, with such resignation to be effective immediately.  In the event that any such Platinum Director fails to resign as

-9-

required by the immediately preceding sentence, the voting power of each such additional Platinum Director shall decrease to zero (0) votes.

SECTION 11.

(a)    Except as set forth in Section 4.1(b)(iv)(7) of the By-laws or this Section 11, the board of directors shall have power without the consent or vote of the stockholders to alter, amend, or repeal the By-laws of the Corporation.

(b)    Until the later of the end of the Initial Board Term and the time the Common Stock is Listed, in addition to any other vote required by applicable law, this Certificate of Incorporation or the By-laws, (i) Section 5, Section 8, Section 10 and this Section 11 of this Certificate of Incorporation may not be amended, including by merger, consolidation or otherwise (except pursuant to the terms of a Permitted Transaction (as defined in the By-laws)), (ii) Section 1.11, Sections 2.1-2.9, Section 2.12, Article III and  Article IV of the By-laws may not be amended, including by merger, consolidation or otherwise (except pursuant to the terms of a Permitted Transaction (as defined in the By-laws)), and (iii) neither this Certificate of Incorporation nor the By-laws may be amended, including by merger, consolidation or otherwise (except pursuant to the terms of a Permitted Transaction (as defined in the By-laws)), to include any provision inconsistent with the sections referred to in clause (i) or (ii), in the case of each of clause (i), (ii) and (iii), to the extent such amendment would be (x) disproportionately favorable to Platinum, its rights under such sections or the rights of any Platinum Director or (y) adverse in any way to the stockholders of the Corporation other than Platinum (the "Non-Platinum Holders"), their rights under such sections or the rights of any directors (or their successors) initially designated by the Other Backstop Parties, without the affirmative vote of a majority of all outstanding shares of Common Stock held by the Non-Platinum Holders.

(c)    From and after the later of the end of the Initial Board Term and the date the Common Stock is Listed, and until the first annual meeting of stockholders to occur after Platinum beneficially owns less than [___]% of the issued and outstanding

-10-

shares of Common Stock, in addition to any other vote required by applicable law, this Certificate of Incorporation or the By-laws, (i) Section 5, Section 8, Section 10 and this Section 11 of this Certificate of Incorporation may not be amended, including by merger, consolidation or otherwise (except pursuant to the terms of a Permitted Transaction (as defined in the Bylaws)), (ii) Sections 2.1-2.9 and Section 2.12, Section 4.1(a), Section 4.1(b)(i)-(iii), Section 4.2, and Section 4.3 of the By-laws may not be amended, including by merger, consolidation or otherwise (except pursuant to the terms of a Permitted Transaction (as defined in the Bylaws)), and (iii) neither this Certificate of Incorporation nor the By-laws may be amended, including by merger, consolidation or otherwise (except pursuant to the terms of a Permitted Transaction (as defined in the Bylaws)), to include any provision inconsistent with the sections referred to in clause (i) or (ii), in the case of each of clause (i), (ii) and (iii), to the extent such amendment would be (x) disproportionately favorable to Platinum, its rights under such sections or the rights of any Platinum Director or (y) adverse in any way to the Non-Platinum Holders, their rights under such sections or the rights of any directors (or their successors) initially designated by the Other Backstop Parties, without the affirmative vote of a majority of all outstanding shares of Common Stock held by the Non-Platinum Holders; provided, however, that any such amendment to the By-laws will not require such vote of the Non-Platinum Holders if such amendment is approved by a Supermajority of the Board.

SECTION 12. The Corporation shall indemnify each director to the fullest extent permitted by Delaware law (as it presently exists or may hereafter be amended but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior to such amendment). Expenses reasonably incurred by a director in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized by law.

-11-

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction for which the director derived any improper personal benefit.

If the DGCL is amended after the filing of this Certificate of Incorporation of which this Section 12 is a part to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.

Any repeal or modification of this Section 12 by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

[*signature page follows*]

LA_LAN01:302645.11
218433198

IN WITNESS WHEREOF, said Corporation has caused this Certificate of Incorporation to be executed by its duly authorized officer this [•] day of [•].

**KEY ENERGY SERVICES, INC.**

By: _____

      Name: [                   ]

      Title:  [                  ]

-13-

LA_LAN01:302645.11
218433198

**Exhibit B**

**Amended and Restated Bylaws of Reorganized Key Energy Services, Inc.**

**BY-LAWS**

**OF**

**KEY ENERGY SERVICES, INC.**

ARTICLE I

<u>Stockholders</u>

Section 1.1. <u>Annual Meetings</u>. An annual meeting of stockholders shall be held for the election of directors to succeed any then current directors whose terms are set to expire. An annual meeting of stockholders shall be held at such date, time and place either within or without the State of Delaware, or may not be held at any place, but may instead be held solely by means of remote communication, as may be designated by the board of directors of the Corporation (the "Board") from time to time. Any other business as may be properly brought before such annual meeting may also be transacted at such meeting.

Section 1.2. <u>Special Meetings</u>. Except as required by law, special meetings of stockholders may be called only by the Board pursuant to a resolution approved by directors holding a majority of the total votes. As set forth in the certificate of incorporation of the Corporation (as in effect from time to time, and including any certificates of designation then in effect, the "Certificate of Incorporation"), stockholders of the Corporation are not permitted to call a special meeting or to require that the Board call a special meeting of stockholders. The business permitted at any special meeting of stockholders shall be limited to the business brought before the meeting by or at the direction of the Board.

Section 1.3. <u>Notice of Meetings</u>. Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise provided by law, the written notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation. In addition, if stockholders have consented to receive notices by a form of electronic transmission, then such notice, by facsimile telecommunication, or by electronic mail, shall be deemed to be given when directed to a number or an electronic mail address, respectively, at which the

stockholder has consented to receive notice.  If such notice is transmitted by a posting on an electronic network together with separate notice to the stockholder of such specific posting, such notice shall be deemed to be given upon the later of (i) such posting, and (ii) the giving of such separate notice.  If such notice is transmitted by any other form of electronic transmission, such notice shall be deemed to be given when directed to the stockholder.  Notice shall be deemed to have been given to all stockholders of record who share an address if notice is given in accordance with the "householding" rules set forth in the rules of the Securities and Exchange Commission under the Securities Exchange Act of 1934 (the "Exchange Act") and Section 233 of the Delaware General Corporation Law.  For purposes of these by-laws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by a recipient through an automated process.

Section 1.4.  Postponements; Adjournments.  The Board of Directors may postpone, reschedule or adjourn any previously scheduled meeting of the stockholders. When a meeting is adjourned to another time or place, unless these by-laws otherwise require, notice need not be given of any such adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with Section 1.9 and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

Section 1.5.  Quorum.  At each meeting of stockholders, except where otherwise provided by law or the Certificate of Incorporation or these by-laws, the holders of a majority of the shares entitled to vote, present in person or represented by proxy, shall constitute a quorum.  Where a separate vote is required to be taken by a class or series of stock or by a class or category of stockholders (including the Other Holders), a majority of the outstanding shares of such class or series or of shares held by such class or category of stockholders, present in person or represented by proxy, shall constitute a quorum to take action with respect to that vote on that matter.  Two (2) or more classes or series of stock or classes or groups of stockholders shall be considered a single class or group if the holders thereof are entitled to vote together as a single class at the meeting. In the absence of a quorum of the holders of any class or series of stock or class or category of stockholders entitled to vote on a matter, either (i) the stockholders of such class or stockholders in such group so present or represented may, by majority vote of the shares held by such stockholders, adjourn the meeting of such class from time to time in the manner provided by Section 1.4 of these by-laws until a quorum of such class shall be so present or represented or (ii) the Chairperson of the meeting may on his or her own motion, without the approval of the stockholders who are present in person or represented

-2-

by proxy and entitled to vote, adjourn the meeting from time to time in the manner provided by Section 1.4 of these by-laws until a quorum of such class shall be so present and represented, without notice other than announcement at the meeting.  Shares of its own capital stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes.  Nothing in this Section 1.5 shall be construed as limiting the right of the Corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

Section 1.6.  Organization.  Meetings of stockholders shall be presided over by the Chairperson of the Board, if any, or in the absence of the Chairperson of the Board by the Vice Chairperson of the Board, if any, or in the absence of the Vice Chairperson of the Board by the President, or in the absence of the President by a Vice President, or in the absence of the foregoing persons by a chairperson designated by the Board, or in the absence of such designation by a chairperson chosen at the meeting.  The Secretary, or in the absence of the Secretary an Assistant Secretary, shall act as secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary the chairperson of the meeting may appoint any person to act as secretary of the meeting.

The order of business at each such meeting shall be as determined by the chairperson of the meeting.  The chairperson of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts and things as are necessary or desirable for the proper conduct of the meeting, including, without limitation, the establishment of procedures for the maintenance of order and safety, limitations on the time allotted to questions or comments on the affairs of the Corporation, restrictions on entry to such meeting after the time prescribed for the commencement thereof and the opening and closing of the voting polls, for each item on which a vote is to be taken.

Section 1.7.   Inspectors.  The Corporation shall, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof.  The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of stockholders, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of such inspector's ability. Every vote taken by ballots shall be conducted by an inspector or inspectors appointed by the Chairperson of the meeting.

Section 1.8.  Voting; Proxies.  Unless otherwise provided in the Certificate of Incorporation and subject to Section 1.9, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one (1) vote for each share of stock held by such stockholder which has voting power upon the matter in question.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for

-3-

such stockholder by proxy, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.  A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or another duly executed proxy bearing a later date with the Secretary of the Corporation.  Voting at meetings of stockholders need not be by written ballot and need not be conducted by inspectors unless the holders of a majority of the outstanding shares of all classes of stock entitled to vote thereon present in person or represented by proxy at such meeting shall so determine.  Except as otherwise provided in the Certificate of Incorporation or Article II, directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.  In all other matters, unless otherwise provided by law or by the Certificate of Incorporation or these by-laws, the affirmative vote of the holders of a majority of the shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders.  Any approval or action required or permitted in these by-laws to be taken by the Other Holders shall be valid if consented to or approved by the Other Holders holding a majority of shares of common stock of the Corporation, par value $0.01 per share ("Common Stock"), held by all Other Holders.  Where a separate vote by class or series of stock or class or category of stockholders is required, the affirmative vote of the majority of the shares of such class or series or of the shares held by stockholders in such class or group present in person or represented by proxy at the meeting shall be the act of such class or series or classes or series, except as otherwise provided by law or by the Certificate of Incorporation or these by-laws.  For purposes of this Section 1.8, votes cast "for" or "against" and "abstentions" with respect to such matter shall be counted as shares of stock of the Corporation entitled to vote on such matter, while "broker non-votes" (or other shares of stock of the Corporation similarly not entitled to vote) shall not be counted as shares present and entitled to vote on such matter.

Section 1.9.  <u>Fixing Date for Determination of Stockholders of Record</u>.  In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of

-4-

stockholders shall apply to any adjournment of such meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at such adjourned meeting in accordance with the foregoing provisions of this Section 1.9.

In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board. If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board and prior action by the Board is required by law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days (60) prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

Section 1.10. List of Stockholders Entitled to Vote. The Secretary shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting; provided, however, if the record date for determining the stockholders entitled to vote is less than ten (10) days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth (10th) day before the meeting date, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Nothing in this Section 1.10 shall require the Corporation to include electronic mail addresses or other electronic content information on such list. Such list shall be open to the examination of any stockholder for any purpose germane to the meeting for a period of at least ten (10) days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided

-5-

with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then a list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then such list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 1.11.  Consent of Stockholders in Lieu of Meeting.  Unless otherwise provided in the certificate of incorporation or these by-laws, any action required by law to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth such action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted,  and shall be delivered to the Corporation by delivery to (a) its registered office in the State of Delaware, (b) its principal place of business, or (c) an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded; provided that if the Common Stock has not been Listed and Platinum executed any action by written consent pursuant to this Section 1.11, then such action shall not be valid unless and until the date that is 20 business days after Platinum provides a copy of the written consent to all Other Holders and any other information required by applicable law. Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this by-law to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to (a) its registered office in the State of Delaware, (b) its principal place of business, or (c) an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.

Section 1.12.  Advance Notice of Stockholder Nominees for Director and Other Stockholder Proposals.

(a)  The matters to be considered and brought before any annual or special meeting of stockholders of the Corporation shall be limited to only such matters, including the nomination and election of directors, as shall be brought properly before such meeting in compliance with the procedures set forth in this Section 1.12.**Error! Reference source not found.**

-6-

(b)  For any matter to be brought properly before the annual meeting of stockholders, the matter must be (i) specified in the notice of the annual meeting given by or at the direction of the Board, (ii) otherwise brought before the annual meeting by or at the direction of the Board or (iii) brought before the annual meeting by a stockholder who is a stockholder of record of the Corporation on the date the notice provided for in this Section 1.12 is delivered to the Secretary of the Corporation, who is entitled to vote at the annual meeting and who complies with the procedures set forth in this Section 1.12.  In addition to any other requirements under applicable law, the Certificate of Incorporation and by-laws of the Corporation, written notice (the "Stockholder Notice") of any nomination or other proposal must be timely and any proposal, other than a nomination, must constitute a proper matter for stockholder action.  To be timely, the Stockholder Notice must be delivered to the Secretary of the Corporation at the principal executive office of the Corporation not less than ninety (90) nor more than one hundred twenty (120) days prior to the first anniversary date of the annual meeting for the preceding year; provided, however, that if (and only if) the annual meeting is not scheduled to be held within a period that commences thirty (30) days before such anniversary date and ends thirty (30) days after such anniversary date (an annual meeting date outside such period being referred to herein as an "Other Meeting Date"), the Stockholder Notice shall be given in the manner provided herein not earlier than the opening of business one hundred twenty (120) days prior to such Other Meeting Date and no later than the later of the close of business on (i) the date ninety (90) days prior to such Other Meeting Date or (ii) the tenth (10th) day following the date such Other Meeting Date is first publicly announced or disclosed.  A Stockholder Notice must contain the following information: (i) whether the stockholder is providing the notice at the request of a beneficial holder of shares, whether the stockholder, any such beneficial holder or any nominee has any agreement, arrangement or understanding with, or has received any financial assistance, funding or other consideration from, any other person with respect to the investment by the stockholder or such beneficial holder in the Corporation or the matter the Stockholder Notice relates to, and the details thereof, including the name of such other person (the stockholder, any beneficial holder on whose behalf the notice is being delivered, any nominees listed in the notice and any persons with whom such agreement, arrangement or understanding exists or from whom such assistance has been obtained are hereinafter collectively referred to as "Interested Persons"), (ii) the name and address of all Interested Persons, (iii) a complete listing of the record and beneficial ownership positions (including number or amount) of all equity securities and debt instruments, whether held in the form of loans or capital market instruments, of the Corporation or any of its subsidiaries held by all Interested Persons, (iv) whether and the extent to which any hedging, derivative or other transaction is in place or has been entered into within the prior six (6) months preceding the date of delivery of the Stockholder Notice by or for the benefit of any Interested Person with respect to the Corporation or its subsidiaries or any of their respective securities, debt instruments or credit ratings, the effect or intent of which transaction is to give rise to gain or loss as a result of changes in the trading price of such securities or debt instruments or changes in the credit ratings for the Corporation, its subsidiaries or any of their respective securities or debt instruments (or, more generally, changes in the perceived creditworthiness of the Corporation or its subsidiaries), or to increase or decrease the voting power of such Interested Person, and if

-7-

LA_LAN01:302644.10B
218433127

so, a summary of the material terms thereof, and (v) a representation that the stockholder is a holder of record of stock of the Corporation that would be entitled to vote at the meeting and intends to appear in person or by proxy at the meeting to propose the matter set forth in the Stockholder Notice. As used herein, "beneficially owned" has the meaning provided in Rules 13d-3 and 13d-5 under the Exchange Act. The Stockholder Notice shall be updated not later than ten (10) days after the record date for the determination of stockholders entitled to vote at the meeting to provide any material changes in the foregoing information as of the record date. Any Stockholder Notice relating to the nomination of directors must also contain (i) the information regarding each nominee required by paragraphs (a), (e) and (f) of Item 401 of Regulation S-K adopted by the Securities and Exchange Commission (or the corresponding provisions of any successor regulation), (ii) each nominee's signed consent to serve as a director of the Corporation if elected and such nominee's representation that he or she currently intends to serve as a director, if elected, for the term for which he or she is standing for election, and (iii) whether each nominee is eligible for consideration as an independent director under the relevant standards contemplated by Item 407(a) of Regulation S-K (or the corresponding provisions of any successor regulation). The Corporation may also require any proposed nominee to furnish such other information, including completion of the Corporation's directors questionnaire, as it may reasonably require to determine whether the nominee would be considered "independent" as a director or as a member of the audit committee of the Board under the various rules and standards applicable to the Corporation. Any Stockholder Notice with respect to a matter other than the nomination of directors must contain (i) the text of the proposal to be presented, including the text of any resolutions to be proposed for consideration by stockholders and (ii) a brief written statement of the reasons why such stockholder favors the proposal.

Notwithstanding anything in this Section 1.12(b) to the contrary, in the event that the number of directors to be elected to the Board of the Corporation is increased and either all of the nominees for director or the size of the increased Board is not publicly announced or disclosed by the Corporation at least one hundred (100) days prior to the first anniversary of the preceding year's annual meeting, a Stockholder Notice shall also be considered timely hereunder, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the Secretary of the Corporation at the principal executive office of the Corporation not later than the close of business on the tenth (10th) day following the first date all of such nominees or the size of the increased Board shall have been publicly announced or disclosed.

(c) For any matter to be brought properly before a special meeting of stockholders, the matter must be set forth in the Corporation's notice of the meeting given by or at the direction of the Board. In the event that the Corporation calls a special meeting of stockholders for the purpose of electing one or more persons to the Board, not at the request of any stockholders acting pursuant to Section 1.12(b) of these by-laws, any stockholder may nominate a person or persons (as the case may be), for election to such position(s) as specified in the Corporation's notice of the meeting, if the Stockholder Notice required by Section 1.12(b) hereof shall be delivered to the Secretary of the Corporation at the principal executive office of the Corporation not later than the close of business on the tenth (10th) day following the day on which the date of the special

-8-

meeting and of the nominees proposed by the Board to be elected at such meeting is publicly announced or disclosed.

(d)  For purposes of this Section 1.12, a matter shall be deemed to have been "publicly announced or disclosed" if such matter is disclosed in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission.

(e)  Only persons who are nominated in accordance with the procedures set forth in this Section 1.12 shall be eligible for election as directors of the Corporation. In no event shall the postponement or adjournment of an annual meeting already publicly noticed, or any announcement of such postponement or adjournment, commence a new period (or extend any time period) for the giving of notice as provided in this Section 1.12.  This Section 1.12 shall not apply to stockholders proposals made pursuant to Rule 14a-8 under the Exchange Act.

(f)  The person presiding at any meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall have the power and duty to determine whether notice of nominees and other matters proposed to be brought before a meeting has been duly given in the manner provided in this Section 1.12 and, if not so given, shall direct and declare at the meeting that such nominees and other matters are not properly before the meeting and shall not be considered.  Notwithstanding the foregoing provisions of this Section 1.12 if the stockholder or a qualified representative of the stockholder does not appear at the annual or special meeting of stockholders of the Corporation to present any such nomination, or make any such proposal, such nomination or proposal shall be disregarded, notwithstanding that proxies in respect of such vote may have been received by the Corporation.

ARTICLE II

Board of Directors

Section 2.1.  Powers; Number; Qualifications.  The business and affairs of the Corporation shall be managed by or under the direction of the Board, except as may be otherwise provided by law or in the Certificate of Incorporation.  The Board shall consist of such number of members as set forth in this Article II and may be increased or decreased by the Board in accordance with these by-laws.  Each member shall be a natural person.  Directors need not be stockholders.

Section 2.2.  Initial Directors.  (a) In accordance with the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its debtor affiliates under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (including all exhibits and schedules thereto, as amended, modified or supplemented) (the "Plan"), which became effective as of [_____] (the "Effective Date"), as of the Effective Date, the Board consists of the ten (10) members listed below (the "Initial Directors") who will each serve

-9-

the term set forth in Section 8 of the Certificate of Incorporation (the "Initial Board Term").  The following table sets forth, for each Initial Director, his or her status as a CEO Director, Super Voting Director or Independent Director (as each term is defined below), the person who designated such Initial Director and, subject to the other terms and provisions of the Certificate of Incorporation and these By-Laws, the number of votes held initially by such Initial Director:

Table 1

| Name | Position | Designation | Designating Party | Initial Number of Votes |
|---|---|---|---|---|
| Robert Drummond | CEO Director | Designated Platinum Director | Platinum | 1 |
| Jacob Kotzubei | Super Voting Director | Designated Platinum Director | Platinum | 2 |
| Philip Norment | Super Voting Director | Designated Platinum Director | Platinum | 2 |
| [Mary Ann Sigler] | Super Voting Director | Designated Platinum Director | Platinum | 2 |
| [Bryan Kelln] | Director | Designated Platinum Director | Platinum | 1 |
| [_____] | Director | Designated Other Director | Other Backstop Parties | 1 |
| [_____] | Director | Designated Other Director | Other Backstop Parties | 1 |
| [_____] | Independent Director | NA | Platinum | 1 |
| [_____] | Independent Director | NA | Other Backstop Parties | 1 |
| [_____] | Independent Director | NA | Mutually Agreed by Platinum and the Other Backstop Parties | 1 |

For purposes of these by-laws:

"CEO Director" means a director of the Corporation who is also the Chief Executive Officer.

"Control", when used with respect to any specified Person, means the power to direct or cause the direction of the management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and "Controlled" has a correlative meaning.

"Controlled Affiliate" means an affiliate (as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended) Controlled, directly or indirectly, by Platinum.

"Designated Other Director" means any director designated as such in Table 1 above, and his or her successors.

LA_LAN01:302644.10B
218433127

"Designated Platinum Director" means any director designated as such in Table 1 above, and his or her successors.

"Independent Director" means a director who meets the independence requirements of the New York Stock Exchange (the "NYSE") or the NASDAQ Global Select Market ("NASDAQ"), as applicable.

"Other Backstop Parties" means the parties (other than Platinum and the Corporation) to the Backstop Commitment Agreement, dated September 21, 2016.

"Other Holders" means, collectively, the stockholders of the Corporation, other than Platinum.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

"Platinum" means Platinum Equity Advisors, LLC and its Controlled Affiliates, managed funds and/or accounts.

"Platinum Director" means any director who is designated or nominated for election to the Board solely by Platinum, including as holder of the Series A Preferred Stock, pursuant to these by-laws.

"Super Voting Director" shall have the meaning set forth in Section 10 of the Certificate of Incorporation.

(b)  During the Initial Board Term, at the election of the holder of the Series A Preferred Stock, the Board size shall increase from ten (10) to up to thirteen (13) directors in accordance with Section 10(b) of the Certificate of Incorporation, such that (i) if the Board size is increased to eleven (11) directors, there will be two (2) Super Voting Directors; (ii) if the Board size is increased to twelve (12) directors, there will be one (1) Super Voting Director; and (iii) if the Board size is increased to thirteen (13) directors, there will be no Super Voting Director.

(c)  During the Initial Board Term, if there is no CEO Director for any reason, including due to a removal, the Board size shall decrease in accordance with Section 10(c) of the Certificate of Incorporation.

Section 2.3.  Subsequent Directors.  (a)  After the Initial Board Term, if the Common Stock has been Listed (as such term is defined in the Certificate of Incorporation) and the Series A Preferred Stock is outstanding, the Board shall be comprised of nine (9) directors consisting of:  (i) five (5) directors who shall be nominated and elected by the holder of the Series A Preferred Stock, of whom (A) two (2) shall be designated by such holder as Super Voting Directors and (B) one (1) shall be an Independent Director, and (ii) four (4) directors who shall be nominated by the Board then in place and elected by the holders of Common Stock, two (2) of whom shall be

-11-

Independent Directors; <u>provided</u> that the Board size shall increase at the election of the holder of the Series A Preferred Stock from nine (9) to up to eleven (11) directors in accordance with Section 10(b) of the Certificate of Incorporation  such that (i) if the Board size is increased to ten (10) directors, there will be one (1) Super Voting Director; and (ii) if the Board size is increased to eleven (11) directors, there will be no Super Voting Director.

(b)  After the Initial Board Term, if the Common Stock has not been Listed, then until the Common Stock is Listed, the Board shall be comprised of ten (10) directors, each of whom shall have one vote, consisting of: (i) three (3) directors who shall be nominated by the two (2) Designated Other Directors (or their successors) and elected by the holders of Common Stock, one (1) of whom shall be an Independent Director, and (ii) seven (7) directors who shall be nominated by the Initial Board or their successors and elected by the holders of Common Stock, two (2) of whom shall be Independent Directors.

(c)  At any time after the Initial Board Term, upon the automatic redemption and cancellation of the Series A Preferred Stock pursuant to Section 5(d)(i) or 5(d)(iii) of the Certificate of Incorporation, the voting power of the Super Voting Directors and the Board size shall decrease in accordance with Section 10(d) of the Certificate of Incorporation.  Commencing from the first annual meeting of stockholders next succeeding such redemption and cancellation of Series A Preferred Stock ("Post-Redemption Meeting") if the Common Stock is Listed, the Board shall be comprised of nine (9) directors who shall be nominated by the Board then in place and elected by the holders of Common Stock, at least three (3) of whom shall be Independent Directors.

(d)  Except as otherwise provided in this Section 2.3, each director elected pursuant to this Section 2.3 will serve until the succeeding annual meeting of stockholders and, shall have one (1) vote on any matter submitted to the Board.

Section 2.4.  <u>Elections to the Board</u>.  Director nominees who are nominated and elected by the holder of Series A Preferred Stock shall be elected by the consent or vote of such holder.  Director nominees who are voted on by all holders of Common Stock shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

Section 2.5.  <u>Resignation; Removal; Vacancies</u>.  Any director may resign at any time upon notice given in writing or by electronic transmission to the Board or to the President or the Secretary of the Corporation.  A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events.  Unless otherwise specified therein no acceptance of such resignation shall be necessary to make it effective.  Any director or the entire Board may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors; <u>provided</u>, <u>however</u>, that any director designated or nominated for election by Platinum including as the holder of the Series A Preferred Stock may not be removed without cause except with its consent or vote, and any director designated by the Other Backstop

-12-

Parties or a director nominated pursuant to Section 2.3(b)(i) may not be removed without cause except with the consent or vote of the holders holding a majority of the shares of Common Stock held by all Other Holders.  Unless otherwise provided in the Certificate of Incorporation or these by-laws, vacancies may be filled by directors holding a majority of the total votes held by directors then in office, although less than a quorum; provided, however, that (x) any vacancy left by any director designated by the Other Backstop Parties or any director nominated pursuant to Section 2.3(b)(i) shall be filled by the remaining director(s) designated by the Other Backstop Parties or the remaining director(s) nominated pursuant to Section 2.3(b)(i), as applicable, and, any resigning director designated by the Other Backstop Parties or director nominated pursuant to Section 2.3(b)(i) may participate in filling the vacancy to be created by his or her resignation, and (y) Platinum including as the holder of the Series A Preferred Stock shall have the right to fill vacancies left by directors which Platinum had appointed.  Any director elected or appointed to fill a vacancy shall hold office until his or her successor is elected or appointed, as applicable, and qualified or until his or her earlier resignation or removal.   In the event that any Platinum Director, a director designated by the Other Backstop Parties or a director nominated pursuant to Section 2.3(b)(i) ceases to be a director for any reason and such position remains vacant for more than ten (10) business days, from and after the eleventh (11th) business day following the creation of such vacancy, until such vacancy is filled, the approval of such Platinum Director, director designated by the Other Backstop Parties or director nominated pursuant to Section 2.3(b)(i) shall not be required for purposes of determining whether a Supermajority has been achieved.

Section 2.6.  Regular Meetings.  Regular meetings of the Board may be held at such places within or without the State of Delaware and at such times as the Board may from time to time determine, and if so determined notice thereof need not be given.

Section 2.7.  Special Meetings.  Special meetings of the Board may be held at any time or place within or without the State of Delaware whenever called by the Chairperson of the Board, if any, by the Vice Chairperson of the Board, if any, by the President or by any two (2) directors.  At least five (5) business days' prior notice thereof shall be given by the person or persons calling the meeting.  Attendance at such meeting by any director (except attendance at such meeting to protest the failure of proper notices) shall constitute waiver of any notice requirement by such director.

Section 2.8.  Participation in Meetings by Conference Telephone Permitted.  Unless otherwise restricted by the Certificate of Incorporation or these by-laws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this by-law shall constitute presence in person at the meeting.

Section 2.9.  Quorum; Vote Required for Action.  At all meetings of the Board, directors holding a majority of the total votes shall constitute a quorum for the

-13-

transaction of business; provided that until the later of (i) the end of the Initial Board Term and (ii) the date that the Series A Preferred Stock is no longer outstanding, a quorum of the Board shall require the presence of at least one (1) Designated Other Director or a director nominated pursuant to Section 2.3(b)(i), but only if at least one of such individuals is then on the Board; provided, further, that if a properly noticed meeting of the Board fails to achieve a quorum solely due to the absence of the directors referred to in the foregoing proviso, then a new notice of meeting of the Board may be called in accordance with this Article II (except that each applicable notice period shall be reduced to two (2) business days for such new notice) and a quorum at such meeting shall require only the presence of directors holding a majority of the total votes.  The vote by directors holding a majority of the total votes present at a meeting at which a quorum is present shall be the act of the Board unless the Certificate of Incorporation or Article IV of these by-laws shall require a vote of a greater number.  In case at any meeting of the Board a quorum shall not be present, the members of the Board present may adjourn the meeting from time to time until a quorum shall be present.

Section 2.10.  Organization.  Meetings of the Board shall be presided over by the Chairperson of the Board, if any, or in the absence of the Chairperson of the Board by the Vice Chairperson of the Board, if any, or in the absence of the Vice Chairperson of the Board by the President, or in their absence by a chairperson chosen at the meeting. The Secretary, or in the absence of the Secretary an Assistant Secretary, shall act as secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary the chairperson of the meeting may appoint any person to act as secretary of the meeting.

Section 2.11.  Action by Directors Without a Meeting.  Unless otherwise restricted by the Certificate of Incorporation or these by-laws, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board, or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 2.12.  Compensation of Directors. Unless otherwise restricted by the Certificate of Incorporation or these by-laws, and except as otherwise provided in the CASA (as defined below) with respect to certain Platinum Directors, all directors shall be paid the same reasonable compensation for their services and reimbursement for expenses of attendance at meetings, which initially shall be $[___] per year, and thereafter shall be such amount as the Board, or any compensation committee designated thereby, may from time to time determine.  **[NTD: Certain exceptions TBD]**

LA_LAN01:302644.10B
218433127

ARTICLE III

Committees

Section 3.1. Committees. The Board may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board, or in these by-laws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matters: (i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by law to be submitted to stockholders for approval or (ii) adopting, amending or repealing these by-laws. Except as otherwise required by applicable provisions of the NYSE or NASDAQ, the holder of the Series A Preferred Stock and the Other Holders shall have the right, upon request, to representation and voting power on any committee formed hereunder in numbers proportionate to their representation and voting power on the Board as a whole, provided, that, except as otherwise required by applicable provisions of the NYSE or NASDAQ, each of the holder of the Series A Preferred Stock and the Other Holders shall be entitled, upon request, to be represented by at least one director who has at least one vote on any such committee.

Section 3.2. Committee Rules. Unless the Board otherwise provides, each committee designated by the Board may adopt, amend and repeal rules for the conduct of its business. A majority of the directors then serving on a committee of the Board shall constitute a quorum for the transaction of business by the committee, provided that to the extent a Designated Other Director or a director nominated pursuant to Section 2.3(b)(i) is a member of any committee, the presence of such director (which shall be no more than one) shall be required for a quorum of such committee; provided, further, that if a committee meeting fails to achieve a quorum solely due to the absence of the director referred to in the foregoing proviso, then at the next meeting of the committee (which shall not be earlier than one (1) business day following the inquorate meeting), a quorum at such next meeting shall require only the presence of directors holding a majority of the total votes. The vote of the majority of the members of a committee present at a meeting at which a quorum is present shall be the act of the committee, unless the Certificate of Incorporation, these by-laws or a resolution of the Board requires a greater number.

LA_LAN01:302644.10B
218433127

ARTICLE IV

Approval of Certain Matters

Section 4.1.  Supermajority Vote of the Board.  (a) As used herein, "Supermajority" shall mean any of the following, as applicable, provided that for all purposes under the definition of Supermajority (including but not limited to the minimum voting thresholds, the numerators and the denominators), all directors (and their successors) added to the Board pursuant to Section 4.1(b)(iv)(4)(A) and their votes shall be disregarded in all respects until the latest to occur of (a) the expiration of the Initial Board Term, (b) the date the Common Stock is Listed, and (c) the date that no director designated by the Other Backstop Parties or nominated pursuant to Section 2.3(b)(i) remains on the Board:

(i) during the Initial Board Term, (A) if there is a CEO Director, at least nine (9) of the thirteen (13) director votes, including (X) at least seven (7) votes cast by the Designated Platinum Directors who are not Independent Directors, (Y) at least two (2) votes cast by directors who are not Platinum Directors and (Z) at least one (1) vote cast by a Designated Other Director; or (B) if there is no CEO Director, at least eight (8) of the eleven (11) director votes, including (X) at least six (6) votes cast by the Designated Platinum Directors, (Y) at least two (2) votes cast by directors who are not Platinum Directors and (Z) at least one (1) vote cast by a Designated Other Director;

(ii) following the Initial Board Term, if the Common Stock has been Listed and the share of Series A Preferred Stock is outstanding, at least eight (8) of the eleven (11) director votes, including (X) at least six (6) votes cast by the Platinum Directors who are not Independent Directors and (Y) at least two (2) votes cast by directors who are not Platinum Directors;

(iii) following the Initial Board Term, if the Common Stock has been Listed and the share of Series A Preferred Stock is not outstanding,

(A) until the Post-Redemption Meeting, at least six (6) of the nine (9) director votes, including (X) at least four (4) votes cast by the Platinum Directors who are not Independent Directors and (Y) at least two (2) votes cast by directors who are not Platinum Directors; and

(B) after the Post-Redemption Meeting, at least two (2) votes cast by Independent Directors; and

(iv) following the Initial Board Term, if the Common Stock has not been Listed, at least seven (7) of the ten (10) director votes, including (X) at least five (5) votes cast by the directors nominated by the Initial Board

-16-

who are not Independent Directors and (Y) at least two (2) votes cast by directors who are nominated pursuant to Section 2.3(b)(i).

(b)     At any time irrespective of listing status and, other than in the case of (i) below, from and after the later of the end of the Initial Board Term and the date the Common Stock is Listed, and until the first annual meeting of stockholders to occur after Platinum beneficially owns less than [___]% of the issued and outstanding shares of Common Stock, the approval of a Supermajority of the Board shall be required:

(i)     for the Corporation to enter into any transaction with a Related Party (as defined below) of the Corporation, Platinum or Related Advisor (as defined in the Corporate Advisory Services Agreement dated [_____] between the Corporation and [insert Platinum affiliate name] (the "CASA")), including any amendments to the CASA or the Letter Agreement dated [____] between the Corporation and Platinum (the "Platinum Letter Agreement"), except for (A) compensation agreements with members of the Board in the ordinary course of business, (B) execution of the CASA and the Platinum Letter Agreement on the Effective Date, (C) **[NTD: Certain exceptions TBD],** (D) arm's length commercial transactions in the ordinary course of business between any Platinum portfolio company and the Corporation if the aggregate transaction value does not exceed $1 million per calendar year, and (E) any other transactions required by the Plan Support Agreement, dated August 24, 2016, among the Corporation and the parties named therein; provided that any decision to waive or enforce the Platinum Letter Agreement shall be delegated solely to the two (2) Designated Other Directors (or their successors).

"Affiliate" means, with respect to any person, is a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the person specified.

"Related Party" means, with respect to any person, (x) any former, current or future director, officer, agent, Affiliate, employee or stockholder of such person and (y) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the persons listed in clause (x) of this definition.

(ii)    for the Corporation to adopt any restrictions on the transferability of any shares of the Corporation; and

(iii)   for the Corporation to approve or authorize any awards under the 2016 annual performance incentive plan of the Corporation.

(c)     If the Common Stock is not Listed, the approval of a Supermajority of the Board shall be required for:

LA_LAN01:302644.10B
218433127

(1)     the Corporation to enter into any fundamental transaction involving a sale of the Corporation (including any consolidation, reorganization, merger or sale of all or substantially all of the assets of the Corporation) other than a transaction (i) pursuant to the Bankruptcy Code (as defined in Plan) or (ii) with an implied equity value of the Corporation of greater than $700 million (each such transaction permitted by clause (i) or (ii) or approved by a Supermajority of the Board pursuant to this Section 4.1(b)(iv)(1), a "Permitted Transaction");

(2)     the Corporation to acquire any assets, make any loan, purchase any securities or make any other investment, or sell, lease, transfer or otherwise dispose of any assets, in each case, the value of which individually or in the aggregate exceeds $25 million in any transaction or series of related transactions;

(3)     the Corporation to incur indebtedness for borrowed money in excess of $5 million, other than for purposes of refinancing the New Term Loan Facility (as defined in the Plan) or the New ABL Credit Facility (as defined in the Plan) at the same or lower effective rates of interest (taking into account the payment to the financing sources of any fees or other amounts);

(4)     any change to the size of the Board, except (A) for increases in the size of the Board to add Independent Directors, (B) for an increase in the size of the Board pursuant to Section 2.2(b) or Section 2.3(a) of these by-laws or (C) pursuant to the terms of a Permitted Transaction;

(5)     the creation of new committees of the Board or the delegation of broader authority to the committees of the Board than is provided in the initial charters for such committees, other than as required by law;

(6)     the Corporation to redeem or repurchase its equity securities and other securities exercisable or exchangeable for, or convertible into, its equity securities, in an amount in excess of $5 million in any transaction and $10 million in the aggregate in any fiscal year, other than (x) redemptions and repurchases offered to all of the Corporation's stockholders on a pro rata basis based on their respective shareholdings and (y) redemptions and repurchases from any employee, consultant, director or officer of the Corporation who ceases to be an employee, consultant, director or officer of the Corporation; and

(7)     any amendment to these by-laws.

Section 4.2.  Unanimous Vote of the Board.  The unanimous approval of the Board shall be required to delist the Common Stock from the NYSE or NASDAQ, as

-18-

applicable, except if such delisting is necessary to effect a cash-out or stock merger of the Corporation that constitutes a Permitted Transaction.

Section 4.3. Majority Vote of Non-Platinum Stockholders. The affirmative vote of stockholders holding a majority of all outstanding shares of Common Stock not held by Platinum shall be required for any issuance of shares of the Corporation in which Platinum or any of its Affiliates would participate, other than an issuance available on the same terms to all stockholders on a pro rata basis based on their respective shareholdings.

Section 4.4. Supermajority Vote of Stockholders. If the Common Stock is not Listed, the affirmative vote of stockholders holding at least 65% of all outstanding shares of Common Stock shall be required for any issuance of equity securities or other securities exercisable or exchangeable for, or convertible into, equity securities of the Corporation in an amount equal to 20% or more of the shares of Common Stock (on an as-converted basis) or with voting power of 20% or more of the Common Stock outstanding prior to such issuance, except for any issuance for the purpose of satisfying the market capitalization requirements of the NYSE or NASDAQ in order to obtain a listing of the Common Stock thereon (and only to the extent necessary to satisfy such requirements), provided that such issuance is made subject to pre-emptive rights available to each of the Other Holders, on a pro rata basis based on their respective shareholdings, if Platinum or any "managing member" or other Person(s) exercising Control over Platinum is acquiring any securities in such issuance.

ARTICLE V

Officers

Section 5.1. Executive and Other Officers. The Corporation shall have a Chief Executive Officer, a President, a Secretary, and a Treasurer. The Corporation may also have one or more Vice-Presidents, assistant officers, and subordinate officers as may be established from time to time by the Board. A person may hold more than one office in the Corporation except that no person may serve concurrently as both President and Vice-President of the Corporation. The Chief Executive Officer shall be a director, and the other officers may be directors.

Section 5.2. Chief Executive Officer. The Chief Executive Officer shall have general charge and supervision of the business of the Corporation subject to the direction of the Board. He or she shall perform the duties customarily performed, and have the powers customarily possessed, by the chief executive officer of a corporation and shall perform such other duties and have such other powers as are from time to time assigned to him or her by the Board. The Chief Executive Officer may execute, in the name of the Corporation, all authorized deeds, mortgages, bonds, contracts or other instruments, except in cases in which the signing and execution thereof shall have been expressly delegated to some other officer or agent of the Corporation.

-19-

Section 5.3. <u>President</u>. Unless otherwise specified by resolution of the Board, the President shall be the chief operating officer of the Corporation, who shall have supervision of the operations of the Corporation, subject to the rights and authority of the Chief Executive Officer. He or she shall perform the duties customarily performed, and have the powers customarily possessed, by a president or chief operating officer of a corporation and shall perform such other duties and have such other powers as are from time to time assigned to him or her by the Board or the Chief Executive Officer. The President may execute, in the name of the Corporation, all authorized deeds, mortgages, bonds, contracts or other instruments, except in cases in which the signing and execution thereof shall have been expressly delegated to some other officer or agent of the Corporation.

Section 5.4. <u>Vice Presidents</u>. The Vice-President or Vice-Presidents, at the request of the Chief Executive Officer or the President, or in the President's absence or during his or her inability to act, shall perform the duties and exercise the functions of the President, and when so acting shall have the powers of the President. If there be more than one Vice-President, the Board may determine which one or more of the Vice-Presidents shall perform any of such duties or exercise any of such functions, or if such determination is not made by the Board, the Chief Executive Officer, or if he or she shall fail to do so, the President may make such determination; otherwise any of the Vice-Presidents may perform any of such duties or exercise any of such functions. Each Vice-President shall perform such other duties and have such other powers, and have such additional descriptive designations in his or her titles (if any), as are from time to time assigned to him or her by the Board, the Chief Executive Officer, or the President.

Section 5.5. <u>Secretary</u>. The Secretary shall keep the minutes of the meetings of the stockholders, of the Board and of any committees, in books provided for the purpose; he or she shall see that all notices are duly given in accordance with the provisions of these by-laws or as required by Delaware law, he or she shall be custodian of the records of the Corporation; he or she may witness any document on behalf of the Corporation, the execution of which is duly authorized, see that the corporate seal is affixed where such document is required or desired to be under its seal, and, when so affixed, may attest the same. In general, he or she shall perform such other duties customarily performed by a secretary of a corporation, and shall perform such other duties and have such other powers as are from time to time assigned to him or her by the Board, the Chief Executive Officer, or the President.

Section 5.6. <u>Treasurer</u>. The Treasurer shall have charge of and be responsible for all funds, securities, receipts and disbursements of the Corporation, and shall deposit, or cause to be deposited, in the name of the Corporation, all moneys or other valuable effects in such banks, trust companies or other depositories as shall, from time to time, be selected by the Board; he or she shall render to the Chief Executive Officer, the President and the Board, whenever requested, an account of the financial condition of the Corporation. In general, he or she shall perform such other duties customarily performed by a treasurer of a corporation, and shall perform such other duties and have such other powers as are from time to time assigned to him or her by the Board, the Chief Executive Officer, or the President. Unless otherwise specified by the

-20-

Board, the Treasurer shall be the chief financial officer and, in the absence of the election of a Controller, the chief accounting officer of the Corporation.

Section 5.7. Assistant and Subordinate Officers. The assistant and subordinate officers of the Corporation are all officers below the office of Vice-President, Secretary, or Treasurer. The assistant or subordinate officers shall have such duties as are from time to time assigned to them by the Board, the Chief Executive Officer, or the President or in the case of Assistant Treasurer and Assistant Secretary by the Treasurer and the Secretary, respectively.

Section 5.8. Election, Tenure and Removal of Officers. The Board shall elect the officers of the Corporation. The Board may from time to time authorize any committee or officer to appoint assistant and subordinate officers. Election or appointment of an officer, employee or agent shall not of itself create contract rights. All officers shall be appointed to hold their offices, respectively, during the pleasure of the Board. The Board (or, as to any assistant or subordinate officer, any committee or officer authorized by the Board) may remove an officer at any time. The removal of an officer does not prejudice any of his or her contract rights. The Board (or, as to any assistant or subordinate officer, any committee or officer authorized by the Board) may fill a vacancy which occurs in any office for the unexpired portion of the term.

Section 5.9. Compensation. The Board shall have power to fix the salaries and other compensation and remuneration, of whatever kind, of all officers of the Corporation. No officer shall be prevented from receiving such salary by reason of the fact that he or she is also a director of the Corporation. The Board may authorize any committee or officer, upon whom the power of appointing assistant and subordinate officers may have been conferred, to fix the salaries, compensation and remuneration of such assistant and subordinate officers.

ARTICLE VI

Stock

Section 6.1. Stock Certificates and Uncertificated Shares. The shares of the Corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of the Corporation's stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate theretofore issued until such certificate is surrendered to the Corporation. Every holder of stock represented by certificates shall be entitled to have a certificate signed by or in the name of the Corporation by any two (2) authorized officers of the Corporation representing the number of shares registered in certificate form. Any or all signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue. The Corporation shall not have power to issue stock certificates in bearer form.

LA_LAN01:302644.10B
218433127

Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated shares and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

Section 6.2.  Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates.  The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

ARTICLE VII

Finance

Section 7.1.  Fiscal Year.  The fiscal year of the Corporation shall be the twelve (12) calendar months period ending December 31 in each year, unless otherwise provided by the Board.

ARTICLE VIII

Miscellaneous

Section 8.1.  Seal.  The Corporation may have a corporate seal, which may be altered from time to time, and use the same by causing it or a facsimile thereof, to be impressed or affixed or in any other manner reproduced.

Section 8.2.  Waiver of Notice of Meetings of Stockholders, Directors and Committees.  Whenever notice is required to be given by law or under any provision of the Certificate of Incorporation or these by-laws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors or members of a committee of directors need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate of Incorporation or these by-laws.

Section 8.3.  Indemnification of Directors and Officers.  Except as provided in this Section 8.3, the Corporation shall indemnify each Indemnitee to the fullest extent permitted by Delaware law (as it presently exists or may hereafter be amended but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior to

-22-

LA_LAN01:302644.10B
218433127

such amendment). Expenses reasonably incurred by Indemnitee in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of Indemnitee to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized by law. Indemnitee's obligation to reimburse the Corporation shall be unsecured and no interest shall be charged thereon.

In the event that any director designated or nominated for election by Platinum or any Other Holder is entitled to indemnification under this Section 8.3 for which such person is also entitled to indemnification from Platinum or such Other Holder, the Corporation hereby agrees that its duties to indemnify such person, whether pursuant to these by-laws or otherwise, shall be primary to those of Platinum or such Other Holder, and to the extent Platinum or such Other Holder actually indemnifies any such person, Platinum or such Other Holder, as applicable, shall be subrogated to the rights of such person against the Corporation for indemnification hereunder. The Corporation hereby acknowledges the subrogation rights of Platinum and such Other Holders under such circumstances and agrees to execute and deliver such further documents and/or instruments as Platinum or such Other Holder, as applicable, may reasonably request in order to evidence any such subrogation rights, whether before or after Platinum or such Other Holder makes any such indemnification payment. The Corporation hereby waives any right against Platinum and such Other Holders to indemnification, subrogation or contribution in respect of amounts payable by the Corporation pursuant to this Section 8.3. Furthermore, the Corporation expressly agrees that Platinum and the Other Holders are intended third party beneficiaries as to the indemnification provisions of this Section 8.3 and shall be entitled to bring suit against the Corporation to enforce said provisions.

No claim for indemnification shall be paid by the Corporation unless the Corporation has determined that Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe that Indemnitee's conduct was unlawful. Unless ordered by a court, such determinations shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct set forth in this Section 8.3. Such determination shall be made by (1) directors holding a majority of the total votes not held by directors who are, or were nominated or designated by, parties, or Affiliates of parties, to the action, suit or proceeding for which indemnification is sought, even though less than a quorum, or (2) by a committee of such directors designated by such majority vote, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders. Indemnitee shall be presumed to have met the relevant standard, and, if the determination is not made by the Corporation within thirty (30) days of a demand by Indemnitee for indemnification, Indemnitee shall be deemed to have met such standard.

-23-

Indemnitee shall promptly notify the Corporation in writing upon the sooner of (a) becoming aware of an action, suit or proceeding where indemnification or the advance payment or reimbursement of Expenses may be sought or (b) being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any matter which may be subject to indemnification or the advance payment or reimbursement of Expenses covered hereunder.  The failure of Indemnitee to so notify the Corporation shall not relieve the Corporation of any obligation which it may have to Indemnitee pursuant to this by-law.  The Corporation shall pay any amounts due under this Section 8.3, in cash, promptly, and in any event within sixty (60) days, following written demand from the Indemnitee, unless the Corporation shall have determined that the Indemnitee has not met the applicable standard of conduct set forth in this Section 8.3.

As a condition to indemnification or the advance payment or reimbursement of Expenses, any demand for payment by Indemnitee hereunder shall be in writing and shall provide reasonable accounting for the Expenses to be paid by the Corporation.

For the purposes of this by-law, the term "Indemnitee" shall mean any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that the person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise; the term "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Section 8.3 with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued; the term "other enterprises" shall include employee benefit plans; service "at the request of the Corporation" shall include service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation"; the term "Expenses" shall include all reasonable out of pocket fees, costs and expenses, including without limitation, attorney's fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, ERISA excise taxes or penalties assessed on Indemnitee with respect to an employee

-24-

LA_LAN01:302644.10B
218433127

benefit plan, Federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this by-law, penalties and all other disbursements or expenses of the types customarily incurred in connection with defending, preparing to defend, or investigating an actual or threatened action, suit or proceeding (including Indemnitee's counterclaims that directly respond to and negate the affirmative claim made against Indemnitee ("Permitted Counterclaims") in such action, suit or proceeding, whether civil, criminal, administrative or investigative, but shall exclude the costs of any of Indemnitee's counterclaims, other than Permitted Counterclaims.

Any action, suit or proceeding regarding indemnification or advance payment or reimbursement of Expenses arising out of these by-laws or otherwise shall only be brought and heard in the Court of Chancery of the State of Delaware.  In the event of any payment under this by-law, the Corporation shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee (under any insurance policy or otherwise), who shall execute all papers required and shall do everything necessary to secure such rights, including the execution of such documents necessary to enable the Corporation to effectively bring suit to enforce such rights.  Except as required by law or as otherwise becomes public, Indemnitee will keep confidential any information that arises in connection with this by-law, including but not limited to, claims for indemnification or the advance payment or reimbursement of Expenses, amounts paid or payable under this by-law and any communications between the Indemnitee, the Corporation and any other parties to such matter.

The rights to indemnification and to the advancement of expenses provided by or granted pursuant to this Section 8.3 shall be deemed independent of, and shall not be deemed exclusive of or a limitation on, any other rights to which any person seeking indemnification or advancement of expenses may be entitled or may hereafter acquire under any statute, provision of the Certificate of Incorporation, provision of these by-laws, agreement, vote of stockholders or of disinterested directors or otherwise, both as to such person's official capacity and as to action in another capacity while holding such office.  It is the intent of the Corporation that indemnification of and advancement of expenses to Indemnitees shall be made to the fullest extent permitted by law.

The Corporation's obligation, if any, to indemnify, to hold harmless, or to provide advancement of expenses to any Indemnitee who was or is serving at its request as a director, officer, employee, agent or manager of another corporation, partnership, limited liability company, joint venture, trust or other enterprise or nonprofit entity (including service with respect to an employee benefit plan) shall be reduced by any amount such Indemnitee actually collects as indemnification, holding harmless, or advancement of expenses from such other corporation, partnership, limited liability company, joint venture, trust or other enterprise nonprofit entity.

The rights to indemnification and advancement of expenses provided by, or granted pursuant to, this Section 8.3 shall be contract rights, and such rights shall continue as to a person who has ceased to be an Indemnitee or has ceased to serve the Corporation or at the Corporation's request, and shall inure to the benefit of the estate, heirs, legatees, distributees, executors, administrators and other comparable legal

-25-

representatives of such person.  No amendment of the Certificate of Incorporation or this by-law shall impair the rights of any Indemnitee arising at any time with respect to events occurring prior to such amendment.

Section 8.4.  Indemnification and Advancement of Expenses to Certain Other Persons.  The Corporation may from time to time grant rights to indemnification and advancement of expenses to such persons and with such scope and effect as the Board may determine, subject to applicable law.

Section 8.5.  Interested Directors; Quorum.  No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board or committee which authorizes the contract or transaction, or solely because such director's or officer's votes are counted for such purpose, if: (1) the material facts as to director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the Board or the committee, and the Board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (2) the material facts as to director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (3) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the Board, a committee thereof or the stockholders.  Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

Section 8.6.  Form of Records.  Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be kept on, or by means of, or be in the form of, any information storage device, or method provided that the records so kept can be converted into clearly legible paper form within a reasonable time.  The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records in accordance with law.

Section 8.7.  Exclusive Forum.  Unless the Corporation consents in writing to the selection of an alternative forum, a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee or agent of the Corporation to the Corporation or the Corporation's stockholders or debtholders, (iii) any action or proceeding asserting a claim against the Corporation or any director or officer or other employee or agent of the Corporation arising pursuant to any provision of the Delaware General Corporation Law

-26-

or the Certificate of Incorporation or these by-laws (in each case, as they may be amended from time to time), or (iv) any other "internal corporate claim" as defined in Section 115 of the Delaware General Corporation Law.  Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this by-law.

Section 8.8.  <u>Voting Stock in Other Corporations</u>.  Stock of other corporations or associations, registered in the name of the Corporation, may be voted by the Chief Executive Officer, the President, a Vice-President, the Treasurer or a proxy appointed by any of them.  The Board, however, may by resolution appoint some other person or persons to vote such shares, in which case such person or persons shall be entitled to vote such shares upon the production of a certified copy of such resolution.

Section 8.9.  <u>Bonds</u>.  The Board may require any officer, agent or employee of the Corporation to give a bond to the Corporation, conditioned upon the faithful discharge of his or her duties, with one or more sureties and in such amount as may be satisfactory to the Board.

Section 8.10.  <u>Amendment of By-Laws</u>.  Except as provided in Section 4.1(b)(iv)(7) of these by-laws or Section 11 of the Certificate of Incorporation, these by-laws of the Corporation may be altered, amended or repealed or new by-laws may be made or adopted by the Board at any regular or special meeting of the Board.

LA_LAN01:302644.10B
218433127

**<u>Exhibit C</u>**

**Amended and Restated Certificate of Formation of Reorganized Key Energy Services, LLC**

**AMENDED AND RESTATED**

**CERTIFICATE OF FORMATION**

**OF**

**KEY ENERGY SERVICES, LLC**

[•], 20[•]

Key Energy Services, LLC, a limited liability company organized and existing under the laws of the State of Texas (the "***Company***"), hereby certifies as follows:

1.    The name of the Company is Key Energy Services, LLC.

2.    The Company is a limited liability company.

3.    The original Certificate of Formation was filed with the Secretary of State of the State of Texas on December 21, 2006, and made effective on December 31, 2006 (the "***Original Certificate***"), pursuant to the Plan of Conversion of Yale E. Key, Inc. into Key Energy Services, LLC.

4.    The file number issued to the Company by the Secretary of State of the State of Texas is 800750440.

5.    Each new amendment contained in this Amended and Restated Certificate of Formation (this "***Certificate***") has been made in accordance with the provisions of the Texas Business Organizations Code, as amended (the "***TBOC***").

6.    This Certificate, including each new amendment contained herein, has been duly made, adopted and approved in the manner and by the vote required by the TBOC and the governing documents of the Company.

7.    This Certificate accurately states the text of the Original Certificate, as further amended by this Certificate.  This Certificate does not contain any other change in the Original Certificate except for the information permitted to be omitted by the provisions of the TBOC applicable to the Company.

8.    This Certificate becomes effective when filed with the Secretary of State of the State of Texas.

9.    The text of the Original Certificate is hereby amended and restated to read in its entirety as follows:

LA_LAN01:304187.2
218433080

## ARTICLE I
### Entity Name and Type

The name of the Company is Key Energy Services, LLC.  The entity is a domestic limited liability company.

## ARTICLE II
### Organization and Conversion

The Company has been formed pursuant to a Plan of Conversion whereby Yale E. Key, Inc., a Texas corporation formed on June 26, 1961 whose address is 1301 McKinney Street, Suite 1800, Houston, Texas 77010, has been converted from a Texas corporation into the Company, a Texas limited liability company.

## ARTICLE III
### Purpose

The purpose for which the Company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the TBOC.

## ARTICLE IV
### Duration

The period of the duration of the Company is perpetual.

## ARTICLE V
### Management

The Company will have managers.  The name and address of each initial manager is set forth below.

| Name | Address |
| --- | --- |
| [•] | [•] |

## ARTICLE VI
### Effectiveness of Filing

This document becomes effective when it is filed with the Texas Secretary of State.

## ARTICLE VII
### Initial Registered Office and Agent

The name and address of the initial registered agent and registered office is as follows:

2

LA_LAN01:304187.2
218433080

| Name | Address |
|------|---------|
| CT Corporation System | 1999 Bryan Street – Suite 900<br>Dallas, Texas 75201-3136 |

## ARTICLE VIII
## Limitation of Sole Member Liability

To the greatest extent permitted by applicable law in effect from time to time, the sole member of the Company shall not be liable to the Company for monetary damages for an act or omission in the sole member's capacity as sole member of the Company except to the extent that the sole member is found to be liable for: (i) a breach of the sole member's duty of loyalty to the Company; (ii) an act or omission not in good faith or which involves intentional misconduct or a knowing violation of the law; (iii) a transaction from which the sole member derived an improper personal benefit; (iv) an act or omission for which the liability of a member is expressly provided by statute; or (v) an act relating to an unlawful membership repurchase or payment of a current or liquidation distribution.  If the applicable law is hereafter amended to authorize the further elimination or limitation of the liability of a member, then the liability of the sole member of the Company shall be eliminated or limited to the fullest extent permitted by the applicable law as so amended.  No amendment, modification, or repeal of this provision will apply to or adversely affect any right or protection of the sole member of the Company hereunder for or with respect to any acts or omissions of the sole member occurring prior to such amendment, modification or repeal.

## ARTICLE IX
## Indemnification and Insurance

The Company shall indemnify the sole member, officers, employees, and agents of the Company to the same extent that a corporation is permitted to indemnify its directors, employees, and agents under the TBOC (or the corresponding provision of any subsequent law), as amended from time to time, as well to the same extent that indemnification is required under the TBOC for directors, employees and agents of corporations.  Such indemnification shall not be deemed exclusive of any other rights to which such persons may be entitled, under any regulations, agreements, vote of the sole member, or otherwise, both as to actions taken in their official capacity and as to action in another capacity while holding such office, and shall inure to the benefit of the heirs, executors and administrators of such persons.  The Company shall have the power to enter into agreements providing for indemnification by the Company of the sole member, or former officers, employees and agents or any other person of or who served any predecessor corporation, partnership, joint venture, trust or other enterprise from and against any and all expenses, liabilities or other matters.  The sole member of the Company may purchase, on behalf of the Company, such liability, indemnification and/or other similar insurance as the sole member, in its sole discretion, shall determine is necessary or appropriate from time to time.  No amendment, modification, or repeal of this provision will apply to or adversely affect any right or protection of the sole member, officer, employee or agent of the Company hereunder for or with respect to any acts or omissions of such persons occurring prior to such amendment, modification or repeal.

LA_LAN01:304187.2
218433080

## ARTICLE X
### Restriction on Issuing Non-Voting Equity Securities

From and after the date hereof, the Company shall not be authorized to issue non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***"); <u>provided</u> that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

[Remainder of page intentionally left blank]

4

IN WITNESS WHEREOF, the undersigned, being an authorized person and manager on behalf of the Company, executes this Amended and Restated Certificate of Formation of Key Energy Services, LLC, and certifies to the truth of the facts stated therein as of the date first written above.

Name:
Title:

**Exhibit D**

**Amended and Restated Limited Liability Agreement of
Reorganized Key Energy Services, LLC**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**KEY ENERGY SERVICES, LLC**

This Amended and Restated Limited Liability Company Agreement (the "*Agreement*") of Key Energy Services, LLC (the "*Company*"), is entered into this [•] of [•], 20[•], by Key Energy Services, Inc., a Delaware corporation, as the sole member (the "*Member*") and the Manager (as defined below).

**RECITALS**

WHEREAS, the Company was formed as a Texas limited liability company by filing a plan of conversion and a certificate of formation with the Secretary of State of the State of Texas effective as of December 31, 2006, pursuant to the Texas Business Organizations Code, as amended from time to time (the "*TBOC*");

WHEREAS, the Member and the managers entered into the Limited Liability Company Agreement of Key Energy Services, LLC (the "*Original Agreement*") on December 31, 2006;

WHEREAS, on October 23, 2016, the Member and the Manager amended the Original Agreement to preserve the Member's membership in the Company upon filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*");

WHEREAS, on October 24, 2016, the Member, the Company, Misr Key Energy Investments, LLC and Misr Key Energy Services, LLC, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

WHEREAS, on [•], 20[•], the Bankruptcy Court entered an order confirming that certain Joint Prepackaged Plan of Reorganization of Key Energy Services, Inc., et al. (the "*Plan*");

WHEREAS, on [•], 20[•], the Plan became effective, and the Company filed an amended and restated certificate of formation (the "*Certificate*") with the Secretary of State of the State of Texas pursuant to such Plan; and

WHEREAS, the Member desires to amend and restate the Original Agreement (as amended) in its entirety to reflect certain restrictions on issuing non-voting equity securities pursuant to Section 1123(a)(6) of the Bankruptcy Code.

NOW, THEREFORE, the Member and the Manager, by execution of this Agreement, do hereby agree as follows:

1.      **Formation.**  The Company has been formed as a Texas limited liability company under and pursuant to the TBOC.  The manager(s) of the Company shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to

qualify to do business in the State of Texas and in any other jurisdiction in which the Company may wish to conduct business.

2.      **Name.**  The name of the Company is Key Energy Services, LLC.  The business of the Company shall be conducted under such name or such other names that comply with applicable law as the managers of the Company may from time to time deem necessary or desirable.

3.      **Purpose and Powers.**  The purpose of the Company shall be to engage in any lawful business or activity for which limited liability companies may be formed under the TBOC.  The Company shall possess and may exercise all of the powers and privileges granted by the TBOC or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purpose of the Company.

4.      **Registered Office and Registered Agent.**  The registered office of the Company required by the Act to be maintained in the State of Texas shall be the registered office named in the Certificate or such other office (which need not be a place of business of the Company) as the Member or managers may designate from time to time in the manner provided by law.  The registered agent of the Company in the State of Texas shall be the registered agent named in the Certificate or such other person or persons as the Member or managers may designate from time to time.

5.      **Member.**  The Member shall be the sole member of the Company and agrees by executing this Agreement to be bound by the terms of this Agreement.  The Member shall have the sole membership interest (as defined in the TBOC) in the Company (the "*Interest*").  The rights, duties and liabilities of the Member and the managers of the Company shall be as provided in the TBOC for members and managers, respectively, except, to the extent permitted by the TBOC, as otherwise provided herein.

6.      **Capital Contribution.**  The Member shall have the right, but not the obligation, to make capital contributions to the Company as the Member in its sole discretion may determine.

7.      **Allocations and Distributions.**

(a)      The net profits and net losses of the Company, and other items of income, gain, loss, deduction and credit, will be allocated 100 percent to the Member for capital account and federal income tax purposes, and the Company, as a separate entity, is to be disregarded for federal income tax purposes.

(b)      The Member (i) shall not be entitled to interest on its capital contributions to the Company, and (ii) shall not have the right to distributions or to the return of any capital contributions except for (x) distributions in accordance with this Section 7(b) and (y) upon dissolution and winding up of the Company.  Distributions prior to dissolution of the Company shall be made at such times and in such amounts as the managers of the Company determine. Notwithstanding any other provision of this Agreement to the contrary, the Company shall not

2

make a distribution to the Member if such distribution would violate Sections 101.206 and 11.053 of the TBOC.

**8.      Management by the Manager.**

(a)      The management of the Company shall be vested exclusively in a manager or manager(s) of the Company, which are hereby each designated as a "manager" of the Company within the meaning of Section 1.002(51) of the TBOC.  No Member, in its capacity as a member, shall have any part in the management of the Company or any authority to, or right to, act on behalf of or bind the Company in connection with any matter.  The managers of the Company shall be appointed solely by the Member.  [The Member hereby appoints [•] as the initial manager of the Company][The present manager of the Company is [•]] (the "***Manager***"), and the Manager hereby agrees to be bound by the provisions of this Agreement.  The Member may remove the Manager (or any other manager(s) of the Company), and appoint substitute managers of the Company, at any time, with or without cause, upon written notice to the Manager (or such other manager(s) of the Company).  To the fullest extent permitted by law, notwithstanding any other provision of this Agreement or the TBOC to the contrary, the managers of the Company shall be authorized to act on behalf of and to bind the Company in all respects, without any further consent, vote or approval of the Member, and the manager's powers shall include, without limitation, the authority to negotiate, complete, execute and deliver any and all agreements, deeds, instruments, receipts, certificates and other documents on behalf of the Company, and to take all such other actions on behalf of the Company as the managers of the Company may consider necessary or advisable in connection with the management of the Company.

(b)      The managers may designate one or more persons to fill one or more officer positions of the Company.

(c)      The managers of the Company may resign at any time upon 30-days' advance written notice to the Member.

(d)      Persons dealing with the Company are entitled to rely conclusively upon the power and authority of the managers of the Company as herein set forth.

**9.      Powers of the Member.**  The Member, in its capacity as the member of the Company, shall not take part in the management of the Company's business or transact any business for the Company and shall have no power to sign for or to bind the Company.

**10.      Transfer of Interest; Admission of Additional Members.**  The Member may assign its Interest in whole or in part at any time.  Upon assignment of the Member's entire Interest to a transferee in compliance with this Section 10, the transferee shall automatically be deemed admitted to the Company as a substituted member of the Company, the Member shall simultaneously be deemed to have resigned from the Company as a member of the Company, and the Company shall continue without dissolution (and all applicable references herein to the "Member" shall be read as references to the transferee as the substituted member of the Company), *provided*, in any event, that the transferee must agree, in a document or instrument delivered to the managers at or prior to the time of such substitution, to be bound by the terms of

3

this Agreement.   One or more additional members of the Company may be admitted to the Company with the consent of the Member.   Upon the admission to the Company of any additional member(s), the members of the Company and the managers of the Company shall cause this Agreement to be amended and restated to reflect the admission of such additional member(s) and the initial capital contribution, if any, of such additional member(s) and the intention of the members to cause the Company to be classified as a partnership or corporation for federal income tax purposes, and to include such other provisions as the parties may agree to reflect the change of status of the Company from a single member limited liability company to a limited liability company with two or more members.

**11.**     **Withdrawal of Members.**  Except pursuant to the second sentence of Section 10, a member of the Company may not withdraw or be expelled from the Company.

**12.**     **Winding Up and Term of the Company.**  The Company shall wind up upon any act or event causing the winding up of the Company under the TBOC, unless, if permitted by the TBOC, the Company is continued in accordance with the TBOC.  For the avoidance of doubt, (a) the Member shall not cease to be a member of the Company upon the filing of a petition in bankruptcy or becoming party to any bankruptcy or insolvency proceeding and (b) the Member or its representative shall take such further action as it deems necessary or advisable to continue the Company in operation notwithstanding the filing of a petition in bankruptcy by either the Member or the Company.  Subject to an earlier winding up as described in the first sentence of this Section 12, the Company shall have a perpetual existence.

**13.**     **Limitation of Liability and Indemnification.**

(a)     Except as otherwise required by the TBOC, neither the Member nor the managers of the Company shall be liable for the debts, obligations or liabilities of the Company, including a debt, obligation, or liability under a judgment, decree or order of a court, solely by reason of being a member or managers of the Company.

(b)     The managers of the Company shall not be liable to the Company or to the Member or to any other member of the Company or other person or entity who may become a party to or bound by this Agreement for any losses, claims, damages or liabilities arising from any act or omission performed or omitted by the managers of the Company in connection with this Agreement or the Company's business and affairs or for breach of any duties (including fiduciary duties) arising under or in connection with this Agreement or the Company, except for any losses, claims, damages or liabilities primarily attributable to the managers' willful misconduct, bad faith, recklessness or gross negligence, as finally determined by a court of competent jurisdiction, or as otherwise required by law.

(c)     Each person who was or is a respondent or defendant, or is threatened to be made a respondent or defendant, or testifies or otherwise participates, in any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, any appeal in such an action, suit or proceeding, and any inquiry or investigation that could lead to such an action, suit, or proceeding (any of the foregoing hereinafter called a "***proceeding***"), whether or not by or in the right of the Company, because such person is or was a member, manager, officer, employee or agent of the Company or is or was serving at the request

4

of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, administrator, agent or similar functionary of another foreign or domestic corporation, limited or general partnership, limited liability company, business trust, real estate investment trust, joint venture, joint stock company, cooperative, association, bank, insurance company, credit union, association, proprietorship, trust, employee benefit plan, other enterprise or other organization (hereinafter a "*Covered Person*") shall be indemnified by the Company to the fullest extent authorized or permitted by applicable law, as the same exists or may hereafter be changed, against all judgments (including arbitration awards), court costs, penalties, excise and similar taxes, fines, settlements, reasonable attorneys' fees and other expenses (all of the foregoing hereinafter called "*expenses*") actually incurred by such person in connection with such proceeding, and such right to indemnification shall continue as to a person who has ceased to be a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, administrator, agent or similar functionary and shall inure to the benefit of his or her heirs, executors and administrators; *provided, however,* that the Company shall not be obligated to indemnify a Covered Person for any such expenses if a court of competent jurisdiction, in a judgment that has become final and non-appealable, shall have determined that the acts or omissions of such Covered Person constituted willful misconduct, bad faith, recklessness or gross negligence.  The right to indemnification conferred by this Section 13 shall be a contract right and shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred in defending or otherwise participating in any such proceeding in advance of its final disposition upon receipt by the Company of a written undertaking by or on behalf of the Covered Person to repay all amounts so advanced if it shall be ultimately determined by final judicial decision from which there is no further right to appeal that the Covered Person is not entitled to be indemnified for such expenses under this Section 13 or otherwise.

**14.    Restriction on Issuing Non-Voting Equity Securities.**    Notwithstanding anything herein to the contrary, the Company shall not be authorized to issue non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; *provided* that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

**15.    Amendment.**  This Agreement may not be amended except by a writing signed by the Member and the managers of the Company.

**16.    Governing Law.**    This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice of law principles.

**17.    Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided that if any provision of this Agreement, as applied to any party or to any circumstance, is judicially determined not to be enforceable in accordance with its terms, the court judicially making such determination may modify the provision in a manner

5

consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its modified form, such provision will then be enforceable and will be enforced.

**18.**     **Entire Agreement**.   This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

**19.**     **Counterparts**.   This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

**20.**     **Effectiveness of Agreement.**   This Agreement shall be effective as of the time of the filing of the Certificate with the Secretary of State of Texas.

**[Remainder of Page Intentionally Left Blank]**

LA_LAN01:304198.2
218433054

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Limited Liability Company Agreement of Key Energy Services, LLC, as of the date first written above.

**MEMBER:**

**KEY ENERGY SERVICES, INC.**

By:  _____
        **[•]**
        **[•]**

**MANAGER:**

By:  _____
        [•]

LA_LAN01:304198.2
218433054

**Exhibit E**

**Amended and Restated Certificate of Formation of
Reorganized Misr Key Energy Investments, LLC**

**AMENDED AND RESTATED CERTIFICATE OF FORMATION**

**OF**

**MISR KEY ENERGY INVESTMENTS, LLC**

[•], 20[•]

On October 24, 2016, Key Energy Services, Inc., a Maryland corporation, and its direct subsidiaries, Key Energy Services, LLC, Misr Key Energy Investments, LLC, and Misr Key Energy Services, LLC, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") seeking relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***").  The Chapter 11 cases are being jointly administered under the caption "In re Key Energy Services, Inc. *et al.*" Case No. 16-12306.  This Amended and Restated Certificate of Formation of Misr Key Energy Investments, LLC (the "***Company***"), has been duly executed and is being filed by [•], as an authorized person, in accordance with the provisions of 6 Del. C. § 18-208, to amend and restate the original Certificate of Formation of Misr Key Energy Investments, LLC, which was filed on January 29, 2004, with the Secretary of State of the State of Delaware (the "***Certificate***").  Provision for the filing of this Amended and Restated Certificate of Formation is contained in the Prepackaged Plan of Reorganization of Key Energy Services, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code dated as of October 24, 2016 (the "***Prepackaged Plan***"), as confirmed on [•], 20[•], by order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the reorganization of the Company under Chapter 11 of the Bankruptcy Code.

The Certificate is hereby amended and restated in its entirety to read as follows:

FIRST:    The name of the limited liability company is Misr Key Energy Investments, LLC.

SECOND:    The address of the registered office of the Company in the State of Delaware is 1209 Orange Street – Corporation Trust Center, Wilmington, Delaware 19801.

THIRD:    The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street – Corporation Trust Center, Wilmington, Delaware 19801.

FOURTH:    From and after the effective date of the Prepackaged Plan, the Company shall not be authorized to issue non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company and (iii) in all

events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

(*Signature Page Follows*)

LA_LAN01:304182.2
218432943

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Formation of Misr Key Energy Investments, LLC, as of the date first written above.

_____
Name:
Title:

LA_LAN01:304182.2
218432943

**<u>Exhibit F</u>**

**Amended and Restated Limited Liability Agreement of
Reorganized Misr Key Energy Investments, LLC**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**MISR KEY ENERGY INVESTMENTS, LLC**

**A Delaware Limited Liability Company**

This Amended and Restated Limited Liability Company Agreement (this "***Agreement***") of Misr Key Energy Investments, LLC (the "***Company***") dated as of [•], 20[•], is adopted, executed and agreed by the sole Member (as defined below).

**RECITALS**

WHEREAS, the Company was formed as a Delaware limited liability company by filing a certificate of formation with the Secretary of State of the State of Delaware on January 29, 2004, pursuant to the Delaware Limited Liability Company Act (6 Del. C. § 18 101, et seq.), as amended from time to time (the "***Act***");

WHEREAS, the Member entered into the Limited Liability Company Agreement of Misr Key Energy Investments, LLC (the "***Original Agreement***") on January 29, 2004;

WHEREAS, on October 23, 2016, the Member amended the Original Agreement to preserve its membership in the Company upon filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***");

WHEREAS, on October 24, 2016, the Member, the Company, Key Energy Services, LLC and Misr Key Energy Services, LLC, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

WHEREAS, on [•], 20[•], the Bankruptcy Court entered an order confirming that certain Joint Prepackaged Plan of Reorganization of Key Energy Services, Inc., *et al.* (the "***Plan***");

WHEREAS, on [•], 20[•], the Plan became effective, and the Company filed an amended and restated certificate of formation with the Secretary of State of the State of Delaware pursuant to such Plan; and

WHEREAS, the Member desires to amend and restate the Original Agreement (as amended) in its entirety to reflect certain restrictions on issuing non-voting equity securities pursuant to Section 1123(a)(6) of the Bankruptcy Code.

NOW, THEREFORE, the Member, by execution of this Agreement, does hereby agree as follows:

1.   ***Formation.***   The Company has been formed as a Delaware limited liability company under and pursuant to the Act.

2.   ***Term.***   The Company shall have a perpetual existence.

3.      *Purposes.*  The purposes of the Company shall be to carry on all lawful business for which limited liability companies may be formed under the Act.

4.      *Sole Member.*    The Company shall have the following initial member (the "*Member*") with the following membership interest:

Key Energy Services, Inc.          100%

5.      *Contributions.*  Without creating rights in favor of any third party, the Member may, from time to time, make contributions of cash or property to the capital of the Company, but shall have no obligation to do so.

6.      *Distributions.*    The Member shall be entitled (a) to receive all distributions (including, without limitation, liquidating distributions) made by the Company, and (b) to enjoy all other rights, benefits and interests in the Company.

7.      *Management.*  The management of the Company is fully reserved to the Member, and the Company shall have no "managers" as that term is used in the Act.

8.      *Officers.*    The Member may appoint officers of the Company, who may be appointed as president, vice president, secretary, treasurer, assistant treasurer, or as such other officers of the Company as the Member may from time to time appoint.  Each officer shall hold office for such term for which he or she is appointed.  Any person may hold any number of offices.  The Company shall indemnify and hold harmless each of the officers for any claims, damages, losses or liability arising from or relating to any act or omission in connection with such officer's appointment or performance of his or her duties hereunder, except to the extent that any such claim, damage, loss or liability is occasioned by the gross negligence, willful misconduct, or fraudulent conduct of such officer.

9.      *Dissolution; Events of Bankruptcy.*  The Company shall dissolve and its affairs shall be wound up at such time, if any, as the Member may elect.  No other event (including, without limitation, an event described in Section 18-801(a)(4) of the Act) will cause the Company to dissolve.  The Member shall not cease to be a member of the Company upon the happening of any of the events specified in Section 18-304 of the Act.  For the avoidance of doubt, the Member or its representative shall take such further action as it deems necessary or advisable to continue the Company in operation notwithstanding the filing of a petition in bankruptcy by either the Member or the Company.

10.     *Restriction on Issuing Non-Voting Equity Securities.*  Notwithstanding anything herein to the contrary, the Company shall not be authorized to issue non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

11.     ***Governing Law.***  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (EXCLUDING ITS CONFLICT-OF-LAWS RULES).

(*Signature Page Follows*)

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Limited Liability Company Agreement of Misr Key Energy Investments, LLC, as of the date first written above.

**KEY ENERGY SERVICES, INC.**

By: _____

Name: _____

Title: _____

LA_LAN01:304183.2
218432904

**Exhibit G**

**Amended and Restated Certificate of Formation of
Reorganized Misr Key Energy Services, LLC**

**AMENDED AND RESTATED CERTIFICATE OF FORMATION**

**OF**

**MISR KEY ENERGY SERVICES, LLC**

[•], 20[•]

On October 24, 2016, Key Energy Services, Inc., a Maryland corporation, and its direct subsidiaries, Key Energy Services, LLC, Misr Key Energy Investments, LLC, and Misr Key Energy Services, LLC, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") seeking relief under Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*").  The Chapter 11 cases are being jointly administered under the caption "In re Key Energy Services, Inc. *et al.*" Case No. 16-12306.  This Amended and Restated Certificate of Formation of Misr Key Energy Services, LLC (the "*Company*"), has been duly executed and is being filed by [•], as an authorized person, in accordance with the provisions of 6 Del. C. § 18-208, to amend and restate the original Certificate of Formation of Misr Key Energy Services, LLC, which was filed on May 9, 2002, with the Secretary of State of the State of Delaware (the "*Certificate*").  Provision for the filing of this Amended and Restated Certificate of Formation is contained in the Prepackaged Plan of Reorganization of Key Energy Services, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code dated as of October 24, 2016 (the "*Prepackaged Plan*"), as confirmed on [•], 20[•], by order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the reorganization of the Company under Chapter 11 of the Bankruptcy Code.

The Certificate is hereby amended and restated in its entirety to read as follows:

FIRST:      The name of the limited liability company is Misr Key Energy Services, LLC.

SECOND:   The address of the registered office of the Company in the State of Delaware is 1209 Orange Street – Corporation Trust Center, Wilmington, Delaware 19801.

THIRD:     The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street – Corporation Trust Center, Wilmington, Delaware 19801.

FOURTH:   From and after the effective date of the Prepackaged Plan, the Company shall not be authorized to issue non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company and (iii) in all

events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

(*Signature Page Follows*)

LA_LAN01:305672.2
218432873

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Formation of Misr Key Energy Services, LLC, as of the date first written above.

_____
Name:
Title:

LA_LAN01:305672.2
218432873

**Exhibit H**

**Amended and Restated Limited Liability Agreement of
Reorganized Misr Key Energy Services, LLC**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**MISR KEY ENERGY SERVICES, LLC**

**A Delaware Limited Liability Company**

This Amended and Restated Limited Liability Company Agreement (this "***Agreement***") of Misr Key Energy Services, LLC (the "***Company***") dated as of [•], 20[•], is adopted, executed and agreed by the sole Member (as defined below).

**RECITALS**

WHEREAS, the Company was formed as a Delaware limited liability company by filing a certificate of formation with the Secretary of State of the State of Delaware on May 9, 2002, pursuant to the Delaware Limited Liability Company Act (6 Del. C. § 18 101, et seq.), as amended from time to time (the "***Act***");

WHEREAS, the Member entered into the Limited Liability Company Agreement of Misr Key Energy Services, LLC (the "***Original Agreement***") on May 9, 2002;

WHEREAS, on October 23, 2016, the Member amended the Original Agreement to preserve its membership in the Company upon filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***");

WHEREAS, on October 24, 2016, the Member, the Company, Key Energy Services, LLC and Misr Key Energy Services, LLC, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

WHEREAS, on [•], 20[•], the Bankruptcy Court entered an order confirming that certain Joint Prepackaged Plan of Reorganization of Key Energy Services, Inc., *et al.* (the "***Plan***");

WHEREAS, on [•], 20[•], the Plan became effective, and the Company filed an amended and restated certificate of formation with the Secretary of State of the State of Delaware pursuant to such Plan; and

WHEREAS, the Member desires to amend and restate the Original Agreement (as amended) in its entirety to reflect certain restrictions on issuing non-voting equity securities pursuant to Section 1123(a)(6) of the Bankruptcy Code.

NOW, THEREFORE, the Member, by execution of this Agreement, does hereby agree as follows:

1.    ***Formation.***    The Company has been formed as a Delaware limited liability company under and pursuant to the Act.

2.    ***Term.***    The Company shall have a perpetual existence.

3.      *Purposes.*  The purposes of the Company shall be to carry on all lawful business for which limited liability companies may be formed under the Act.

4.      *Sole Member.*    The Company shall have the following initial member (the "*Member*") with the following membership interest:

Key Energy Services, Inc.            100%

5.      *Contributions.*  Without creating rights in favor of any third party, the Member may, from time to time, make contributions of cash or property to the capital of the Company, but shall have no obligation to do so.

6.      *Distributions.*    The Member shall be entitled (a) to receive all distributions (including, without limitation, liquidating distributions) made by the Company, and (b) to enjoy all other rights, benefits and interests in the Company.

7.      *Management.*  The management of the Company is fully reserved to the Member, and the Company shall have no "managers" as that term is used in the Act.

8.      *Officers.*    The Member may appoint officers of the Company, who may be appointed as president, vice president, secretary, treasurer, assistant treasurer, or as such other officers of the Company as the Member may from time to time appoint.  Each officer shall hold office for such term for which he or she is appointed.  Any person may hold any number of offices.  The Company shall indemnify and hold harmless each of the officers for any claims, damages, losses or liability arising from or relating to any act or omission in connection with such officer's appointment or performance of his or her duties hereunder, except to the extent that any such claim, damage, loss or liability is occasioned by the gross negligence, willful misconduct, or fraudulent conduct of such officer.

9.      *Dissolution; Events of Bankruptcy.*  The Company shall dissolve and its affairs shall be wound up at such time, if any, as the Member may elect.  No other event (including, without limitation, an event described in Section 18-801(a)(4) of the Act) will cause the Company to dissolve.  The Member shall not cease to be a member of the Company upon the happening of any of the events specified in Section 18-304 of the Act.  For the avoidance of doubt, the Member or its representative shall take such further action as it deems necessary or advisable to continue the Company in operation notwithstanding the filing of a petition in bankruptcy by either the Member or the Company.

10.     *Restriction on Issuing Non-Voting Equity Securities.*  Notwithstanding anything herein to the contrary, the Company shall not be authorized to issue non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

LA_LAN01:305673.2
218432807

11.    *Governing Law.*  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (EXCLUDING ITS CONFLICT-OF-LAWS RULES).

(*Signature Page Follows*)

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Limited Liability Company Agreement of Misr Key Energy Services, LLC, as of the date first written above.

**KEY ENERGY SERVICES, INC.**

By:
Name:
Title:

[*Signature Page to MKE Services A&R LLC Agreement*]

LA_LAN01:305673.2
218432807

**Exhibit I**

**New Warrant Agreement**

**WARRANT AGREEMENT**

**dated as of [●], 201[●] between**

**KEY ENERGY SERVICES, INC.**

**and**

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,**

**as Warrant Agent**

ACTIVE 218432773v.2 66735/30020

**TABLE OF CONTENTS**

**Page**

Article 1 Definitions ..................................................................................................................1

   Section 1.01  Certain Definitions ...........................................................................1

Article 2 Issuance, Execution and Transfer of Warrants .........................................................7

   Section 2.01  Issuance and Delivery of Warrants...................................................7
   Section 2.02  Execution and Authentication of Warrants.......................................7
   Section 2.03  Registration, Transfer, Exchange and Substitution ........................8
   Section 2.04  Form of Warrant Certificates; Private Placement Legend...............9
   Section 2.05  Cancellation of the Warrant Certificates .......................................10
   Section 2.06  Limitations on Transfer of Plan Warrants .....................................10
   Section 2.07  Limitations on Transfer of Cash-Out Warrants .............................10

Article 3 Exercise and Settlement of Warrants......................................................................11

   Section 3.01  Exercise of Warrants ......................................................................11
   Section 3.02  Procedure for Exercise ...................................................................11
   Section 3.03  Settlement of Warrants ...................................................................12
   Section 3.04  Delivery of Common Shares ..........................................................13
   Section 3.05  No Fractional Common Shares to Be Issued..................................14
   Section 3.06  Acquisition of Warrants by Company ............................................14
   Section 3.07  Validity of Exercise........................................................................14
   Section 3.08  Certain Calculations .......................................................................14
   Section 3.09  Reservation and Listing of Shares .................................................15
   Section 3.10  Charges, Taxes and Expenses.........................................................15

Article 4 Adjustments.............................................................................................................15

   Section 4.01  Adjustments to Exercise Price........................................................15
   Section 4.02  Adjustments to Number of Warrants...............................................17
   Section 4.03  Certain Distributions of Rights and Warrants; Stockholder Rights Plan....................17
   Section 4.04  Restrictions on Adjustments...........................................................18
   Section 4.05  Adjustment upon Reorganization Transaction ...............................18
   Section 4.06  Successor upon Consolidation or Merger.......................................19
   Section 4.07  Common Shares Outstanding; Common Shares Reserved for Issuance on Exercise ......................................................................19
   Section 4.08  Calculations; Instructions to Warrant Agent .................................20
   Section 4.09  Notice of Adjustment .....................................................................20
   Section 4.10  Statements on Warrants...................................................................20
   Section 4.11  Effect of Adjustment ......................................................................20
   Section 4.12  Warrant Agent Not Responsible for Adjustments or Validity.....................................20

Article 5 Cash Exit Transaction..............................................................................................21

   Section 5.01  Cash Exit Transaction .....................................................................21

Article 6 Other Provisions Relating to Rights of Warrantholders .........................................21

   Section 6.01  No Rights as Stockholders..............................................................21
   Section 6.02  Mutilated or Missing Global Warrant Certificates ........................21
   Section 6.03  Modification, Waiver and Meetings................................................21
   Section 6.04  Reorganization Transaction ...........................................................22

Article 7 Concerning the Warrant Agent and Other Matters .................................................22

   Section 7.01  Change of Warrant Agent...............................................................22
   Section 7.02  Compensation; Further Assurances ................................................23
   Section 7.03  Reliance on Counsel.......................................................................23
   Section 7.04  Proof of Actions Taken ..................................................................23
   Section 7.05  Correctness of Statements ..............................................................24
   Section 7.06  Validity of Agreement....................................................................24

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| Section 7.07 | Use of Agents | 24 |
| Section 7.08 | Liability of Warrant Agent | 24 |
| Section 7.09 | Legal Proceedings | 24 |
| Section 7.10 | Actions as Agent | 25 |
| Section 7.11 | Appointment and Acceptance of Agency | 25 |
| Section 7.12 | Successors and Assigns | 25 |
| Section 7.13 | Notices | 25 |
| Section 7.14 | Applicable Law; Jurisdiction | 25 |
| Section 7.15 | Waiver of Jury Trial | 26 |
| Section 7.16 | Benefit of this Warrant Agreement | 26 |
| Section 7.17 | Registered Warrantholder | 26 |
| Section 7.18 | Headings | 26 |
| Section 7.19 | Counterparts | 27 |
| Section 7.20 | Entire Agreement | 27 |
| Section 7.21 | Severability | 27 |
| Section 7.22 | Termination | 27 |
| Section 7.23 | Confidentiality | 27 |

| | |
|---|---|
| SCHEDULE A | SCHEDULE OF INCREASES OR DECREASES IN GLOBAL WARRANTS |
| Exhibit A-1 | Form of 4-Year Global Warrant Certificate |
| Exhibit A-2 | Form of 4-Year Individual Warrant Certificate |
| Exhibit B-1 | Form of 5-Year Global Warrant Certificate |
| Exhibit B-2 | Form of 5-Year Individual Warrant Certificate |
| Exhibit C-1 | Form of Global Warrant Exercise Notice |
| Exhibit C-2 | Form of Individual Warrant Exercise Notice |
| Exhibit D | Fee Schedule |
| Exhibit E | Initial Cash-Out Warrantholders |
| Exhibit F | Private Placement Legend for Individual Warrant Certificates |
| Exhibit G | Private Placement Legend for Cash-Out Warrant Shares Acquired Upon Exercise of Individual Warrant Certificates |

**WARRANT AGREEMENT**

Warrant Agreement (as it may be amended from time to time, this "**Warrant Agreement**"), dated as of [●], 201[●], between Key Energy Services, Inc., a Delaware corporation (the "**Company**"), and American Stock Transfer & Trust Company, LLC, a New York State chartered limited purpose trust company (the "**Warrant Agent**").

**WITNESSETH THAT:**

WHEREAS, pursuant to the terms and conditions of the Plan of Reorganization, dated September 21, 2016 (the "**Plan**"), relating to the reorganization under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") of the Company and certain of its direct Subsidiaries (as hereinafter defined), certain holders of the Company's common stock to be cancelled on the date the Plan becomes effective (the "**Initial Beneficial Owners**") are to be issued the 4-Year Warrants and the 5-Year Warrants to purchase [•] Common Shares (as hereinafter defined) in the aggregate at an exercise price of $[●] per share for the 4-Year Warrants and [•] Common Shares in the aggregate at an exercise price of $[●] per share for the 5-Year Warrants, as the same may be adjusted pursuant to Article 4 hereof;

WHEREAS, the Warrants have the terms, conditions and rights set forth in this Warrant Agreement (including the Exhibits hereto);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, Transfer, substitution and exercise of Warrants;

WHEREAS, the Plan Warrants (as hereinafter defined) and the Common Shares underlying the Plan Warrants have been offered and sold in reliance on the exemption from the registration requirements of the Securities Act and any applicable state securities or "blue sky" laws (the "**Securities Law Registration Requirements**") afforded by Section 1145(a)(2) of the Bankruptcy Code; and

WHEREAS, the Cash-Out Warrants (as hereinafter defined) and the Common Shares underlying the Cash-Out Warrants have been offered and sold in reliance on the exemption from the Securities Law Registration Requirements set forth in Section 4(a)(2) of the Securities Act and Rule 506 promulgated thereunder.

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

**Article 1**

**Definitions**

Section 1.01    Certain Definitions.  As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**4-Year Global Warrant**" means a 4-Year Warrant in the form of a Global Warrant Certificate.

"**4-Year Global Warrant Certificate**" means any certificate representing the 4-Year Warrants satisfying the requirements set forth in Section 2.04(a).

"**4-Year Exercise Price**" means $[●] per share, subject to adjustment pursuant to Article 4.

"**4-Year Expiration Date**" means the Close of Business on [●], 20[●].

"**4-Year Individual Warrant**" means a 4-Year Warrant in the form of an Individual Warrant Certificate.

"**4-Year Individual Warrant Certificate**" means any certificate representing the 4-Year Warrants satisfying the requirements set forth in Section 2.04(b).

"**4-Year Warrants**" means the warrants of the Company which expire on the 4-Year Expiration Date and are issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth herein.

"**5-Year Global Warrant**" means a 5-Year Warrant in the form of a Global Warrant Certificate.

"**5-Year Global Warrant Certificate**" means any certificate representing the 5-Year Warrants satisfying the requirements set forth in Section 2.04(a).

"**5-Year Exercise Price**" means $[●] per share, subject to adjustment pursuant to Article 4.

"**5-Year Expiration Date**" means the Close of Business on [●], 20[●].

"**5-Year Individual Warrant**" means a 5-Year Warrant in the form of an Individual Warrant Certificate.

"**5-Year Individual Warrant Certificate**" means any certificate representing the 5-Year Warrants satisfying the requirements set forth in Section 2.04(b).

"**5-Year Warrants**" means the warrants of the Company which expire on the 5-Year Expiration Date and are issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth herein.

"**Affiliate**" shall mean, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first specified Person.  For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Appropriate Officer**" has the meaning set forth in Section 2.02(a).

"**Authentication Order**" means a Company Order for authentication and delivery of the Warrants.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Beneficial Owner**" means any Person beneficially owning an interest in a Global Warrant, which interest is credited to the account of a direct participant in the Depository for the benefit of such Person through the book-entry system maintained by the Depository (or its agent).  For the avoidance of doubt, a Participant may also be a Beneficial Owner.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day other than a Saturday, a Sunday, a day which is a legal holiday in the State of New York, or a day on which banking institutions and trust companies in the State of New York are authorized or obligated by Law, regulation or executive order to close.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Cash Exit Transaction**" means any Reorganization Transaction in which the Common Shares would be converted into, changed into or exchanged for consideration consisting solely of Cash.

"**Cash-Out Warrants**" means those (i) Warrants issued to the Initial Cash-Out Warrantholders pursuant to the Equity Holder Cash-Out Subscription and (ii) any Warrants issued pursuant to this Warrant Agreement in replacement or substitution of, or upon Transfer of, any Warrants referred to in clause (i).

"**Cash-Out Warrant Shares**" has the meaning set forth in Section 2.04(c).

"**Close of Business**" means 5:00 p.m., New York City time.

-2-

"**Closing Date**" means the effective date of the Plan.

"**Common Shares**" means shares of the common stock, par value $0.01 per share, of the Company.

"**Common Shares Deemed Outstanding**" means, at any given time, the sum of (a) the number of Common Shares actually outstanding at such time, plus (b) the number of Common Shares issuable upon conversion or exchange of Convertible Securities actually outstanding at such time, regardless of whether the Convertible Securities are actually exercisable at such time, plus (c) the number of Common Shares reserved for issuance at such time under the Company's New MIP or any other equity incentive plan of the Company, regardless of whether the Common Shares are actually subject to outstanding options at such time or whether any outstanding options are actually exercisable at such time; provided, that Common Shares Deemed Outstanding at any given time shall not include shares owned or held by or for the account of the Company or any of its wholly-owned subsidiaries.

"**Company**" has the meaning set forth in the Preamble.

"**Company Order**" means a written request or order signed in the name of the Company by any Appropriate Officer and delivered to the Warrant Agent.

"**Convertible Securities**" means options, rights, warrants or other securities convertible into or exchangeable or exercisable for Common Shares (including the Warrants).

"**Depository**" means The Depository Trust Company, its nominees, and their respective successors.

"**Equity Holder Cash-Out Subscription**" has the meaning set forth in the Plan.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and the related rules and regulations promulgated thereunder.

"**Exercise Date**" has the meaning set forth in Section 3.02(c).

"**Ex-Date**" means with respect to a dividend or distribution to holders of the Common Shares, the first date on which the Common Shares can be traded without the right to receive such dividend or distribution.

"**Exercise Notice**" means a Global Warrant Exercise Notice or an Individual Warrant Exercise Notice, as the case may be.

"**Exercising Owner**" means any Beneficial Owner that exercises Plan Warrants pursuant to the terms hereof or any Warrantholder that exercises Cash-Out Warrants pursuant to the terms hereof.

"**Exercise Price**" means the 4-Year Exercise Price or the 5-Year Exercise Price, as applicable.

"**Expiration Date**" means the 4-Year Expiration Date or the 5-Year Expiration Date, as applicable.

"**Fair Value**," as of a specified date, means the price per Common Share or per unit of other Securities or other distributed property determined as follows:

(i)      in the case of Common Shares or other Securities listed on the New York Stock Exchange or the NASDAQ Stock Market, the VWAP of a Common Share or a single unit of such other Security for the 20 Trading Days ending on, but excluding, the specified date (or if the Common Shares or other Securities have been listed for less than 20 Trading Days, the VWAP for such lesser period of time);

(ii)     in the case of Common Shares or other Securities listed on a U.S. exchange other than the New York Stock Exchange or the NASDAQ Stock Market, the VWAP of a Common Share or a single unit of such other Security in composite trading for the principal U.S. national or regional securities exchange on which such Securities are then listed for the 20 Trading Days ending on, but excluding, the specified date (or if the Common Shares or other Securities have been listed for less than 20 Trading Days, the VWAP for such lesser period of time);

(iii)    in the case of Common Shares or other Securities that are publicly traded but are not listed on a U.S. exchange, the average of the reported bid and ask prices of a Common Share or a single unit of such other Security in the over-the-counter market on which such Securities are then traded for the 20 Trading Days ending on, but excluding, the specified date (or if the Common Shares or other Securities have been publicly traded (but not listed) for less than 20 Trading Days, the average of the reported bid and ask prices for such lesser period of time); or

(iv)    in all other cases, the fair value per Common Share or per unit of other Securities or other distributed property as of a date not earlier than 20 Business Days preceding the specified date as determined in good faith by the Board (subject to the provisions of Section 3.03(c));

provided, however, that in the case of a determination of Fair Value of a Common Share as a result of a Cash Exit Transaction, such Fair Value shall be equal to the amount of the Cash consideration payable in respect of one Common Share in such Cash Exit Transaction.

"**Full Physical Settlement**" means the settlement method pursuant to which an Exercising Owner shall be entitled to receive from the Company, for each Warrant exercised, a number of Common Shares equal to the Full Physical Share Amount in exchange for payment in Cash by the Exercising Owner of the applicable Exercise Price.

"**Full Physical Share Amount**" means, for each Warrant exercised as to which Full Physical Settlement is applicable, one Common Share.

"**Funds Account**" has the meaning set forth in Section 3.02(e) hereof.

"**Global Warrants**" means the 4-Year Global Warrants or the 5-Year Global Warrants, as applicable.

"**Global Warrant Certificates**" means the 4-Year Global Warrant Certificates or the 5-Year Global Warrant Certificates, as applicable.

"**Global Warrant Exercise Notice**" means, for any Global Warrant, an exercise notice substantially in the form set forth in Exhibit C-1 hereto.

"**Global Warrantholder**" means the Person acting as the Depository or nominee of the Depository in whose name the applicable Warrants are registered in the Warrant Register.  The initial Global Warrantholder shall be Cede & Co., as the Depository's nominee.

"**Independent Appraiser**" shall mean a United States investment banking firm or valuation firm of national or regional standing in the United States which firm does not, and whose directors and officers or Affiliates do not, have a direct or indirect financial interest in or prior material relationship with the Company or any of its Affiliates.

"**Individual Warrants**" means the 4-Year Individual Warrants or the 5-Year Individual Warrants, as applicable.

"**Individual Warrant Certificates**" means the 4-Year Individual Warrant Certificates or the 5-Year Individual Warrant Certificates, as applicable.

"**Individual Warrant Exercise Notice**" means, for any Individual Warrant, an exercise notice substantially in the form set forth in Exhibit C-2 hereto.

"**Initial Beneficial Owners**" has the meaning set forth in the Recitals.

"**Initial Cash-Out Warrantholders**" means the Persons set forth on Exhibit E hereto.

"**Law**" means any federal, state, local, foreign or provincial law, statute, ordinance, rule, regulation, judgment, order, injunction, decree or agency requirement having the force of law or any undertaking to or agreement with any governmental authority, including common law.

"**Net Share Amount**" means for each Warrant exercised as to which Net Share Settlement is applicable, a fraction of a Common Share equal to (i) the Fair Value (as of the Exercise Date for such Warrant) of one Common Share minus the Exercise Price therefor *divided* by (ii) such Fair Value. The number of Common Shares issuable upon exercise, on the same Exercise Date, of Warrants as to which Net Share Settlement is applicable shall be aggregated for each Beneficial Owner or Warrantholder, as applicable, with any fractional Common Share rounded down to the nearest whole share as provided in Section 3.05. In no event shall the Company deliver a fractional Common Share in connection with an exercise of Warrants as to which Net Share Settlement is applicable.

"**Net Share Settlement**" means the settlement method pursuant to which an Exercising Owner shall be entitled to receive from the Company, for each Warrant exercised, a number of Common Shares equal to the Net Share Amount without any payment of Cash therefor.

"**New MIP**" has the meaning set forth in the Plan.

"**Number of Warrants**" means the "Number of Warrants" specified on the face of the applicable Warrant Certificate, subject to adjustment pursuant to Article 4.

"**Objecting Owner**" means any Exercising Owner that delivers a written objection to the determination of Fair Value pursuant to Section 3.03(c).

"**Officer's Certificate**" means a certificate signed by any Appropriate Officer.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Participant**" means any direct participant of the Depository, the account of which is credited with a beneficial interest in the Global Warrant for the benefit of a Beneficial Owner through the book-entry system maintained by the Depository (or its agent).

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Plan**" has the meaning set forth in the Recitals.

"**Plan Warrants**" means all Warrants other than the Cash-Out Warrants.

"**Private Placement Legend**" has the meaning set forth in Section 2.04(c).

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Shares have the right to receive any Cash, Securities or other property or in which Common Shares (or another applicable Security) are exchanged for or converted into, or any combination of, Cash, Securities or other property, the date fixed for determination of holders of Common Shares entitled to receive such Cash, Securities or other property or participate in such exchange or conversion (whether such date is fixed by the Board or by statute, contract or otherwise).

"**Reference Property**" has the meaning set forth in Section 4.05(a).

"**Reorganization Transaction**" means any (i) sale, lease, license, or other disposition of all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, (ii) sale, transfer or other disposition of all or substantially all of the outstanding Common Shares, (iii) merger or consolidation of the Company into or with another person or entity or (iv) recapitalization, reorganization, consolidation, reclassification, change in the outstanding Common Shares (other than changes resulting from a subdivision or combination to which Section 4.01(a) applies), statutory share exchange or other transaction, in each case as a result of which the Common Shares would be converted into, changed into or exchanged for Securities or other property or assets (including Cash) or any combination thereof.

"**Securities**" means (i) any capital stock (whether common stock or preferred stock, voting or nonvoting), partnership, membership or limited liability company interest or other equity or voting interest, (ii) any right, option,

warrant or other security or evidence of indebtedness convertible into, or exercisable or exchangeable for, directly or indirectly, any interest described in clause (i), (iii) any notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, and (iv) any other "securities," as such term is defined or determined under the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the related rules and regulations promulgated thereunder.

"**Securities Law Registration Requirements**" has the meaning set forth in the Recitals.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, (a) in all circumstances other than a Net Share Settlement where Fair Value has been determined by the Board pursuant to clause (iv) of the definition thereof, the third Business Day immediately following the Exercise Date for such Warrant, and (b) in the event of a Net Share Settlement where Fair Value has been determined by the Board pursuant to clause (iv) of the definition thereof, the third Business Day immediately following (1) the determination of Fair Value by the Independent Appraiser, (2) the election by the Exercising Owner pursuant to Section 3.03(c) to have Full Physical Settlement apply or (3) if neither clause (1) nor clause (2) applies, the tenth (10th) day after receipt by the Exercising Owner of notice of such Fair Value and supporting documentation regarding such determination, as required by Section 3.03(c).

"**Subsidiary**" means, as to any Person, any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, of which at least a majority of the securities or other interests having by their terms voting power to elect a majority of the Board or others performing similar functions with respect to such corporation or other organization is directly or indirectly beneficially owned or controlled by such party or by any one or more of its subsidiaries, or by such party and one or more of its subsidiaries.

"**Trading Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday, other than any day on which Securities are not traded on the applicable securities exchange.

"**Transfer**" means, with respect to any Warrant, to directly or indirectly (whether by act, omission or operation of law), sell, exchange, transfer, hypothecate, negotiate, gift, convey in trust, pledge, assign, encumber, or otherwise dispose of, or by adjudication of a Person as bankrupt, by assignment for the benefit of creditors, by attachment, levy or other seizure by any creditor (whether or not pursuant to judicial process), or by passage or distribution of Warrants under judicial order or legal process, carry out or permit the transfer or other disposition of, all or any portion of such Warrant.

"**Transferee**" means a Person to whom any Warrant (or interest in a Global Warrant) is Transferred.

"**Trigger Event**" has the meaning set forth in Section 4.03(a)(i).

"**Unit of Reference Property**" has the meaning set forth in Section 4.05(a).

"**VWAP**" means, for any Trading Day, the price for Securities (including Common Shares) determined by the daily volume weighted average price per unit of such Securities for such Trading Day on the trading market on which such Securities are then listed or quoted, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange or NASDAQ Stock Market, or if such Securities are not listed or quoted on the New York Stock Exchange or NASDAQ Stock Market, as reported by the principal U.S. national or regional securities exchange on which such Securities are then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 p.m., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, or if such volume weighted average price is unavailable or in manifest error, the price per unit of such Securities using a volume weighted average price method selected by an Independent Appraiser selected by the Board in good faith.

"**Warrant**" or "**Warrants**" means the 4-Year Warrants and/or the 5-Year Warrants, as applicable.

"**Warrant Agent**" has the meaning set forth in the Preamble.

"**Warrant Agreement**" has the meaning set forth in the Preamble.

"**Warrant Certificates**" means the Global Warrant Certificates and the Individual Warrant Certificates.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

"**Warrant Register**" has the meaning set forth in Section 2.03(a).

**Article 2**

**Issuance, Execution and Transfer of Warrants**

Section 2.01     Issuance and Delivery of Warrants.

(a)     On the Closing Date, the Company shall issue and execute the Global Warrant Certificates (in accordance with Section 2.02) evidencing an initial number of Plan Warrants equal to [●] in the aggregate in the case of the 4-Year Warrants and [●] in the aggregate in the case of the 5-Year Warrants (each such Number of Warrants to be subject to adjustment from time to time as described herein) in accordance with the terms of this Warrant Agreement and deliver such Global Warrant Certificates to the Warrant Agent for authentication, along with duly executed Authentication Orders.  The Warrant Agent shall then register such Global Warrants in the name of the Global Warrantholder, which will then credit interests in such Global Warrants to the accounts of the applicable Participants for the benefit of the applicable Initial Beneficial Owners pursuant to the procedures of the Depository and in accordance with the Plan on the Closing Date.

(b)     On the Closing Date, the Company shall issue and execute the Individual Warrant Certificates (in accordance with Section 2.02) evidencing an initial number of Cash-Out Warrants equal to [●] in the aggregate in the case of the 4-Year Warrants and [●] in the aggregate in the case of the 5-Year Warrants (each such Number of Warrants to be subject to adjustment from time to time as described herein) in accordance with the terms of this Warrant Agreement and the Plan and deliver such Individual Warrant Certificates to the Warrant Agent for authentication, along with duly executed Authentication Orders.  The Warrant Agent shall then deliver such Individual Warrant Certificates to the respective Initial Cash-Out Warrantholders.

(c)     The Warrant Certificates shall each evidence one or more Warrants.  Each Warrant evidenced thereby shall be exercisable, in the event of Full Physical Settlement, for one Common Share upon payment of the applicable Exercise Price and compliance with the procedures set forth in this Warrant Agreement.  On the Closing Date, the Warrant Agent shall, upon receipt of such Global Warrants, Individual Warrants and Authentication Orders, authenticate such Global Warrants and Individual Warrants in accordance with Section 2.02 and register such Global Warrants and Individual Warrants in the Warrant Register.  The Global Warrants and Individual Warrants shall be dated as of the Closing Date and, subject to the terms hereof, shall evidence the only Warrants issued or outstanding under this Warrant Agreement as of the Closing Date.  The Global Warrant Certificates shall be deposited on the Closing Date with the Warrant Agent as custodian for the Depository.

(d)     All 4-Year Warrants and all 5-Year Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to their respective benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.  Each Warrant shall be, and shall remain, subject to the provisions of this Warrant Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.  Each Beneficial Owner and Warrantholder shall be bound by all of the terms and provisions of this Warrant Agreement as fully and effectively as if such Beneficial Owner or Warrantholder had signed the same.

(e)     Any Warrant that is included in an Unclaimed Distribution referred to in paragraph (3)(d) of Section E of Article VI of the Plan shall be deemed cancelled and no longer outstanding for all purposes of this Warrant Agreement.

Section 2.02     Execution and Authentication of Warrants.

(a)    Each of the Warrant Certificates shall be executed on behalf of the Company by a duly authorized officer (each such officer, an "**Appropriate Officer**") of the Company. The signature of any of the Appropriate Officers on the Warrant Certificates may be in the form of a facsimile or other electronically transmitted signature (including, without limitation, electronic transmission in portable document format (.pdf)).

(b)    Any of the Warrant Certificates bearing the signatures of individuals, each of whom was, at the time he or she signed any of the Warrant Certificates or his or her facsimile signature was affixed to such Warrant Certificates, as the case may be, an Appropriate Officer, shall bind the Company, notwithstanding that such individuals or any of them have ceased to be such an Appropriate Officer prior to the authentication of such Warrant Certificate by the Warrant Agent or was not such an Appropriate Officer at the date of such Warrant Certificate.

(c)    No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on the applicable Warrant Certificate a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent, and such signature upon any of the Warrant Certificates shall be conclusive evidence, and the only evidence, that such Warrant Certificate has been duly authenticated and delivered hereunder. The signature of the Warrant Agent on any of the Warrant Certificates may be in the form of a facsimile or other electronically transmitted signature (including, without limitation, electronic transmission in portable document format (.pdf)).

Section 2.03    Registration, Transfer, Exchange and Substitution.

(a)    The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which the Company shall provide for the registration of any Warrants and any Transfers, exchanges or substitutions of any Warrant as provided herein. Any Warrant issued upon any registration of Transfer or exchange of or substitution for any Warrant shall be a valid obligation of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as any Warrant surrendered for such registration of Transfer, exchange or substitution. Upon the Company's request, the Warrant Agent shall provide to the Company as soon as reasonably practicable a copy of the Warrant Register as of the date of such request.

(b)    Transfers of a Global Warrant shall be limited to Transfers in whole, and not in part, to the Company, the Depository, their successors, and their respective nominees. A Global Warrant may be Transferred to such parties upon the delivery of a written instruction of Transfer in form reasonably satisfactory to the Warrant Agent and the Company, duly executed by the Global Warrantholder or by such Global Warrantholder's attorney, duly authorized in writing. No such Transfer shall be effected until, and the Transferee shall succeed to the rights of the Global Warrantholder only upon, final acceptance and registration of the Transfer in the Warrant Register by the Warrant Agent. Prior to the registration of any Transfer of a Global Warrant by the Global Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name such Global Warrant is registered as the owner thereof for all purposes, notwithstanding any notice to the contrary. To permit a registration of a Transfer of a Global Warrant, the Company shall execute the Global Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall authenticate such Global Warrant Certificates. Any of such Global Warrant Certificates shall be deposited on or after the date hereof with the Warrant Agent. No service charge shall be made for any such registration of Transfer. A party requesting transfer of a Global Warrant must provide any evidence of authority that may be required by the Warrant Agent, including but not limited to, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, Inc.

(c)    Interests of Beneficial Owners in a Global Warrant registered in the name of the Depository or its nominee shall only be Transferred in accordance with the procedures of the Depository, the applicable Participant and applicable Law.

(d)    So long as any Global Warrant is registered in the name of the Depository or its nominee, the Beneficial Owners shall have no rights under this Warrant Agreement with respect to such Global Warrant held on their behalf by the Depository, and the Depository may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such Beneficial Owner's interest in such Global Warrant will be shown only on, and the Transfer

-8-

of such interest shall be effected only through, records maintained by the Depository or its nominee or the applicable Participant, and neither the Company nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depository or its nominee or the applicable Participant.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair the operation of customary practices of the Depository or Participants governing the exercise of the rights of a Beneficial Owner.

(e)    Cash-Out Warrants may be Transferred only upon surrender of the Individual Warrant Certificate representing such Warrants for registration of Transfer.  Individual Warrant Certificates may be presented for registration of Transfer and exchange at the offices of the Warrant Agent upon the delivery of a written instruction of Transfer in form reasonably satisfactory to the Warrant Agent and the Company, duly executed by the holder thereof or by such holder's attorney,  duly authorized in writing.  No such Transfer shall be effected until, and the Transferee shall succeed to the rights of the holder thereof only upon, final acceptance and registration of the Transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any Transfer of a Cash-Out Warrant represented by an Individual Warrant Certificate as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name such Individual Warrant Certificate is registered as the owner thereof for all purposes, notwithstanding any notice to the contrary.  To permit a registration of a Transfer of a Cash-Out Warrant, the Company shall execute any Individual Warrant Certificate at the Warrant Agent's request and the Warrant Agent shall authenticate such Individual Warrant Certificate.  No service charge shall be made for any such registration of Transfer.  A party requesting Transfer of a Cash-Out Warrant mush provide any evidence of authority that may be required by the Warrant Agent, including but not limited to, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, Inc.  If less than all Cash-Out Warrants represented by an Individual Warrant Certificate are Transferred, exchanged or substituted in accordance with this Warrant Agreement, the Individual Warrant Certificate shall be surrendered to the Warrant Agent and a new Individual Warrant Certificate for a Number of Warrants equal to the Cash-Out Warrants represented by such individual Warrant Certificate that were not Transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent along with a duly executed Authentication Order and the Warrant Agent shall authenticate such new Individual Warrant Certificate and shall deliver such new Individual Warrant Certificate to the Person or Persons entitled to receive the same.  Upon the written request of a Warrantholder, subject to applicable Law and receipt by the Company of an opinion of counsel (which may be in-house counsel of such holder) or seller's representation letter reasonably satisfactory to the Company indicating that the Cash-Out Warrants of such Warrantholder are no longer "restricted securities" under the applicable federal securities laws of the United States, the Company shall enable eligible Cash-Out Warrants held by such Warrantholder to be "DTC eligible" so that such Cash-Out Warrants may be held in book-entry form through the Depository.  Once such Cash-Out Warrants become "DTC eligible," any Individual Warrant Certificates representing such Cash-Out Warrants may be presented to the Warrant Agent by such Warrantholder in exchange for one or more Global Warrants up to the aggregate number of such Cash-Out Warrants, to be registered in the name of the Depository, or its nominee, for crediting to the accounts of its participants pursuant to the procedures of the Depository.  Upon such presentation, the Company may execute one or more Global Warrant Certificates representing the aggregate number of such Cash-Out Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.  Such Global Warrant Certificates shall be deposited with the Warrant Agent as custodian for the Depository.  An Individual Warrant Certificate representing Cash-Out Warrants may not be exchanged for a Global Warrant except upon satisfaction of the requirements set forth above.

Section 2.04    Form of Warrant Certificates; Private Placement Legend.

(a)    Each of the Global Warrant Certificates shall be in substantially the form set forth in Exhibit A-1 hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any Law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

(b)     Each Individual Warrant Certificate shall be in substantially the form set forth in Exhibit A-2 hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any Law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

(c)     Except as provided below, each Individual Warrant Certificate shall bear a legend substantially to the effect set forth in Exhibit F.  Common Shares issuable upon exercise of Warrants represented by an Individual Warrant Certificate (the "**Cash-Out Warrant Shares**") shall bear a legend substantially to the effect set forth in Exhibit G.  Each of such legends is referred to herein as a "**Private Placement Legend**".

Upon any Transfer of a Cash-Out Warrant Share pursuant to Rule 144 under the Securities Act or under an effective registration statement under the Securities Act, the Company shall permit the holder of such Cash-Out Warrant Share to exchange such Cash-Out Warrant Share for a Common  Share that does not bear the Private Placement Legend subject to the following sentence.  In the case of a Transfer of Cash-Out Warrant Shares pursuant to Rule 144 under the Securities Act, an opinion of counsel (which may be in-house counsel of such holder) or seller's representation letter reasonably satisfactory to the Company shall be tendered therewith indicating that there are no impediments to the removal of such Private Placement Legend under the applicable federal securities laws of the United States.  Once the Private Placement Legend has been removed with respect to a Cash-Out Warrant Share, upon the written request of the holder thereof, the Company will cooperate with such holder to register such Cash-Out Warrant Shares in the name of the Depository, or its nominee or custodian for crediting to the accounts of its participants pursuant to the procedures of the Depository.

Section 2.05     Cancellation of the Warrant Certificates.  Any Warrant Certificate shall be promptly cancelled by the Warrant Agent upon the earlier of (i) its Expiration Date, (ii) the consummation of a Cash Exit Transaction (as provided in Section 5.01), (iii) the mutilation of the Warrant Certificate as described in Section 6.02, or (iv) registration of Transfer or exercise of all Warrants represented thereby and, except as provided in this Article 2 in case of a Transfer or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof.  The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

Section 2.06     Limitations on Transfer of Plan Warrants.  Notwithstanding any other provision of this Warrant Agreement, the Plan Warrants are being offered and sold, and the Common Shares issuable upon exercise thereof are being offered and sold, pursuant to an exemption from the registration requirement of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code, and to the extent that any Beneficial Owner is an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code, such Beneficial Owner may not be able to Transfer any Plan Warrants or Common Shares issuable upon exercise thereof in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder.  Notwithstanding anything contained in this Warrant Agreement (but without limiting or modifying any express obligation of the Warrant Agent hereunder), the Warrant Agent shall not be under any duty or responsibility to ensure compliance by the Company, the Global Warrantholder, any Beneficial Owner of Plan Warrants or Common Shares issuable upon exercise thereof or any other Person with any applicable federal or state securities or bankruptcy Laws.  By accepting a Transfer of a Plan Warrant or Common Share issuable upon exercise thereof, (x) the applicable Participant agrees to inform the Beneficial Owner of the limitations on Transfer set forth in this Section 2.06, and shall instruct and direct such Beneficial Owner to conform to the restrictions set forth herein and shall maintain any applicable legends in its books and records and (y) the Beneficial Owner acknowledges the foregoing.

Section 2.07     Limitations on Transfer of Cash-Out Warrants.  Notwithstanding any other provision of this Warrant Agreement, the Cash-Out Warrants and the Cash-Out Warrant Shares are being offered and sold pursuant to an exemption from the registration requirement of Section 5 of the Securities Act provided by Section 4(a)(2) of the Securities Act and Rule 506 promulgated thereunder.  Warrantholders and the holders of Cash-Out Warrant Shares may not be able to Transfer any Cash-Out Warrants or Cash-Out Warrant Shares in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder. Notwithstanding anything contained in this Warrant Agreement (but without limiting or modifying any express

obligation of the Warrant Agent hereunder), the Warrant Agent shall not be under any duty or responsibility to ensure compliance by the Company, any Warrantholders or holders of Cash-Out Warrant Shares or any other Person with any applicable federal or state securities or bankruptcy Laws.

**Article 3**

**Exercise and Settlement of Warrants**

Section 3.01    Exercise of Warrants.  At any time prior to Close of Business on its Expiration Date or cancellation pursuant to Section 2.05, each Warrant may be exercised in accordance with this Article 3.  Subject to Section 5.01 hereof, any Warrants not exercised prior to their applicable Expiration Date shall expire unexercised and all rights thereunder and all rights in respect thereof under this Warrant Agreement shall cease as of the Close of Business on their applicable Expiration Date.

Section 3.02    Procedure for Exercise.

(a)    To exercise a Plan Warrant, a Beneficial Owner must arrange for (i) the delivery of the Exercise Notice duly completed and executed by its applicable Participant to the principal office of each of the Warrant Agent and the Company, (ii) if Full Physical Settlement is elected, payment to the Warrant Agent in an amount equal to the respective Exercise Price for each Warrant to be exercised together with all applicable taxes and charges thereto (except for taxes and charges for which the Company is responsible pursuant to Section 3.10), (iii) delivery of each Warrant to be exercised through the facilities of the Depository and (iv) compliance with all other procedures established by the Depository, the applicable Participant and the Warrant Agent for the exercise of Warrants.

(b)    To exercise a Cash-Out Warrant, a Warrantholder must (i) surrender the Individual Warrant Certificate evidencing such Cash-Out Warrant at the principal office of the Warrant Agent, (ii) arrange for the delivery of the Exercise Notice duly completed and executed to the principal office of each of the Warrant Agent and the Company and (iii) if Full Physical Settlement is elected, pay to the Warrant Agent an amount equal to the Exercise Price for each Warrant to be exercised together with all applicable taxes and charges thereto (except for such taxes and charges for which the Company is responsible pursuant to Section 3.10).

(c)    The date on which all the requirements for exercise set forth in this Section 3.02 in respect of a Warrant are satisfied is the "**Exercise Date**" for such Warrant.

(d)    Subject to Section 3.02(f) and Section 3.02(g), any exercise of a Warrant pursuant to the terms of this Warrant Agreement shall be irrevocable and enforceable in accordance with its terms.

(e)    All funds received by the Warrant Agent under this Warrant Agreement that are to be distributed or applied by the Warrant Agent in the performance of services in accordance with this Warrant Agreement (the "**Funds**") shall be held by the Warrant Agent as agent for the Company and deposited in one or more bank accounts to be maintained by the Warrant Agent in its name as agent for the Company (the "**Funds Account**").  Until paid pursuant to the terms of this Warrant Agreement, the Warrant Agent will hold the Funds through the Funds Account in deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating), each as reported by Bloomberg Finance L.P. The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.  The Warrant Agent shall pay such interest, dividends or earnings to the Company.

(f)    The Company shall use commercially reasonable efforts to assist and cooperate with any Exercising Owner required to make any governmental filings or obtain any governmental approvals prior to or in connection with any exercise of a Warrant (including, without limitation, making any filings required to be made by

-11-

the Company), and any exercise of a Warrant may be made contingent upon the making of any such filing and the receipt of any such approval.

(g)        Notwithstanding any other provision of this Warrant Agreement, if the exercise of any Warrant is to be made in connection with a registered public offering or a Reorganization Transaction, such exercise may, upon proper election in the Exercise Notice, be conditioned upon consummation of such offering or transaction in which case such exercise shall not be deemed effective until the consummation of such offering or transaction.

(h)        The Warrant Agent shall forward funds deposited in the Funds Account in a given month by the fifth Business Day of the following month by wire transfer to an account designated by the Company.

(i)        In the case of Full Physical Settlement, payment of the applicable Exercise Price upon exercise of Warrants shall be by federal wire or other immediately available funds payable to the account maintained by the Warrant Agent in its name as agent for the Company.  The Warrant Agent shall provide an exercising Beneficial Owner or Warrantholder, as the case may be, upon request, with the appropriate payment instructions.

Section 3.03        Settlement of Warrants.

(a)        Full Physical Settlement shall apply to each Warrant unless the Exercising Owner elects for Net Share Settlement to apply upon exercise of such Warrant.  Such election shall be made in the Exercise Notice for such Warrant or as otherwise provided in Section 3.03(c).

(b)        If Full Physical Settlement applies to the exercise of a Warrant, upon the proper and valid exercise thereof by an Exercising Owner, the Company shall cause to be delivered to the Exercising Owner, the Full Physical Settlement Amount on the Settlement Date.

(c)        If Net Share Settlement applies to the exercise of a Warrant and Fair Value has been determined by the Board pursuant to clause (iv) of the definition thereof, then the Company shall provide each Exercising Owner with written notice of such Fair Value and supporting documentation regarding such determination as reasonably requested by such Exercising Owner.  An Exercising Owner may, within 10 days after its receipt of notice of such Fair Value and supporting documentation:

(1) deliver to the Company and the Warrant Agent a written objection to such determination, in which case the Fair Value shall be determined by an Independent Appraiser selected by the Company in good faith, subject to the following:

(i)        The Independent Appraiser's determination shall be based upon the fair market value of the Company determined on a going concern basis as between a willing buyer and a willing seller and taking into account all relevant factors determinative of value.  In determining the Fair Value of any Common Shares, no consideration shall be given to any restrictions on transfer of the Common Shares imposed by agreement or by federal or state securities laws, or to the existence or absence of, or any limitations on, voting rights; and

(ii)        The Independent Appraiser shall be instructed to deliver a written opinion regarding Fair Value within 30 days after submission to it of such objection.  Such opinion shall be final and binding on the Company and the Objecting Owner.  The reasonable costs and expenses of the Independent Appraiser in making such determination shall be borne equally by the Company and the Objecting Owner; or

(2) elect to have Full Physical Settlement apply to the exercise of each such Warrant by (x) delivering written notice of such election to the Company and the Warrant Agent, and (y) making payment to the Warrant Agent in an amount equal to the Exercise Price for each such Warrant together with all applicable taxes and charges thereto (except for taxes and charges for which the Company is responsible pursuant to Section 3.10).

-12-

(d)        If Net Share Settlement applies to the exercise of a Warrant, upon the proper and valid exercise thereof by an Exercising Owner, the Company shall cause to be delivered to the Exercising Owner, the Net Share Amount on the Settlement Date, with any fractional Common Share rounded down to the nearest whole share as provided in Section 3.05.

(e)        If there is a dispute as to the determination of the applicable Exercise Price or the calculation of the number of Common Shares to be delivered to an Exercising Owner, the Company shall cause to be promptly delivered to the Exercising Owner, the number of Common Shares that is not in dispute.

Section 3.04        Delivery of Common Shares.

(a)        In connection with the exercise of Warrants, the Warrant Agent shall:

(1)        examine all Exercise Notices and all other documents delivered to it to ascertain whether, on their face, such Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(2)        where an Exercise Notice or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the Person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(3)        inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Notices received and delivery of Warrants to the Warrant Agent's account;

(4)        advise the Company with respect to an exercise, no later than two Business Days following the satisfaction of each of the applicable procedures for exercise set forth in Section 3.02(a) or Section 3.02(b), as the case may be, of (v) the receipt of such Exercise Notice and the number of Warrants exercised in accordance with the terms and conditions of this Warrant Agreement, (w) the number of Common Shares to be delivered by the Company, (x) the instructions with respect to issuance of the Common Shares, subject, in the case of exercise of a Global Warrant, to the timely receipt from the Depository of the necessary information, (y) the number of Persons who will become holders of record of the Company (who were not previously holders of record) as a result of receiving Common Shares upon exercise of the Warrants and (z) such other information as the Company shall reasonably require;

(5)        promptly deposit in the Funds Account all Funds received in payment of the applicable Exercise Price in connection with Full Physical Settlement of Warrants;

(6)        promptly cancel and destroy the applicable Warrant Certificate if all Warrants represented thereby have been exercised in full and deliver a certificate of destruction to the Company, unless the Company shall otherwise direct in writing;

(7)        if all Warrants represented by a Warrant Certificate shall not have been exercised in full, (i) in respect of a Global Warrant Certificate, note and authenticate such decrease in the Number of Warrants on Schedule A of such Global Warrant Certificate and (ii) in respect of an Individual Warrant Certificate, deliver a new Individual Warrant Certificate, authenticated by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Individual Warrant Certificate; and

(8)        provide to the Company, upon the Company's request, the number of Warrants previously exercised, the number of Common Shares issued in connection with such exercises and the number of remaining outstanding Warrants.

(b)      With respect to each properly exercised Warrant in accordance with this Warrant Agreement, the Company shall cause its transfer agent to issue, in book-entry form at the transfer agent or through the Depository, the Common Shares due in connection with such exercise for the benefit and in the name of the Person designated by the Beneficial Owner or Warrantholder submitting the applicable Exercise Notice.  The Person on whose behalf and in whose name any Common Shares are registered shall for all purposes be deemed to have become the holder of record of such Common Shares as of the Close of Business on the applicable Exercise Date.

(c)      Promptly after the Warrant Agent shall have taken the action required by this Section 3.04 (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to the consummation of any exercise of any Warrants.

Section 3.05      No Fractional Common Shares to Be Issued.

(a)      Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a Common Share upon exercise of any Warrants.

(b)      If any fraction of a Common Share would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrants, the Company shall instead round down to the nearest whole share the number of Common Shares that such Person designated in the applicable Exercise Notice shall receive.  All Warrants exercised by a Beneficial Owner or Warrantholder on the same Exercise Date shall be aggregated for purposes of determining the number of Common Shares to be delivered pursuant to Section 3.04(b).

(c)      Each Beneficial Owner and Warrantholder, by its acceptance of an interest in a Warrant, expressly waives its right to any fraction of a Common Share upon its exercise of such Warrant.

Section 3.06      Acquisition of Warrants by Company.  The Company shall have the right, except as limited by Law, to purchase or otherwise to acquire one or more Warrants at such times, in such manner and for such consideration as agreed by the Company and the applicable Beneficial Owner or Warrantholder.

Section 3.07      Validity of Exercise.  All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in good faith, which determination shall be final and binding with respect to the Warrant Agent.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of such determination by the Company.  The Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Exercise Notices with regard to any particular exercise of Warrants.

Section 3.08      Certain Calculations.

(a)      The Warrant Agent shall be responsible for performing all calculations, save for in the case of Net Share Settlements, required in connection with the exercise and settlement of the Warrants as described in this Article 3.  In connection therewith, the Warrant Agent shall provide prompt written notice to the Company, in accordance with Section 3.04(a)(4), of the number of Common Shares deliverable upon exercise and settlement of Warrants.  For the avoidance of doubt, the Warrant Agent shall not be responsible for performing the calculations set forth in Article 4 or the calculations delegated to the Independent Appraiser in accordance with this Warrant Agreement.

(b)      The Warrant Agent shall not be accountable with respect to the validity or value of any Common Shares or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible, to the extent not arising from the Warrant Agent's negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), for any failure of the Company to issue, transfer or deliver any Common Shares or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

-14-

Section 3.09    Reservation and Listing of Shares.  The Company will at all times reserve and keep available, out of its authorized but unissued Common Shares, solely for the purpose of providing for the exercise of the Warrants, the aggregate number of Common Shares then issuable upon exercise of the Warrants at any time.  The Company will use its commercially reasonable efforts to (A) procure, at its sole expense, the listing of the Common Shares issuable upon exercise of the Warrants (other than Cash-Out Warrant Shares that contain a Private Placement Legend) at any time, subject to issuance or notice of issuance, on all principal stock exchanges on which the Common Shares are then listed or traded and (B) maintain such listings of such Common Shares at all times after issuance.  The Company will use commercially reasonable efforts to ensure that the Common Shares may be issued without violation of any applicable law or regulation or of any requirement of any securities exchange on which the Common Shares are listed or traded.

Section 3.10    Charges, Taxes and Expenses.  Issuance of the Warrants and issuance of Common Shares upon the exercise of the Warrants shall be made without charge for any issue or transfer tax or other incidental expense in respect of the issuance thereof, all of which taxes and expenses shall be paid by the Company; provided, however, that the Company shall not be required to pay any tax that may be payable in respect of any Transfer involved in the issuance and delivery of such Warrants or Common Shares (including certificates therefor) in a name other than the Beneficial Owner or Warrantholder of the Warrant surrendered upon exercise or Transfer of the Warrant, and the Company shall  not be required to issue or deliver such Warrants or Common Shares, as applicable, unless and until the Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

**Article 4**

**Adjustments**

Section 4.01    Adjustments to Exercise Price.  After the date on which the Warrants are first issued and while any Warrants remain outstanding and unexpired, the Exercise Prices shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Shares as a dividend or distribution to all holders of Common Shares, or a subdivision, combination, split, reverse split or reclassification of the outstanding Common Shares into a greater or smaller number of Common Shares, in which event the Exercise Prices shall be adjusted based on the following formula:

$$E_1 = E_0 \times \frac{N_0}{N_1}$$

where:

$E_1$ = the applicable Exercise Price in effect immediately after (i) the Open of Business on the Ex-Date in the case of a dividend or distribution or (ii) the consummation of the transaction in the case of a subdivision, combination, split, reverse split or reclassification;

$E_0$ = the applicable Exercise Price in effect immediately prior to (i) the Open of Business on the Ex-Date in the case of a dividend or distribution or (ii) the consummation of the transaction in the case of a subdivision, combination, split, reverse split or reclassification;

$N_0$ = the number of Common Shares Deemed Outstanding immediately prior to (i) the Open of Business on the Record Date in the case of a dividend or distribution or (ii) the consummation of the transaction in the case of a subdivision, combination, split, reverse split or reclassification; and

$N_1$ = the number of Common Shares equal to (i) in the case of a dividend or distribution, the sum of the number of Common Shares Deemed Outstanding immediately prior to the Open of Business on the Record Date for such dividend or distribution plus the total number of Common Shares issued pursuant to such dividend or distribution or (ii) in the case of a subdivision, combination, split, reverse split or

reclassification, the number of Common Shares Deemed Outstanding immediately after such subdivision, combination, split, reverse split or reclassification.

Such adjustment shall become effective immediately after (i) the Open of Business on the Ex-Date in the case of a dividend or distribution or (ii) the consummation of the transaction in the case of a subdivision, combination, split, reverse split or reclassification.  If any dividend or distribution or subdivision, combination, split, reverse split or reclassification of the type described in this Section 4.01(a) is declared or announced but not so paid or made, the Exercise Prices shall again be adjusted to the applicable Exercise Prices that would then be in effect if such dividend or distribution or subdivision, combination, split, reverse split or reclassification had not been declared or announced, as the case may be.

(b)     The issuance as a dividend or distribution to all holders of Common Shares of evidences of indebtedness, Securities of the Company or any other Person (other than Common Shares), Cash or other property (excluding any dividend or distribution covered by Section 4.01(a)), in which event the Exercise Prices will be adjusted based on the following formula:

$$E_1 = E_0 \times \frac{P - FMV}{P}$$

where:

$E_1$     =   the applicable Exercise Price in effect immediately after the Open of Business on the Ex-Date for such dividend or distribution;

$E_0$     =   the applicable Exercise Price in effect immediately prior to the Open of Business on the Ex-Date for such dividend or distribution;

$P$     =   the Fair Value of a Common Share as of immediately prior to the Open of Business on the second Business Day preceding the Ex-Date for such dividend or distribution; and

$FMV$   =   the Fair Value of the portion of such dividend or distribution applicable to one Common Share as of the Open of Business on the date of such dividend or distribution.

Such decrease shall become effective immediately after the Open of Business on the Ex-Date for such dividend or distribution.  In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Prices shall again be adjusted to be the Exercise Prices which would then be in effect if such distribution had not been declared or announced.

(c)     If any single action would require adjustment of the Exercise Prices pursuant to more than one subsection of this Section 4.01, only one adjustment shall be made and such adjustment shall be the amount of adjustment that has the highest, relative to the rights and interests of the registered holders of the Warrants then outstanding, absolute value.

(d)     The Company may from time to time, to the extent permitted by Law, decrease the Exercise Prices and/or increase the Number of Warrants by any amount for any period of at least twenty days.  In that case, the Company shall give the Global Warrantholder, the Warrantholders and the Warrant Agent at least ten days' prior written notice of such increase or decrease, and such notice shall state the applicable decreased Exercise Prices and/or increased Number of Warrants and the period during which the decrease and/or increase will be in effect.  The Company may make such decreases in the Exercise Prices and/or increases in the Number of Warrants, in addition to those set forth in this Article 4, as the Board deems advisable, including to avoid or diminish any income tax to holders of the Common Shares resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

(e)     Notwithstanding this Section 4.01 or any other provision of this Warrant Agreement or the Warrants, if an Exercise Prices adjustment becomes effective on any Ex-Date, and a Warrant has been exercised on or after such Ex-Date and on or prior to the related Record Date resulting in the Person issued Common Shares being treated as the record holder of the Common Shares on or prior to the Record Date, then, notwithstanding the

-16-

Exercise Prices adjustment provisions in this <u>Section 4.01</u>, the Exercise Prices adjustment relating to such Ex-Date will not be made with respect to such Warrant.  Instead, such Person will be treated as if it were the record owner of Common Shares on an un-adjusted basis and participate in the related dividend, distribution or other event giving rise to such adjustment.

Section 4.02     <u>Adjustments to Number of Warrants</u>.  Concurrently with any adjustment to the Exercise Prices under <u>Section 4.01</u>, the Number of Warrants in respect of each Warrant Certificate will be adjusted such that the Number of Warrants in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants in effect immediately prior to such adjustment, multiplied by a fraction, (i) the numerator of which is the applicable Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the applicable Exercise Price in effect immediately following such adjustment.

Section 4.03     <u>Certain Distributions of Rights and Warrants; Stockholder Rights Plan</u>.

(a)     (i)     Rights or warrants distributed by the Company to all holders of Common Shares entitling the holders thereof to subscribe for or purchase the Company's Securities (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(1)     are deemed to be transferred with such Common Shares;

(2)     are not exercisable; and

(3)     are also issued in respect of future issuances of Common Shares,

shall be deemed not to have been distributed for purposes of Article 4 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 4 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Prices and the Number of Warrants shall be made under this Article 4 (subject in all respects to Section 4.04).

(ii)     If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 4.03(b)).

(iii)     In addition, except as set forth in Section 4.03(b), in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in clause (ii) above) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Prices and the Number of Warrants under Article 4 was made:

(1)     in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Prices and the Number of Warrants shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, equal to the per share redemption or repurchase price received by a holder or holders of Common Shares with respect to such rights or warrants (assuming such holder had retained such rights or warrants) made to all holders of Common Shares as of the date of such redemption or repurchase; and

(2)     in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Prices and the Number of Warrants shall be readjusted as if such rights and warrants had not been issued or distributed.

(b)     If the Company has a stockholder rights plan in effect with respect to the Common Shares, upon exercise of a Warrant the holder shall be entitled to receive, in addition to the Common Shares, the rights under such stockholder rights plan, unless, prior to such exercise, such rights have separated from the Common Shares, in which

case the Exercise Prices and the Number of Warrants shall be adjusted at the time of separation as if the Company had made a distribution to all holders of Common Shares as described in the first paragraph of Section 4.01(b), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 4.04    Restrictions on Adjustments.

(a)    No adjustment shall be made to the 4-Year Exercise Price or the 5-Year Exercise Price under Section 4.01, nor will any corresponding adjustment be made to the Number of Warrants under Section 4.02, unless the adjustment would result in a change of at least 1% of the 4-Year Exercise Price or the 5-Year Exercise Price, as the case may be; provided, however, that any adjustment of less than 1% that was not made by reason of this Section 4.04(a) shall be carried forward and made as soon as such adjustment, together with any other adjustments not previously made by reason of this Section 4.04(a), would result in a change of at least 1% in the aggregate.  All calculations under this Article 4 shall be made to the nearest cent or to the nearest 1/100th of a Common Share, as the case may be.

(b)    In no event shall the Company adjust the 4-Year Exercise Price or the 5-Year Exercise Price or make a corresponding adjustment to the number of Common Shares issuable upon exercise of any Warrant to the extent that the adjustment would reduce the applicable Exercise Price below the par value of the Common Shares.

(c)    No adjustment shall be made to the 4-Year Exercise Price or the 5-Year Exercise Price under Section 4.01, nor will any corresponding adjustment be made to the Number of Warrants under Section 4.02, upon: (i) the issuance of any Securities by the Company on the Effective Date and pursuant to the Plan, (ii) the issuance of any Common Shares pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's Securities and the investment of additional optional amounts in Common Shares under any plan, (iii) the issuance of Securities by the Company to employees, officers, directors or consultants of the Company or its Subsidiaries pursuant to the New MIP or other management or director incentive plans or stock or stock option compensation plans, including pursuant to any employment, severance or consulting agreements, or (iv) a change in par value of the Common Shares.

(d)    If the Company takes a record of the holders of Common Shares for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to members) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Prices or the Number of Warrants then in effect shall be required by reason of the taking of such record.

Section 4.05    Adjustment upon Reorganization Transaction.

(a)    If there occurs any Reorganization Transaction (other than a Cash Exit Transaction) while any Warrants remain outstanding and unexpired, then following the effective time of the Reorganization Transaction, the right to receive Common Shares upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including Cash or any combination thereof) (the "**Reference Property**") that a holder of one Common Share would have owned or been entitled to receive in connection with such Reorganization Transaction (such kind and amount of Reference Property per Common Share, a "**Unit of Reference Property**").  In the event holders of Common Shares have the opportunity to elect the form of consideration to be received in a Reorganization Transaction, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Transaction shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Shares in such Reorganization Transaction.  The Company hereby agrees not to become a party to any Reorganization Transaction unless its terms are consistent with this Section 4.05.

(b)    At any time from, and including, the effective time of a Reorganization Transaction:

(1)        each Warrant shall be exercisable for a single Unit of Reference Property instead of one Common Share; and

(2)        any calculation of Fair Value shall be made with respect to a Unit of Reference Property.

(c)        On or prior to the effective time of any Reorganization Transaction, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 4.05.  If the Reference Property in connection with any Reorganization Transaction includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Transaction, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Global Warrantholder (for the benefit of the Beneficial Owners) and the Warrantholders as the Board shall reasonably consider necessary by reason of the foregoing.  Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 4.  In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 4.05, the Company shall promptly file with the Warrant Agent an Officer's Certificate briefly stating the reasons therefor, the kind or amount of Cash, securities or property or assets that will comprise a Unit of Reference Property after the relevant Reorganization Transaction, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.  The Company shall cause notice of the execution of the amendment to be mailed to the Global Warrantholder and the Warrantholders within 20 Business Days after execution thereof.

(d)        The above provisions of this Section 4.05 shall similarly apply to successive Reorganization Transactions.

Section 4.06        Successor upon Consolidation or Merger .

(a)        The Company may consolidate or merge with another Person only (i) if the Company is the surviving Person or (ii) if the Company is not the surviving Person, then:

(1)        the successor to the Company assumes all of the Company's obligations under this Warrant Agreement; and

(2)        the successor to the Company provides written notice of such assumption to the Warrant Agent prior to the consummation of such consolidation or merger, together with such identifying corporate information as may be reasonably requested by the Warrant Agent.

(b)         Such successor to the Company thereafter may cause to be signed, and may issue any or all of, the Global Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been issued by the Company; and, upon the order of such successor Person, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement, the Warrant Agent shall authenticate and deliver, as applicable, any Global Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor to the Company thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 4.07        Common Shares Outstanding; Common Shares Reserved for Issuance on Exercise.

(a)        For the purposes of this Article 4, the number of Common Shares at any time outstanding shall not include Common Shares held, directly or indirectly, by the Company or any of its Subsidiaries.

(b)        Such number of Common Shares as will be issuable upon the exercise of all outstanding Warrants for Common Shares have been authorized and reserved for issuance.  The Company covenants that all Common Shares that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

-19-

(c)      The Company agrees to authorize and direct its current and future transfer agents for the Common Shares to reserve for issuance the number of Common Shares specified in this Section 4.07 and shall take all action required to increase the authorized number of Common Shares if at any time there shall be insufficient authorized but unissued Common Shares to permit such reservation or to permit the exercise of a Warrant. Promptly after each of the Expiration Dates, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no Common Shares shall be required to be reserved in respect of such Warrants.

Section 4.08      Calculations; Instructions to Warrant Agent. The Company shall be responsible for making all calculations called for under this Article 4 for purposes of determining any adjustments to the Exercise Prices and the Number of Warrants, including determinations as to Fair Value and the composition of Units of Reference Property. Such calculations and determinations shall be final and binding on the Global Warrantholder and all Beneficial Owners and Warrantholders absent manifest error. The Company shall provide a schedule of the Company's calculations and determinations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

Section 4.09      Notice of Adjustment. The Company shall mail, or cause to be mailed, to the Global Warrantholder, the Warrantholders and the Warrant Agent, in accordance with Section 7.13, a notice of any adjustment or readjustment to the Exercise Prices or the Number of Warrants no less than three Business Days prior to the effective date of such adjustment or readjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate setting forth such adjustment or readjustment and kind and amount of securities, Cash or other property for which a Warrant shall thereafter be exercisable and the applicable Exercise Price, showing in reasonable detail the facts upon which such adjustment or readjustment is based. The Officer's Certificate shall be conclusive evidence that the adjustment or readjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments or readjustments unless and until it has received such Officer's Certificate. The Warrant Agent shall not be under any duty or responsibility with respect to any such Officer's Certificate except to exhibit the same to the Global Warrantholder and the Warrantholders.

Section 4.10      Statements on Warrants. Other than notation of any applicable increase or decrease in the Number of Warrants on Schedule A of each Global Warrant Certificate, the form of each Global Warrant Certificate need not be changed because of any adjustment or readjustment made pursuant to this Article 4, and Global Warrant Certificates issued after such adjustment or readjustment may state the same information (other than the applicable adjusted Exercise Price and the adjusted Number of Warrants) as are stated in the Global Warrant Certificates initially issued pursuant to this Warrant Agreement.

Section 4.11      Effect of Adjustment. The Depository and applicable Participants shall effect any applicable adjustments, changes or payments to the Beneficial Owners with respect to beneficial interests in the Global Warrants resulting from any adjustments or readjustments, changes or payments effected pursuant to this Article 4 in accordance with the procedures of the Depository and the applicable Participants.

Section 4.12      Warrant Agent Not Responsible for Adjustments or Validity. The Warrant Agent shall at no time be under any duty or responsibility to determine whether any facts exist that may require an adjustment or readjustment of the Exercise Prices and the Number of Warrants, or with respect to the nature or extent of any such adjustment or readjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same. The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder. The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any Common Shares or of any Securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment or readjustment pursuant to this Article 4, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any Common Shares or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 4, or to comply with any of the covenants of the Company contained in this Article 4. The Warrant Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein or in any notice from the Company. The Warrant Agent may rely

-20-

conclusively, and shall be protected in acting, upon any notice, instruction, request, order, judgment, certification, opinion or advice of counsel, statement, demand or other instrument or document, not only as to its due execution, validity (including the authority of the person signing or presenting the same) and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Warrant Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same.

**Article 5**

**Cash Exit Transaction**

Section 5.01      Cash Exit Transaction.  Upon consummation of a Cash Exit Transaction, all unexercised Warrants shall be automatically cancelled for no consideration; provided, however, that in the case of a Cash Exit Transaction in which the Cash consideration paid per Common Share exceeds the exercise price of any Warrant, each such Warrant shall be deemed to have been, for all purposes, exercised immediately prior to consummation of such Cash Exit Transaction for the Net Share Amount.

**Article 6**

**Other Provisions Relating to Rights of Warrantholders**

Section 6.01      No Rights as Stockholders.  Nothing contained in this Warrant Agreement or in any Warrant Certificate shall be construed as conferring upon any Person, by virtue of holding or having a beneficial interest in a Warrant, the right to vote, to consent, to receive any Cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Shares, or to exercise any rights whatsoever as a stockholder of the Company unless, until and only to the extent such Persons become holders of record of Common Shares issued upon settlement of Warrants.

Section 6.02      Mutilated or Missing Global Warrant Certificates.  If any Warrant Certificate is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant Certificate may be replaced with a new Warrant Certificate, of like date and tenor and representing the same number of Warrants, at the cost of the Company at the office of the Warrant Agent subject to the replacement procedures of the Warrant Agent which shall include obtaining an open penalty surety bond satisfactory to the Warrant Agent holding the Company and the Warrant Agent harmless.  Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone.  All Warrant Certificates shall be issued upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any Law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03      Modification, Waiver and Meetings.

(a)      This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of any Warrantholder, any Beneficial Owner of any Warrant, or any applicable Participant with respect to any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement or to make any other provisions in regard to matters or questions arising in this Warrant Agreement which the Company and the Warrant Agent may deem necessary or desirable; provided that such modification or amendment does not adversely affect the interests of the Warrantholders or the Beneficial Owners in any material respect.  As a condition precedent to the Warrant Agent's execution of any amendment, the Company shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 6.03.

(b)      Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants not contemplated by Section 6.03(a) may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, by the Beneficial Owners

-21-

and Warrantholders (pursuant to a proper vote or consent of a majority of the Warrants at the time outstanding). Notwithstanding anything to the contrary herein, the Company may amend Schedule A from time to time to accurately reflect the name and address of the Global Warrantholder after the Closing Date without any further consent or agreement from any other Person.

(c)     However, no modification, amendment or waiver may, without the written consent of the Beneficial Owners and Warrantholders of the 4-Year Warrants (if such modification, amendment or waiver relates to the 4-Year Warrants) or the 5-Year Warrants (if such modification, amendment or waiver relates to the 5-Year Warrants), pursuant to a proper vote or consent of each applicable Warrant:

(A)     change the applicable Expiration Date; or

(B)     increase the applicable Exercise Price or decrease the applicable Number of Warrants (except as set forth in Article 4).

Section 6.04     Reorganization Transaction.  In the event of any Reorganization Transaction, then, and in each such case, the Company will mail or cause to be mailed to the Global Warrantholder and each other Warrantholder, as promptly as reasonably practicable upon execution of the agreement providing for such Reorganization Transaction, a notice specifying the effective date on which such Reorganization Transaction is or is expected to take place, and the time, if any is to be fixed, as of which the holders of record of Common Shares (or such other stock or Securities at the time deliverable upon the exercise of a Warrant) shall be entitled to exchange their Common Shares (or such other stock or Securities) for Securities or other property deliverable upon such Reorganization Transaction.

**Article 7**

**Concerning the Warrant Agent and Other Matters**

Section 7.01     Change of Warrant Agent.

(a)     The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder (except for liability arising as a result of the Warrant Agent's own negligence, willful misconduct or bad faith) after giving sixty (60) days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of thirty (30) days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by the Global Warrantholder or Beneficial Owners and Warrantholders representing a majority of the Warrants at the time outstanding, then the Global Warrantholder or Beneficial Owners and Warrantholders representing a majority of the Warrants at the time outstanding  may appoint a successor warrant agent.

(b)     The Warrant Agent may be removed by the Company at any time upon thirty (30) days' written notice to the Warrant Agent; provided, however, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed; provided, further, that, until such successor warrant agent has been appointed, the Company shall compensate the Warrant Agent in accordance with Section 7.02.

(c)     Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the Laws of the United States of America or any state thereof or the District of Columbia, and authorized under such Laws to exercise corporate trust powers and subject to supervision or examination by federal or state authority and having a combined capital and surplus of not less than $50,000,000.  The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; provided that such reports are published at least annually pursuant to Law or to the requirements of a federal or state supervising or examining authority.  After acceptance in writing of

such appointment by the successor warrant agent, such successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Global Warrantholder and each transfer agent for its Common Shares. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)     Any entity into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the corporate trust or agency business of the Warrant Agent, shall be the successor warrant agent under this Warrant Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto; provided that such entity would be eligible for appointment as a successor warrant agent under Section 7.01(c). In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any Global Warrant Certificate shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Global Warrant Certificate so countersigned, and in case at that time any Global Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Global Warrant Certificate either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Global Warrant Certificate shall have the full force provided in the Global Warrant Certificate and in this Warrant Agreement.

(e)     In case at any time the name of the Warrant Agent shall be changed and at such time any Global Warrant Certificate shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Global Warrant Certificate so countersigned; and in case at that time any Global Warrant Certificate shall not have been countersigned, the Warrant Agent may countersign such Global Warrant Certificate either in its prior name or in its changed name; and in all such cases such Global Warrant Certificate shall have the full force provided in the Global Warrant Certificate and in this Warrant Agreement.

Section 7.02     Compensation; Further Assurances. The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent in accordance with Exhibit D attached hereto and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon written demand for all reasonable and documented expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable and documented compensation, expenses and disbursements of its counsel not to exceed $[•] incurred in connection with the execution and administration of this Warrant Agreement), except any such expense, disbursement or advance as may arise from its or any of their negligence, willful misconduct or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.03     Reliance on Counsel. The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.04     Proof of Actions Taken. Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the

-23-

Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be relied upon by the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.05    Correctness of Statements.  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or any Warrant Certificate (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.06    Validity of Agreement.  From time to time, the Warrant Agent may apply to any Appropriate Officer for instruction and the Company shall provide the Warrant Agent with such instructions concerning the services to be provided hereunder.  The Warrant Agent shall not be held to have notice of any change of authority of any Person, until receipt of notice thereof from the Company.  The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Global Warrant Certificate (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Shares to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any Common Shares will, when issued, be validly issued and fully paid and non-assessable. The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Company for any action taken or omitted by Warrant Agent in reliance in good faith upon any Company instructions except to the extent that the Warrant Agent had actual knowledge of facts and circumstances that would render such reliance unreasonable.

Section 7.07    Use of Agents.  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents provided that the Warrant Agent shall remain responsible for the activities or omissions of any such agent or attorney and reasonable care has been exercised in the selection and in the continued employment of such attorney or agent.

Section 7.08    Liability of Warrant Agent.  The Warrant Agent shall incur no liability or responsibility to the Company or to any Beneficial Owner or Warrantholder for any action taken or not taken (i) in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties or (ii) in relation to its services under this Warrant Agreement, unless such liability arises out of or is attributable to the Warrant Agent's negligence, breach of this Warrant Agreement, or willful misconduct or bad faith.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence, breach of this Warrant Agreement, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment).  The Warrant Agent shall be liable hereunder only for its negligence, breach of this Warrant Agreement, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), for which the Warrant Agent is not entitled to indemnification under this Warrant Agreement.

Section 7.09    Legal Proceedings.  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company, any Warrantholder or any applicable Participant on behalf of a Beneficial Owner shall furnish the Warrant Agent with reasonable indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.  The Warrant Agent shall promptly notify the Company and each Beneficial Owner and Warrantholder in writing of any claim made or action, suit or proceeding instituted against it arising out of or in connection with this Warrant Agreement.

Section 7.10     Actions as Agent.  The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.  The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.  No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence, willful misconduct or bad faith.

Section 7.11     Appointment and Acceptance of Agency.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth or as the Company and the Warrant Agent may hereafter agree.

Section 7.12     Successors and Assigns.  All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.  The Warrant Agent may assign this Warrant Agreement or any rights and obligations hereunder, in whole or in part, to an Affiliate thereof with the prior consent of the Company, provided that the Warrant Agent may make such an assignment without consent of the Company to any successor to the Warrant Agent by consolidation, merger or transfer of its assets subject to the terms and conditions of the Warrant Agreement.

Section 7.13     Notices.  Any notice or demand authorized by this Warrant Agreement to be given or made to the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent) or electronic mail, as follows:

Key Energy Services, Inc.
1301 McKinney Street, Suite 1800
Houston, Texas 77010
Attention:  [●]
Email:  [●]

with a copy (which shall not constitute notice) to:

[Address]
[Attention]
[Email]

Any notice or demand authorized by this Warrant Agreement to be given or made to the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company) or electronic mail, as follows:

American Stock Transfer & Trust Company, LLC
Attention:  [●]
Address:  [●]
Email:  [●]

Any notice or demand authorized by this Warrant Agreement to be given or made to the Global Warrantholder or any other Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid or electronic mail to the last address of the Global Warrantholder or other Warrantholder as it shall appear on the Warrant Register.

Section 7.14     Applicable Law; Jurisdiction.  The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of Laws thereof.  The parties hereto irrevocably consent to the exclusive jurisdiction of the courts of the State of Delaware and any federal court located in such state

-25-

in connection with any action, suit or proceeding arising out of or relating to this Warrant Agreement.  Each party agrees to commence any such suit, action or proceeding either in the Court of Chancery of the State of Delaware or any court of the United States located in the State of Delaware.  Each party hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any suit, action or proceeding with respect to this Warrant Agreement, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve process in accordance with this Section 7.14, that its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the fullest extent permitted by applicable law, that the suit, action or proceeding in any such court is brought in an inconvenient forum, or that this Warrant Agreement, or the subject matter hereof, may not be enforced in or by such courts and further irrevocably waives, to the fullest extent permitted by applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is entitled pursuant to the final judgment of any court having jurisdiction.  Each party irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered mail, postage prepaid, to such party at its mailing address determined in accordance with this Warrant Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail.  Nothing herein shall affect the right of any party to serve process in any other manner permitted by law.

Section 7.15    Waiver of Jury Trial.  EACH OF THE COMPANY AND THE WARRANT AGENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS WARRANT AGREEMENT OR A WARRANT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS WARRANT AGREEMENT OR A WARRANT.  EACH OF THE COMPANY AND THE WARRANT AGENT CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (d) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS WARRANT AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.16    Benefit of this Warrant Agreement.  Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Beneficial Owners and Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto, Beneficial Owners, the Warrantholders and their respective successors.

Section 7.17    Registered Warrantholder.  Prior to due presentment for registration of Transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of Transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of Transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.18    Headings.  The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

-27-

Section 7.19    Counterparts.  This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

Section 7.20    Entire Agreement.  This Warrant Agreement and the Warrant Certificates constitute the entire agreement of the Company, the Warrant Agent and the Beneficial Owners and Warrantholders with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Company, the Warrant Agent and the Beneficial Owners and Warrantholders with respect to the subject matter hereof.

Section 7.21    Severability.  Wherever possible, each provision of this Warrant Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Warrant Agreement shall be prohibited by or invalid under applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Warrant Agreement.

Section 7.22    Termination.  This Warrant Agreement, as it relates to the 4-Year Warrants and the 5-Year Warrants shall terminate at the 4-Year Expiration Date and the 5-Year Expiration Date, respectively (or Close of Business on the Settlement Date with respect to any Exercise Notice delivered or deemed delivered prior to the applicable Expiration Date).  Notwithstanding the foregoing, this Warrant Agreement, as it relates to the 4-Year Warrants and the 5-Year Warrants will terminate on such earlier date on which all outstanding 4-Year Warrants or the 5-Year Warrants have been exercised, respectively.  All provisions regarding indemnification, warranty, liability and limits thereon shall survive the termination or expiration of this Warrant Agreement.

Section 7.23    Confidentiality.  The Warrant Agent and the Company agree that personal, non-public Global Warrantholder, Beneficial Owner and Warrantholder information which is exchanged or received pursuant to the negotiation or the carrying out of this Warrant Agreement shall remain confidential, and shall not be voluntarily disclosed to any other person, except  disclosures pursuant to applicable securities Laws or otherwise as may be required by Law, including, without limitation, pursuant to subpoenas from state or federal government authorities.

[*signature pages follow*]

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

KEY ENERGY SERVICES, INC.

By:  _____
     Name:
     Title:


AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC

By:  _____
     Name:
     Title:


[SIGNATURE PAGE TO WARRANT AGREEMENT]

**Schedule A**

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL WARRANTS**

The initial Number of Global Warrants is [●].  In accordance with the Warrant Agreement dated as of [●], 201[●] among the Company and American Stock Transfer & Trust Company, LLC, as Warrant Agent, the following increases or decreases in the Number of Warrants have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|---|---|---|---|---|

**EXHIBIT A-1**

**FORM OF 4-YEAR GLOBAL WARRANT CERTIFICATE**

No.  [1]

CUSIP NO. [●]

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO KEY ENERGY SERVICES, INC. (THE "**COMPANY**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

A1-1

**Key Energy Services, Inc.**

[●] [ ], 201[●]

NUMBER OF WARRANTS:  Initially, [●] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [●], 201[●] between Key Energy Services, Inc. and American Stock Transfer & Trust Company, LLC, as Warrant Agent (as supplemented or amended, the "**Warrant Agreement**"), each of which is exercisable for one Common Share.

EXERCISE PRICE:  Initially, $[●] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF SETTLEMENT:

Full Physical Settlement:  If Full Physical Settlement is applicable, the Company shall deliver, against payment of the Exercise Price, a number of Common Shares equal to the number of Warrants exercised.

Net Share Settlement:  If Net Share Settlement is applicable, the Company shall deliver, without any Cash payment therefor, a number of Common Shares equal to the quotient determined by dividing (i) the Fair Value (as of the Exercise Date) of the number of Common Shares deliverable pursuant to Full Physical Settlement minus the aggregate Exercise Price that would be payable pursuant to Full Physical Settlement by (ii) the Fair Value (as of the Exercise Date) of the number of Common Shares deliverable pursuant to Full Physical Settlement.

DATES OF EXERCISE:  At any time, and from time to time, prior to the Close of Business on the Expiration Date.

EXPIRATION DATE:  The Close of Business on [●], 20[●].

This Global Warrant Certificate certifies that:

[ ], or its registered assigns, is the Global Warrantholder of the Number of Warrants (the "**Warrants**") specified above (such number subject to adjustment from time to time as described in the Warrant Agreement).

Reference is hereby made to the further provisions of this Global Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Global Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Global Warrant Certificate, the Warrant Agreement shall govern.

IN WITNESS WHEREOF, Key Energy Services, Inc. has caused this instrument to be duly executed as of the date first written above.

KEY ENERGY SERVICES, INC.


By: _____
Name:
Title:

A1-3

**Certificate of Authentication**

These are the Warrants referred to in the above-mentioned Warrant Agreement.  Countersigned as of the date above written:

American Stock Transfer & Trust Company, LLC,
as Warrant Agent


By: _____
                    Authorized Officer

A1-4

**KEY ENERGY SERVICES, INC.**

The Warrants evidenced by this Global Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to the Warrant Agreement, dated as of [●], 201[●] (as it may be amended or supplemented, the "**Warrant Agreement**"), between the Company and American Stock Transfer & Trust Company, LLC, as Warrant Agent, and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the Global Warrantholder consents by issuance of this Global Warrant Certificate. Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of Delaware.

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____

Name, Address and Zip Code of Assignee

and irrevocably appoints _____
Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

Date: [ ]

_____

Name of Assignor

By: _____

     Name:

     Title:

(Sign exactly as your name appears on this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

**EXHIBIT A-2**

**FORM OF 4-YEAR INDIVIDUAL WARRANT CERTIFICATE**

[FACE]

No. [●]

CUSIP NO. [●]

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON THE SALE, TRANSFER, ASSIGNMENT, DISTRIBUTION OR OTHER DISPOSITION (EACH, A "TRANSFER") OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE, IN THAT CERTAIN WARRANT AGREEMENT DATED AS OF [●], 2016 (THE "WARRANT AGREEMENT"), BETWEEN THE COMPANY AND THE WARRANT AGENT NAMED THEREIN. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE WARRANT AGREEMENT. A COPY OF THE WARRANT AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE ISSUER OF THIS CERTIFICATE.

**Key Energy Services, Inc.**

[●] [ ], 201[●]

NUMBER OF WARRANTS:  Initially, [●] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [●], 201[●] between Key Energy Services, Inc. and American Stock Transfer & Trust Company, LLC, as Warrant Agent (as supplemented or amended, the "**Warrant Agreement**"), each of which is exercisable for one Common Share.

EXERCISE PRICE:  Initially, $[●] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF SETTLEMENT:

<u>Full Physical Settlement</u>:  If Full Physical Settlement is applicable, the Company shall deliver, against payment of the Exercise Price, a number of Common Shares equal to the number of Warrants exercised.

<u>Net Share Settlement</u>:  If Net Share Settlement is applicable, the Company shall deliver, without any Cash payment therefor, a number of Common Shares equal to the quotient determined by dividing (i) the Fair Value (as of the Exercise Date) of the number of Common Shares deliverable pursuant to Full Physical Settlement minus the aggregate Exercise Price that would be payable pursuant to Full Physical Settlement by (ii) the Fair Value (as of the Exercise Date) of the number of Common Shares deliverable pursuant to Full Physical Settlement.

DATES OF EXERCISE:  At any time, and from time to time, prior to the Close of Business on the Expiration Date.

EXPIRATION DATE:  The Close of Business on [●], 20[●].

This Warrant Certificate certifies that:

[ ], or its registered assigns, is the holder of the Number of Warrants (the "**Warrants**") specified above (such number subject to adjustment from time to time as described in the Warrant Agreement).

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

A2-3

IN WITNESS WHEREOF, Key Energy Services, Inc. has caused this instrument to be duly executed as of the date first written above.

KEY ENERGY SERVICES, INC.

By: _____
Name:
Title:

A2-3

**Certificate of Authentication**

These are the Warrants referred to in the above-mentioned Warrant Agreement.  Countersigned as of the date above written:

American Stock Transfer & Trust Company, LLC,
as Warrant Agent


By: _____
                    Authorized Officer

[Form of Reverse of Warrant Certificate]

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to the Warrant Agreement, dated as of [●], 201[●] (as it may be amended or supplemented, the "**Warrant Agreement**"), between the Company and American Stock Transfer & Trust Company, LLC, as Warrant Agent, and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the holder consents by issuance of this Warrant Certificate.  Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of Delaware.

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____

Name, Address and Zip Code of Assignee

and irrevocably appoints          Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

Date:  [ ]

_____

Name of Assignor

By:  _____

        Name:
        Title:

(Sign exactly as your name appears on this Certificate)


NOTICE:  The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

A2-6

**EXHIBIT B-1**

**FORM OF 5-YEAR GLOBAL WARRANT CERTIFICATE**

No.  [●]

CUSIP NO. [●]

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO KEY ENERGY SERVICES, INC. (THE "**COMPANY**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

**Key Energy Services, Inc.**

[●] [ ], 201[●]

NUMBER OF WARRANTS:  Initially, [●] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [●], 201[●] between Key Energy Services, Inc. and American Stock Transfer & Trust Company, LLC, as Warrant Agent (as supplemented or amended, the "**Warrant Agreement**"), each of which is exercisable for one Common Share.

EXERCISE PRICE:  Initially, $[●] per Warrant, subject to adjustment as described in the Warrant Agreement.
FORM OF SETTLEMENT:

Full Physical Settlement:  If Full Physical Settlement is applicable, the Company shall deliver, against payment of the Exercise Price, a number of Common Shares equal to the number of Warrants exercised.

Net Share Settlement:  If Net Share Settlement is applicable, the Company shall deliver, without any Cash payment therefor, a number of Common Shares equal to the quotient determined by dividing (i) the Fair Value (as of the Exercise Date) of the number of Common Shares deliverable pursuant to Full Physical Settlement minus the aggregate Exercise Price that would be payable pursuant to Full Physical Settlement by (ii) the Fair Value (as of the Exercise Date) of the number of Common Shares deliverable pursuant to Full Physical Settlement.

DATES OF EXERCISE:  At any time, and from time to time, prior to the Close of Business on the Expiration Date.

EXPIRATION DATE:  The Close of Business on [●], 20[●].

This Global Warrant Certificate certifies that:

[ ], or its registered assigns, is the Global Warrantholder of the Number of Warrants (the "**Warrants**") specified above (such number subject to adjustment from time to time as described in the Warrant Agreement).

Reference is hereby made to the further provisions of this Global Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Global Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Global Warrant Certificate, the Warrant Agreement shall govern.

IN WITNESS WHEREOF, Key Energy Services, Inc. has caused this instrument to be duly executed as of the date first written above.

KEY ENERGY SERVICES, INC.

By: _____
Name:
Title:

**Certificate of Authentication**

These are the Warrants referred to in the above-mentioned Warrant Agreement.  Countersigned as of the date above written:

American Stock Transfer & Trust Company, LLC,
as Warrant Agent


By:  _____
                 Authorized Officer

**KEY ENERGY SERVICES, INC.**

The Warrants evidenced by this Global Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to the Warrant Agreement, dated as of [●], 201[●] (as it may be amended or supplemented, the "**Warrant Agreement**"), between the Company and American Stock Transfer & Trust Company, LLC, as Warrant Agent, and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the Global Warrantholder consents by issuance of this Global Warrant Certificate. Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of Delaware.

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____

Name, Address and Zip Code of Assignee

and irrevocably appoints _____

Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

Date:  [ ]

_____

Name of Assignor

By:    _____

Name:

Title:

(Sign exactly as your name appears on this Certificate)

NOTICE:  The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

**EXHIBIT B-2**

**FORM OF 5-YEAR INDIVIDUAL WARRANT CERTIFICATE**

[FACE]

No. [●]

CUSIP NO. [●]

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON THE SALE, TRANSFER, ASSIGNMENT, DISTRIBUTION OR OTHER DISPOSITION (EACH, A "TRANSFER") OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE, IN THAT CERTAIN WARRANT AGREEMENT DATED AS OF [●], 2016 (THE "WARRANT AGREEMENT"), BETWEEN THE COMPANY AND THE WARRANT AGENT NAMED THEREIN. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE WARRANT AGREEMENT. A COPY OF THE WARRANT AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE ISSUER OF THIS CERTIFICATE.

**Key Energy Services, Inc.**

[●] [ ], 201[●]

NUMBER OF WARRANTS:  Initially, [●] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [●], 201[●] between Key Energy Services, Inc. and American Stock Transfer & Trust Company, LLC, as Warrant Agent (as supplemented or amended, the "**Warrant Agreement**"), each of which is exercisable for one Common Share.

EXERCISE PRICE:  Initially, $[●] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF SETTLEMENT:

Full Physical Settlement:  If Full Physical Settlement is applicable, the Company shall deliver, against payment of the Exercise Price, a number of Common Shares equal to the number of Warrants exercised.

Net Share Settlement:  If Net Share Settlement is applicable, the Company shall deliver, without any Cash payment therefor, a number of Common Shares equal to the quotient determined by dividing (i) the Fair Value (as of the Exercise Date) of the number of Common Shares deliverable pursuant to Full Physical Settlement minus the aggregate Exercise Price that would be payable pursuant to Full Physical Settlement by (ii) the Fair Value (as of the Exercise Date) of the number of Common Shares deliverable pursuant to Full Physical Settlement.

DATES OF EXERCISE:  At any time, and from time to time, prior to the Close of Business on the Expiration Date.

EXPIRATION DATE:  The Close of Business on [●], 20[●].

This Warrant Certificate certifies that:

[ ], or its registered assigns, is the holder of the Number of Warrants (the "**Warrants**") specified above (such number subject to adjustment from time to time as described in the Warrant Agreement).

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

IN WITNESS WHEREOF, Key Energy Services, Inc. has caused this instrument to be duly executed as of the date first written above.

KEY ENERGY SERVICES, INC.

By: _____
Name:
Title:

**Certificate of Authentication**

These are the Warrants referred to in the above-mentioned Warrant Agreement. Countersigned as of the date above written:

American Stock Transfer & Trust Company, LLC,
as Warrant Agent

By: _____
Authorized Officer

[Form of Reverse of Warrant Certificate]

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to the Warrant Agreement, dated as of [●], 201[●] (as it may be amended or supplemented, the "**Warrant Agreement**"), between the Company and American Stock Transfer & Trust Company, LLC, as Warrant Agent, and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the holder consents by issuance of this Warrant Certificate.  Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of Delaware.

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____

Name, Address and Zip Code of Assignee

and irrevocably appoints _____ Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

Date:  [ ]

_____

Name of Assignor

By: _____

　　Name:

　　Title:

(Sign exactly as your name appears on this Certificate)

NOTICE:  The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

**EXHIBIT C-1**

**Form of Global Warrant Exercise Notice**

[Address]

Attention:  Transfer Department

Re:      Warrant Agreement dated as of [●], 201[●] between Key Energy Services, Inc. (the "**Company**") and American Stock Transfer & Trust Company, LLC, as Warrant Agent (as it may be supplemented or amended, the "**Warrant Agreement**")

The undersigned hereby irrevocably elects to exercise the right, represented by the Global Warrant Certificate No. held for its benefit through the book-entry facilities of The Depository Trust Company (the "**Depository**"), to exercise Warrants and receive the consideration deliverable in exchange therefor pursuant to the following settlement method (check one):

☐      Full Physical Settlement

☐      Net Share Settlement

If Full Physical Settlement is elected, the undersigned shall tender payment of the Exercise Price therefore in accordance with instructions received from the Warrant Agent.

Please check below if this exercise is contingent upon a registered public offering or any Reorganization Transaction in accordance with Section 3.02(g) of the Warrant Agreement.

☐      This exercise is being made in connection with a registered public offering or any other Reorganization Transaction; provided, that in the event that such transaction shall not be consummated, then this exercise shall be deemed revoked.

THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO CLOSE OF BUSINESS ON THE EXPIRATION DATE.  THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS AND PHONE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

By:      _____

Authorized Signature
Address:
Telephone:

**EXHIBIT C-2**

**FORM OF INDIVIDUAL WARRANT EXERCISE NOTICE**

[Address]

Attention:  Transfer Department

Re:      Warrant Agreement dated as of [●], 201[●] between Key Energy Services, Inc. (the "**Company**") and American Stock Transfer & Trust Company, LLC, as Warrant Agent (as it may be supplemented or amended, the "**Warrant Agreement**")

The undersigned hereby irrevocably elects to exercise the right, represented by the Warrant Certificate No. held for its benefit through the book-entry facilities of the Warrant Agent, to exercise Warrants and receive the consideration deliverable in exchange therefor pursuant to the following settlement method (check one):

☐      Full Physical Settlement

☐      Net Share Settlement

If Full Physical Settlement is elected, the undersigned shall tender payment of the Exercise Price therefore in accordance with instructions received from the Warrant Agent.

Please check below if this exercise is contingent upon a registered public offering or any Reorganization Transaction in accordance with Section 3.02(g) of the Warrant Agreement.

☐      This exercise is being made in connection with a registered public offering or any other Reorganization Transaction; provided, that in the event that such transaction shall not be consummated, then this exercise shall be deemed revoked.

THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO CLOSE OF BUSINESS ON THE EXPIRATION DATE.  THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS AND PHONE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

By:      _____

Authorized Signature
Address:
Telephone:

**EXHIBIT D**

**Fee Schedule**

[The Company shall pay the Warrant Agent for performance of its services under this Warrant Agreement such compensation as shall be agreed in writing between the Company and the Warrant Agent.][1]

---

[1] NTD: Fees to be discussed.

D-1

**EXHIBIT E**

**INITIAL CASH-OUT WARRANTHOLDERS**

| Name | No. of 4-Year Warrants | No. of 5-Year Warrants |
| --- | --- | --- |

**EXHIBIT F**

**PRIVATE PLACEMENT LEGEND FOR INDIVIDUAL WARRANT CERTIFICATES**

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE SECURITIES MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.

**EXHIBIT G**

**PRIVATE PLACEMENT LEGEND FOR
CASH-OUT WARRANT SHARES ACQUIRED UPON
EXERCISE OF INDIVIDUAL WARRANT CERTIFICATES**

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE SECURITIES MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.

**Exhibit J**

**In re: Key Energy Services, Inc., et al.**
**Proposed Directors and Officers of the Reorganized Debtors[1]**

In accordance with Article IV.W of the Plan and section 1129(a)(5) of the Bankruptcy Code, this Exhibit J lists the identities and affiliations of the individuals who have been proposed as of the date hereof to serve as directors and officers of the Reorganized Debtors.

1.    Directors of Reorganized Key[2]

**Jacob Kotzubei**: Mr. Kotzubei joined Platinum Equity in 2002 and is a Partner at the firm and a member of the firm's Investment Committee.  Mr. Kotzubei serves as an officer and/or director of a number of Platinum's portfolio companies.  Prior to joining Platinum in 2002, Mr. Kotzubei worked for 4 1/2 years for Goldman Sachs' Investment Banking Division in New York City.  Previously, he was an attorney at Sullivan & Cromwell LLP in New York City, specializing in mergers and acquisitions.  Mr. Kotzubei received a Bachelor's degree from Wesleyan University and holds a Juris Doctor from Columbia University School of Law where he was elected a member of the Columbia Law Review.  Mr. Kotzubei shall be designated by Platinum and shall have two (2) votes on the New Key Board.

**Philip E. Norment**: Mr. Norment is a partner at Platinum Equity and a member of Platinum Equity's Investment Committee and is a senior advisor on specific operational initiatives throughout the portfolio.  He is also the senior operations executive responsible for evaluating acquisition opportunities and integrating new acquisitions into the portfolio.  Prior to joining Platinum Equity in 1997, Mr. Norment served in a variety of management positions at Pilot.  Over the course of 12 years he worked in the areas of global support, operations, consultative services and sales support, achieving the position of Chief Operating Officer.  Mr. Norment earned a Bachelor's degree in Economics and an MBA from the University of Massachusetts, Amherst.  Mr. Norment shall be designated by Platinum and shall have two (2) votes on the New Key Board.

**Mary Ann Sigler**: Ms. Sigler is the Chief Financial Officer of Platinum Equity.  Ms. Sigler joined Platinum Equity in 2004 and is responsible for overall accounting, tax, and financial reporting as well as managing strategic planning projects for the firm.  Prior to joining Platinum Equity, Ms. Sigler was with Ernst & Young LLP for 25 years where she was a partner.  Ms. Sigler has a B.A. in Accounting from California State University Fullerton and a Masters in Business Taxation from the University of Southern California.  Ms. Sigler is a Certified Public Accountant in California, as well as a member of the American Institute of Certified Public

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[2] Robert Drummond is an "insider" (as such term is defined in the Bankruptcy Code) of the Debtors.  It is expected that Mr. Drummond will not receive any separate compensation for serving as a director of Reorganized Key, but instead will be compensated for his service as the President and Chief Executive Officer of the company.

Accountants and the California Society of Certified Public Accountants.  Ms. Sigler shall be designated by Platinum and shall have two (2) votes on the New Key Board.

**Bryan Kelln**: Mr. Kelln is a Partner at Platinum Equity and the President of Portfolio Operations, a group responsible for overseeing business strategy and operations at Platinum Equity's portfolio companies.  Mr. Kelln joined Platinum in 2008.  He works closely with the firm's Operations Team and portfolio company executive management to drive strategic initiatives and to deploy operational resources.  Prior to joining Platinum Equity, Mr. Kelln held senior operations roles at a number of companies including Nortek, Inc, Jacuzzi, Inc., RockShox, Inc. and General Cable Corporation.  During a portion of this time, Mr. Kelln was an Operating Executive with The Jordan Company, a private investment firm, where he was involved in acquisitions, divestitures and operations for the firm and served as a board member of various portfolio companies.  Mr. Kelln also previously served as a Partner in the Supply Chain Management Practice of Mercer Management Consulting.  Mr. Kelln received his bachelor's degree, Summa Cum Laude, from Washington State University and a Masters of Business Administration from The Ohio State University, Fisher College of Business.  Mr. Kelln shall be designated by Platinum and shall have one (1) vote on the New Key Board.

**Robert Drummond**: Mr. Drummond will be Reorganized Key's President and Chief Executive Officer.  He joined the Company in June 2015 as President and Chief Operating Officer and has been a member of the Board of Directors since November 2015.  He is also a member of the Board's Executive Committee and currently serves as Chair of the Equity Award Committee.  Prior to joining the Company, Mr. Drummond served for 31 years at Schlumberger Limited, where he held various executive positions including President North America, Vice President of General Manager US Land, Vice President of Global Sales, Vice President General Manager US Gulf of Mexico, and President North American Offshore and Alaska.  Mr. Drummond currently sits on the board of directors of the National Ocean Industries Association and the board of directors for the Petroleum Equipment Suppliers Association.  Previously, he served on the board of directors of Houston Offshore Energy Center, Greater Houston Partnership, and as Advisory Board Member of the University of Houston Global Energy Management Institute.  Mr. Drummond received a Bachelor's degree in Mineral/Petroleum Engineering from the University of Alabama in 1982 and sits on their College of Engineering Leadership Board. Mr. Drummond shall be designated by Platinum and shall have one (1) vote on the New Key Board.

In addition to the above, pursuant to the Certificate of Incorporation of Key Energy Services, Inc., and the Bylaws of Key Energy Services, Inc., forms of which are included as Exhibits A and B of the Plan Supplement, respectively (the "Certificate and Bylaws"), five additional individuals shall be designated to serve as initial directors of Reorganized Key on or before the Effective Date as follows:

- two (2) directors to be designated by the Other Backstop Parties (as defined in the Certificate and Bylaws), each with one (1) vote on the New Key Board, and

- three (3) Independent Directors (as defined in the Charter) each with one (1) vote on the New Key Board, of which:

-2-

SC1:4275378.4
218432764

-3-

       o    one (1) Independent Director shall be designated by Platinum;

       o    one (1) Independent Director shall be designated by the Other Backstop Parties; and

       o    one (1) Independent Director shall be designated and mutually agreed by Platinum and the Other Backstop Parties.

The identity and affiliations of such proposed directors shall be disclosed in the Plan Supplement on or before the Effective Date.

2.       Officers of Reorganized Key[3]

| Name | Title | Base Salary[4] |
|------|-------|------------|
| Robert Drummond | President and Chief Executive Officer | $750,000 |
| J. Marshall Dodson | Senior Vice President and Chief Financial Officer | $375,000 |
|  |  |  |
| I. Katherine Hargis | Vice President, Chief Legal Officer and Secretary | $275,000 |
| Scott P. Miller | Senior Vice President, Operations Services, and Chief Administrative Officer | $275,000 |
| Eddie Picard | Vice President and Controller | $235,000 |

3.       Directors and Officers of Reorganized Debtors other than Reorganized Key

The directors and officers of the Reorganized Debtors other than Reorganized Key, if any, will be appointed as of the Effective Date and are expected to be comprised of certain officers and members of the board of Reorganized Key. The identity and affiliations of such proposed directors and officers, if any, shall be disclosed in the Plan Supplement on or before the Effective Date.

---

[3] Additional Officers of Reorganized Key may be designated prior to the Combined Hearing.

[4] In addition to the base salary, the officers of Reorganized Key will be eligible to participate in the New MIP (as defined in the Plan).

-3-

SC1:4275378.4
218432764